# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK BILELLO, individually and on behalf of all others similarly situated,<br><br>  Plaintiff, | Civ. No. |
| v. | **CLASS ACTION COMPLAINT** |
| JPMORGAN CHASE RETIREMENT PLAN, JPMORGAN CHASE DIRECTOR OF HUMAN RESOURCES, as administrator of the JPMorgan Chase Retirement Plan,<br><br>  Defendants | JURY TRIAL DEMANDED |

## I. PRELIMINARY STATEMENT

1.    Plaintiff, Frank J. Bilello, a participant in the pension plan formerly maintained by Chemical Banking Corporation ("Chemical Bank"), which was merged into the Defendant JPMorgan Chase Retirement Plan ("the Plan"), brings this action on his own behalf and on behalf of all similarly situated plaintiffs, Plan participants, their beneficiaries and estates, pursuant to the Employee Retirement Income Security Act of 1974, as Amended ("ERISA").

2.    Plaintiff Bilello is currently an employee of JPMorgan Chase & Co.  Plaintiff began his career with Chemical Bank, now known as JPMorgan Chase & Co., in 1960.

3.    Plaintiff brings this action on his behalf, and on behalf of a class of plaintiffs similarly situated, to the extent the claims asserted herein are outside the scope of the certified class claims in the related action pending before the Hon. Harold Baer, Jr. in the United States District Court for the Southern District of New York, *In re JP Morgan Chase Cash Balance Litig.*, No. 06-cv-0732 (HB).[1]

---

[1] *See, e.g., In re JP Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265 (S.D.N.Y. 2007) (Class Certification Order); *In re JP Morgan Chase Cash Balance Litig.*, No. 06-cv-0732, 2007 WL 2177019 (S.D.N.Y. July 31, 2007) (Order Denying Plaintiffs' Motion for Reconsideration of Class Certification Order).

4.      Plaintiff alleges the following violations of ERISA by the Plan, formerly known as the Cash Plan for Retirement of Chemical Bank (the "Cash Plan"): a) the Cash Plan and the Defendant Plan Administrator violated ERISA § 204(h) by their failure to provide advance notice of a significant reduction in the rate of benefit accrual caused by the Plan's adoption of the cash balance formula on January 1, 1991 and which adoption was made retroactively applicable; (b) the Plan and the Defendant Plan Administrator violated ERISA §§ 102, 104(b), and 204(h) by failing to provide proper advance notice of reductions in participants' rates of future benefit accrual, by failing to provide proper advance notice that participants' rates of future benefit accrual would decrease with advancing age, and by failing to satisfy ERISA notice and disclosure laws through providing timely, adequate, and accurate notices, summary plan descriptions ("SPDs"), and summaries of material modifications ("SMMs") from January 1, 1989 through December 31, 2001; and (c) the Cash Plan is impermissibly backloaded in violation of the 133 1/3 percent rule,  ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), 26 U.S.C. § 411(b)(1).  Accordingly, Plaintiff asks the Court to: (a) order Defendants to reform the Plan to cure all ERISA violations;  (b) declare that the plan amendment(s) purportedly implementing the cash balance formula(s) never became effective; (c) order Defendants to retroactively recalculate the accrued benefits of all participants as though the plan amendment(s) implementing or subsequently amending the cash balance formulas did not become effective; (d) pay participants, their beneficiaries and estates the greater of the benefits paid to them heretofore, and the benefits recalculated as though the challenged plan amendment(s) did not become effective.

## II. JURISDICTION AND VENUE

5.      Jurisdiction over this action is based on:

- 2 -

(a)     ERISA Section 502(e)(1), 29 USC § 1132(e)(1); and

(b)     28 USC § 1331(a), because this action arises under the laws of the United States, namely ERISA.

6.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, by Rules 57 and 65 of the Federal Rules of Civil Procedure and by ERISA Sections 502(a)(1)(B) and 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

7.     Venue in this district is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered and Defendants can be found in this District.

### III. PARTIES

**Plaintiff**

8.     Plaintiff Frank J. Bilello is a "participant," within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), of the plan formerly administered by Chemical Bank and now administered by the Defendant plan administrator. Mr. Bilello resides in Riverdale, New Jersey. Plaintiff Bilello began working for Chemical Bank in 1960 and is currently an employee of JP Morgan Chase & Co, the successor in interest to Chemical Bank.

**Defendants**

9.     Defendant JPMorgan Chase Retirement Plan (the "Plan") is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 USC § 1002(2)(A), and more precisely, a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plan is administered in this District. The Plan covers employees and former employees of JPMorgan Chase & Co. ("JPMC"), which is the successor-in-interest to numerous other companies, including, without limitation, Chemical Bank, The Chase Manhattan Bank ("Chase"), Manufacturers Hanover Trust ("MHT"), Bank One, and J.P. Morgan & Co., Inc.

("J.P. Morgan") (collectively, the "JPMC Predecessor Companies"), whose former employees participate in the Plan and/or whose prior retirement plans have been merged into the Plan.

10.    JPMC's Director of Human Resources (or the person, persons or entity appointed by the Board of Directors of JPMC or JPMorgan Chase Bank, N.A. to serve in this role) is the Plan Administrator within the meaning of ERISA § 3(16)(A)(i), 29 USC §1002(16)(A)(i), a Plan fiduciary within the meaning of ERISA § 3(21)(A), 29 USC § 1002(21)(a), and is a named defendant herein.  The Plan Administrator administers the Plan and the plans of the JPMC Predecessor Companies, including Chemical Bank's Cash Plan.  The Plan Administrator's offices are also located in this District.

## IV. FACTUAL BACKGROUND

**Cash Balance Plans**

11.    A cash balance plan is a defined benefit plan that relies on a hypothetical account to keep track of each participant's accrued benefit.

12.    A hypothetical cash balance account tracks credited amounts, or "inputs," to a participant's hypothetical account by utilizing a formula that is dependent on, among other things, a participant's age, salary, and years of service.

13.    An employee's hypothetical cash balance account is "credited" on a periodic basis with a percentage of compensation, typically referred to as a "salary" or "pay" credit. Hypothetical cash balance accounts are also credited with an additional amount, sometimes referred to as an "interest" credit, which can be derived in numerous different ways, but are most commonly derived by reference to either a fixed or variable outside index.

14.    While an employer's hypothetical allocation of pay credits pursuant to a cash

balance plan terminates when the participant discontinues employment, the "interest credits" continue to be allocated to the participant's cash balance account until benefits are distributed.

15.    Although a cash balance formula provides for an individual (albeit only "hypothetical") account for each participant, the Plan is not a "defined contribution plan," as that term is defined at ERISA § 3(34), 29 USC § 1002(34). Instead, it is a "defined benefit plan," which is defined at ERISA § 3(35), 29 USC § 1002(35), as "a pension plan other than an individual account plan."

16.    For defined benefit plans, ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i), makes it unlawful if, "under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."

17.    By definition, under a defined benefit plan, a participant never receives the credit balance in his or her hypothetical account. Instead, the inputs (contributions and any additional amounts) made to the account must be converted into an age-65 annuity. See *In re J.P. Morgan Chase Cash Balance Litig.*, 460 F. Supp. 2d 479, 486 (S.D.N.Y. 2006) (citation omitted).

18.    Cash balance plans, like the one at issue here, violate ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i), where they rely on interest to supply the additional credit amount, because a worker's age is required to convert the hypothetical account balance into an age-65 annuity, and as a matter of simple arithmetic, this conversion results in a smaller benefit retirement for older workers compared to similarly situated younger workers because they have fewer years in which to earn interest. *In re J.P. Morgan Chase*, 460 F. Supp. 2d at 487.

19.    Where, as here, a cash balance plan relies on interest credits as the additional credit amount, older workers will accrue benefits at a slower rate than younger workers who are similarly situated, even though both sets of employees are subject to the same interest rate and

continue to accrue interest in their accounts until normal retirement age. *See id.*

20.    In addition, where, as here, a cash balance plan relies on interest as the additional credit amount, the rate of future benefit accrual for any individual participant under such a plan formula will decrease with his or her advancing age. *See id.*

**The Chemical Bank Plan's Conversion to a Cash Balance Plan**

21.    Although the Cash Plan states an effective date of January 1, 1989, the Cash Plan was amended as of January 1, 1991.

22.    Prior to the implementation of the Cash Plan, the Plan operated as a traditional defined benefit pension plan and provided for the calculation of retirement benefits pursuant to a final average pay formula, under which participants accrued benefits based upon a specified percentage of their final average compensation (the "Prior Plan").

23.    By letters dated July 25 and July 30, 1990, Chemical Bank announced to its employees that its traditional, final average pay pension plan, would be converted to a "Cash Plan" effective January 1, 1991.    Exs. 1 & 2.

24.    Subsequently, in an undated corporate brochure that appears to have been circulated in late summer 1990, Chemical Bank, on information and belief, announced for the first time that the Cash Plan would be applied retroactively to the period beginning January 1, 1989. Ex. 3 at 2.

25.    Effective January 1, 1991, the Cash Plan utilized a hypothetical cash balance account for eligible Plan participants for the period January 1, 1989 forward.

26.    For the period beginning January 1, 1989, the Cash Plan applied a pay credit percentage that was allocated quarterly and which ranged from 5% of a participant's pay for 1 to 10 years of service, to 7% for 21 or more years of service with Chemical Bank.

27.    The Cash Plan's formula also applied an additional hypothetical amount to participants' notional accounts, characterized as an "interest credit," which was tied to an outside index (the average one-year Treasury-bill rate for September-November of the prior calendar year, plus 3%, up to a 15% maximum). These interest credits were calculated with reference to a participant's number of years remaining until normal retirement age of 65, and thus, necessarily took age into account as part of its formula when calculating the value of this credited amount.

28.    The pay credits under the Cash Plan increased from 5% to 7% based on years of service. For certain individuals, these pay credit increases might have provided temporary bumps in a participant's rate of future benefit accrual, but did not resolve the underlying plan formula or structure, which reduces rates of benefit accrual as participants age.

29.    The Cash Plan provided and still provides that participants do not receive the lump sum amount of their notional accounts as their retirement benefit. Rather, the Cash Plan dictates that the credit balance in the notional account is converted into an accrued benefit before distribution. Cash Plan, Ex. 4 at ¶ 4.5 ("The Accrued Benefit of a Participant, as of any determination date, is an increasing monthly annuity for the life of the Participant . . . , commencing immediately, which is the Actuarial Equivalent of the Participant's credit Balance as of the determination date."). An accrued benefit is defined by the Plan as: "as of any determination date, an increasing monthly annuity determined in accordance with Section 4.5, which benefit is the Actuarial Equivalent of such individual's Credit Balance." *Id.*, Definitions at 1.2. *Compare In re J.P. Morgan Chase*, 460 F. Supp. 2d at 486 (same).

30.    The Cash Plan defines "Actuarial Equivalent" as "another annuity or benefit commencing at a different date and/or payable in a different form than the specified annuity or benefit, but which has the same present value as the specified annuity or benefit ( . . . determined

- 7 -

on the basis of the interest rate, mortality table and other factors. . . .)." Cash Plan, Ex. 4, Definitions at ¶ 1.4.

31.     As a result of the required conversion to an age-65 annuity, under both ERISA and the Cash Plan, and because the Cash Plan allocates interest credits to the account through normal retirement age, the Cash Plan reduces rates of benefit accrual as participants age, and on information and belief reduces rates of benefit accrual compared to the Prior Plan, which operated under a final average pay formula.

**Corporate and Plan Disclosures Regarding the Cash Plan Were Insufficient, Untimely, and Misleading**

32.     Although the Cash Plan's Effective Date was made retroactive to January 1, 1989, Cash Plan, Ex. 4, Definitions ¶ 1.21, on information and belief participants did not receive any information regarding its implementation until eighteen months later, or July 1990. Thus, for eighteen months, participants were subject to a new Plan formula without being given a warning that their benefit structure had changed.

33.     In the fall of 1990, Chemical Bank distributed brochures and booklets to Plan participants, touting the benefits of the Cash Plan, but failing to describe the reduced rate in future benefit accrual that occurred with the conversion.   For example, Chemical Bank distributed a brochure to Plan participants dated September 17, 1990, that purported to include "examples showing how account balances grow over time," but failed to reveal that participants' total accrued benefits under the new cash balance plan would actually be less, as compared to the Prior Plan formula.  The brochure described the cash balance plan as being "easy to understand" with "special advantages" and a way to "watch your retirement funds start to grow," but did not explain to participants that their rate of future benefit accrual was actually being reduced with

advancing age.

34.    Pursuant to the Cash Plan conversion, the accrued benefits of employees who were participants in the Prior Plan were converted into a "prior service balance." The prior service balance was calculated with reference to the present lump sum value of a participant's accrued benefit under the Prior Plan formula; *i.e.*, prior to January 1, 1989. The literature distributed to Plan participants stated that by converting the previously accrued, final average pay benefit to a cash balance benefit, Chemical Bank "preserves your benefit under the prior Plan formula." However, the brochures distributed to Plan participants failed to disclose the interest rate used to calculate the value of their prior accrued benefits.

35.    Corporate brochures distributed to Plan participants during the fall of 1990 showed examples purporting to evince how cash balance accounts could grow under the new formula for hypothetical participants; however, the examples provided were materially misleading because they did not show that these hypothetical employees would actually accrue significantly less—and were thus worse off—under the cash balance formula, as compared to the Prior Plan. Nor did the corporate brochures disclose reductions in participants' rates of future benefit accrual based on age.

36.    These documents were further materially misleading in that they provided different salaries, ages, and work histories for each hypothetical individual, precluding direct comparison, and thereby masking the fact that participants' rates of benefit accrual would decrease with advancing age.

**The JP Morgan Chase Plan is the Successor in Interest to the Chemical Bank Plan**

37.    On or about December 31, 1991, Chemical Bank merged with MHT, but retained the Chemical corporate name. Effective January 1, 1993, the 1989 Chemical Plan was merged

advancing age.

34.    Pursuant to the Cash Plan conversion, the accrued benefits of employees who were participants in the Prior Plan were converted into a "prior service balance." The prior service balance was calculated with reference to the present lump sum value of a participant's accrued benefit under the Prior Plan formula; *i.e.*, prior to January 1, 1989. The literature distributed to Plan participants stated that by converting the previously accrued, final average pay benefit to a cash balance benefit, Chemical Bank "preserves your benefit under the prior Plan formula." However, the brochures distributed to Plan participants failed to disclose the interest rate used to calculate the value of their prior accrued benefits.

35.    Corporate brochures distributed to Plan participants during the fall of 1990 showed examples purporting to evince how cash balance accounts could grow under the new formula for hypothetical participants; however, the examples provided were materially misleading because they did not show that these hypothetical employees would actually accrue significantly less—and were thus worse off—under the cash balance formula, as compared to the Prior Plan. Nor did the corporate brochures disclose reductions in participants' rates of future benefit accrual based on age.

36.    These documents were further materially misleading in that they provided different salaries, ages, and work histories for each hypothetical individual, precluding direct comparison, and thereby masking the fact that participants' rates of benefit accrual would decrease with advancing age.

**The JP Morgan Chase Plan is the Successor in Interest to the Chemical Bank Plan**

37.    On or about December 31, 1991, Chemical Bank merged with MHT, but retained the Chemical corporate name. Effective January 1, 1993, the 1989 Chemical Plan was merged

into the Retirement Plan of Manufacturers Hanover Trust and Certain Affiliated Companies. The resulting plan, known as the "The Retirement Plan of Chemical Bank and Certain Affiliated Companies" (the "1993 Chemical Plan") incorporated both a final average pay component and a cash balance component for the accrual of pension benefits.

38.    Pay credits under the 1993 Chemical Plan's cash balance component varied according to a participant's years of service and ranged from four to six percent of eligible salary. Interest credits under the 1993 Chemical Plan were based upon the average rate for one-year U.S. Treasury bills for the months of September, October and November of the previous year.

39.    In 1996, Chemical Bank merged with the Chase Manhattan Bank ("Chase"), with the surviving entity assuming the Chase name. On about January 1, 1997, pursuant to the merger, the Chemical Plan changed its name to the "1997 Chase Plan," and the pension plan maintained by Chase for its employees was merged into it. The 1997 Chase Plan continued to operate under a cash balance formula and was further amended for benefits accrued after December 31, 1996. The 1997 Chase Plan assumed the Chase Plan's accrued liabilities and assets as of December 31, 1996.

40.    Generally, under the 1997 Chase Plan, pay credits were based upon years of completed pay-credit service and ranged from four percent for the first three years of service to fourteen percent for 26 or more years of service. Interest credits were based upon the average rate for one-year U.S. Treasury bills for the months of September, October and November of the previous year, plus one percent, with no minimum rate.

41.    On December 31, 2000, J.P. Morgan & Co., Inc. was merged into Chase by way of a stock for stock transaction. Following the merger, Chase changed its name to JPMorgan

Chase & Co. Effective January 1, 2002, the prior cash balance pension plan formerly maintained by J.P. Morgan (the "Morgan Plan") was merged into the cash balance plan maintained by Chase (the "Chase Plan"). To effectuate the merger of the plans, at the close of business on December 31, 2001, the net assets of the Morgan Plan were transferred to the Chase Plan, which was amended and renamed "The JPMorgan Chase Retirement Plan."

42.    On July 1, 2004, JPMorgan Chase & Co. merged with Bank One, but retained its corporate name. Subsequent to its merger with Bank One, JPMorgan Chase & Co merged the cash balance plan previously maintained by Bank One into the Plan, effective December 31, 2004, and made certain other Plan revisions. The Plan was amended effective January 1, 2005.

43.    Thus, through the aforementioned mergers, the pension plan originally maintained by Chemical Bank is now called the JPMorgan Chase & Co. Plan (hereinafter the "JPMC Plan"). The Plan is administered by the Defendant Plan Administrator.

44.    The Plan, as presently in effect, is a cash balance formula plan that applies interest credits, and which covers all eligible employees and former employees of JPMC, inclusive of its predecessor companies.

45.    On May 30, 2007, the Honorable Harold Baer, Jr. certified under Fed. R. Civ. P. 23(b)(1) and 23(b)(2) two sets of class claims with respect to the JPMC Plan: 1) plaintiffs' allegation that the Plan reduces participants' rates of benefit accrual as participants age, in violation of ERISA § 204(b)(1)(H)(i) (the "Age Discrimination Claim"); and 2) plaintiffs' notice allegations that the Plan and Defendant Plan Administrator failed to provide Plan participants with proper notice of reduction of the rate of their future benefit accrual and proper notice that their future rate of benefit accrual would decrease with age under ERISA § 204(h), failed to provide adequate summary plan descriptions ("SPDs") in violation of ERISA § 102(b), and

failed to provide adequate summaries of material modification ("SMMs") in violation of ERISA § 102(a) (collectively, the "Notice Claims"). *In re JP Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265 (S.D.N.Y. 2007). In his Order dated May 30, 2007, Judge Baer certified the Age Discrimination Claim beginning January 1, 1989, and he certified the Notice Claims that stem from the JPMC Plan as of January 1, 2002. *See id.* Judge Baer issued a supplemental ruling with respect to class certification on July 31, 2007, in which he further stated that he had "granted clearly and unequivocally Plaintiffs' notice claims that stemmed from the JPMC Plan as of January 1, 1989." *In re JP Morgan Chase Cash Balance Litig.*, No. 06-cv-0732, 2007 WL 2177019, *1 (S.D.N.Y. July 31, 2007). Plaintiff brings this action on his behalf, and on behalf of a class of plaintiffs similarly situated, to the extent the claims asserted herein are outside the scope of the certified class claims in the related action against the JPMC Plan.

## V. CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action on his own behalf and, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of all others similarly situated, defined as all Plan participants who were formerly employees of Chemical Bank, whether active, inactive or retired, their beneficiaries and estates, whose accrued benefits or pension benefits are or were based in whole or in part on the Plan's cash balance formula(s), from January 1, 1989 to December 31, 2001.

47.     The requirements for maintaining this action as a class action under Rule 23(b)(1) and (b)(2), Federal Rules of Civil Procedure, are satisfied in that:

a)     The class is large in number; the exact number and identities of all class members are currently unknown to Plaintiff, but are known to Defendants. The number of class members is believed to be in the thousands;

b)     The members of the class are so numerous that joinder of all members is impracticable;

c)     There are questions of law common to all members of the class, such as: i) whether the challenged plan amendments caused a significant reduction in the rate of future benefit accrual, and, if so, whether participants were provided with adequate notice that complied with the requirements of ERISA § 204(h); ii) whether the Plan's communications with participants regarding the cash balance plan conversions and amendments complied with ERISA §§ 102, 104(b)(1), and their implementing regulations; and iii) whether the Cash Plan is impermissibly backloaded in violation of the 133 1/3 percent rule, ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), 26 U.S.C. § 411(b)(1)).

c)     Plaintiff is a member of the class as defined above; his claims are typical of the claims of the members of the class and he will fairly and adequately protect the interests of the class. Plaintiff's interests are coincidental with, and not antagonistic to those of the remainder of the class, and Plaintiff is represented by experienced ERISA class action counsel;

d)     The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and a risk of adjudications which as a practical matter would be dispositive of the interests of other members of the class who were not parties; and

e)     Defendants have acted and/or refused to act and are likely to act and/or

refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive and other relief with respect to the class as a whole.

## VI. CLAIMS FOR RELIEF

### COUNT I
### Violation of ERISA Notice Provision Regarding Reduced Rate of Benefit Accrual, ERISA § 204(h), 29 U.S.C. § 1054(h)

48.     Plaintiff re-alleges all paragraphs above as if fully set forth herein.

49.     At all times relevant to this action, ERISA Section 204(h), 29 U.S.C. § 1054(h), required advance notice to participants in a defined benefit pension plan of any amendment whose effect is to "provide for a significant reduction in the rate of future benefit accrual." 29 U.S.C. § 1054(h)(1).

50.     At all times relevant to this action, ERISA § 204(h) generally required that Plan participants receive notice from the Plan administrator of a significant reduction in their future rate of benefit accrual *after* a plan amendment had been adopted, but *before* the amendment's purported effective date. *See* ERISA § 204(h), 29 U.S.C. § 1054(h).

51.     As indicated by the language in Section 204(h), "may not be amended," a purported Plan amendment may not become effective unless the Plan administrator complies with § 204(h) of ERISA.

52.     Upon information and belief, the Cash Plan amendments as of January 1, 1991 and subsequent Plan amendments during the Class Period caused "a significant reduction in the rate of future benefit accrual" by converting the Plan from a final average pay plan to a cash balance plan, and/or by reducing participants' future rates of benefit accrual by these conversions

- 14 -

or other plan amendments.

53.    Upon information and belief, the impact of the Cash Plan's 1991 Plan amendment that reduces a participant's rate of benefit accrual as he or she ages causes over time a substantial drop in a participant's final benefit when compared with the formula under the Prior Plan.

54.    At a minimum, as of the following dates, the Plan affected a significant reduction in plan participants' rates of future benefit accrual:   January 1, 1989 (upon the retroactive implementation date of the Chemical Plan's 1991 amendment converting the Plan from a final average pay formula to a cash balance formula); January 1, 1993 (upon the Plan's merger with the Manufacturer's Hanover Trust Plan); January 1, 1997 (upon the Plan's merger with the Retirement Plan of Chase Manhattan Bank).

55.    When the Cash Plan was implemented on about January 1, 1991 with a retroactive Effective Date of January 1, 1989, the Plan administrator could satisfy ERISA § 204(h) by providing participants either a copy of the plan amendment or by providing a notice of a significant reduction in rate of future benefit accrual that contained a summary of the amendment, *provided* that the summary was written in a manner calculated to be understood by the average plan participant and complied with the statute's mandatory timing requirements.

56.    In order to provide adequate warning to plan participants, any summary of a plan amendment should not include materially false or misleading information, or omit information so as to cause a misleading effect.   Rather, the notice should provide participants with a fair warning of the impact of the plan amendment.

57.    On information and belief, the conversion from the Prior Plan to the Cash Plan caused a significant reduction in the rate of future benefit accrual for all participants. Nonetheless, Plan participants did not receive the warning required by ERISA § 204(h).  Simply

put, the reduction in the rate of future benefit accrual and the reduction in the rate of future benefit accrual based on age was not disclosed in advance – or at any other time – to Plan participants. As described *supra*, Defendants failed to meet the § 204(h) notice requirement in at least two material respects. First, participants were not informed of the Cash Plan's Effective Date of January 1, 1989 until July 1990, at the earliest, thereby violating the § 204(h) requirement of advance notice. Second, any information that was provided to participants about the Cash Plan conversion and subsequent cash balance formula amendments and conversions was materially misleading in that the information repeatedly touted the purported benefits of the cash balance formula, thereby providing a misleading description of the formula's operation and effects. On information and belief, participants were never informed that the Cash Plan amendment reduced future rates of benefit accrual, or that the Cash Plan amendment reduced rates of future benefit accrual with a participant's advancing age.

58.    Any summaries of the plan amendment provided to Plan participants were insufficient and inadequate because they failed to fully and accurately describe the Cash Plan amendment in a manner that could be understood by the average Plan participant. Further, any summaries of the amendment that were provided did not provide participants with the requisite warning of a reduction in the rate of future benefit accrual, or that the rate of benefit accrual decreased with a participant's advancing age.

59.    In addition to the foregoing, any literature provided to Plan participants in conjunction with the implementation of the Cash Plan did not constitute § 204 notice because Defendants failed to comply with the timing requirement of the statute. At all relevant times, ERISA required that § 204 notice must be provided at least fifteen days *before* the effective date of the plan amendment. The amendment implementing the Cash Plan was made retroactively

effective to January 1, 1989. However, upon information and belief, Plan participants were provided with no information regarding the plan amendment until July of 1990—over 18 months after the amendment's retroactive effective date. Thus, participants were not provided with the required advance written warning of the amendment.

60.    Similarly, Defendants did not satisfy ERISA § 204(h) with respect to disclosures related to the Plan amendment(s) implementing the 1993 Chemical Plan. Plan participants were not provided with a warning of a reduction in the rate of future benefit accrual; further, they were not provided with information that was adequate for an average plan participant to understand the Plan amendment. For example, a corporate "Benefit Directions" brochure dated October 1992 devoted only one page to the retirement plan. Similarly, a corporate "magazine" from November 1992 touted the new formula's purported advantages, but provided no warning of its drawbacks.

61.    Further, upon information and belief, the Plan did not provide adequate advance notice of subsequent Plan amendments, including, without limitation, Plan amendments implementing the 1997 Chase Plan. As a result, these Plan amendments similarly failed to become effective with respect to Plaintiff and the Class based on the failure to provide adequate § 204(h) notices. The literature provided to Plaintiff and the Class failed to fully describe, in a manner calculated to be understood by the average Plan participant, the true operation of the Plan's formula for calculating pension benefits. It also failed to provide a warning of a significant reduction in the rate of future benefit accrual or a warning that future rates of benefit accrual would decrease with a participant's advancing age.

62.    Upon information and belief, at no time during the class period or during the period required by ERISA § 204(h), did Plan participants receive advance notice of the

reductions in the rate of future benefit accruals due to the Plan's conversions to a cash balance formula, as is required under 29 U.S.C. § 1054(h).

63.    Upon information and belief, at no time during the class period or during the period required by ERISA § 204(h), did Plan participants receive advance notice that the reductions in their rate of future benefit accruals were correlated with the attainment or advancement of age, as is required under 29 U.S.C. § 1054(h).

64.    In addition to the foregoing, upon information and belief, at no time during the Class Period or during the period required by ERISA § 204(h), did Plan participants receive timely, accurate, or sufficiently comprehensive notice of reductions in the Plan's rate of future benefit accruals, as is required under 29 U.S.C. § 1054(h).

65.    Defendants' failures to comply with the timing, content and method of distribution requirements of the notice and disclosure laws violated ERISA Section 204(h), 29 U.S.C. § 1054(h), and all applicable regulations.

66.    Defendants' acts and/or omissions prejudiced or likely prejudiced Plaintiff and the Class because the inadequate notice deprived Plan participants of a full understanding of the impact of these plan amendments and therefore prevented or likely prevented them from taking any necessary measures to supplement their retirement savings accordingly.

67.    As a consequence of these violations of ERISA § 204(h), and all applicable regulations, the Plan amendments that purported to adopt cash balance formulas or otherwise effect a significant reduction in the rate of participants' future benefit accrual never became effective and, thus, are unenforceable.

## COUNT II

### Failure to Provide Adequate Summary Plan Descriptions
### ERISA §§ 102, 104(b)(1), 29 U.S.C. §§ 1022, 1024(b)(1), and 29 C.F.R. § 2520.102-2

68.    Plaintiff re-alleges all paragraphs above as if fully set forth herein.

69.    ERISA Section 102(a), 29 U.S.C. § 1022(a), requires the Plan administrator to provide all participants and beneficiaries with a summary plan description ("SPD"):

70.    The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

71.    In turn, ERISA Section 102(b), 29 U.S.C. § 1022(b), provides in pertinent part:

The summary plan description shall contain the following information: . . . the plan's requirements respecting eligibility for . . . benefits; . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . .

72.    Similarly, 29 C.F.R. § 2520.102-2 provides in pertinent part:

(a) Method of presentation.    The summary plan description shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan . . . .    Consideration of these factors will usually require . . . the use of clarifying examples and illustrations, the use of clear cross-references and a table of contents. (b) General format. The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries.    Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.    Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or

minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

73.     ERISA § 104(b)(1) imposes timing requirements for issuance of the SPD. In general, a plan administrator must furnish an SPD to each participant within 90 days of becoming a participant. A plan administrator must furnish subsequent SPDs integrating all intervening plan amendments to each participant every fifth year. 29 U.S.C. § 1024(b)(1).

74.     Upon information and belief, to the extent that Defendants issued any SPDs to Plan participants, none of the SPDs issued by Defendants regarding the Plan or the Predecessor Plans summarize their cash balance formulas in compliance with ERISA.

75.     By describing the cash balance formula in a misleading manner, without full disclosure, any SPDs that Defendants distributed had the effect of "misleading, misinforming [and] failing to inform participants" as to the rate of accrual, and "minimized, rendered obscure, or otherwise made to appear unimportant" the "description of exceptions, limitations, reductions, and other restrictions of plan benefits."

76.     In short, upon information and belief, the corporate literature that Defendants provided to Plan participants, and on which Defendants may purport to rely to satisfy their ERISA obligations, did not explain, inter alia: (a) that the rate of accrual under the Plan was reduced on the basis of age for all Plan participants as a matter of simple arithmetic; or (b) that the rate of future benefit accrual would be reduced for all Plan participants under the Cash Plan and its subsequent amendments.

77.     On information and belief, omissions of this type were pervasive throughout the class period with respect to all corporate literature and/or summary plan descriptions issued for

the Plan and the Predecessor Plans.

78.    The failure of the Plan's summary plan descriptions to timely and fully disclose Plan provisions that negatively impacted the benefits participants reasonably expected to receive violates ERISA Sections 102, 104(b)(1), 29 U.S.C. §§ 1022, 1024(b)(1) and 29 C.F.R. § 2520.102-2. These acts and/or omissions prejudiced or likely prejudiced Plaintiff and the Class by precluding their understanding of the impact of the cash balance formula and/or preventing them from further supplementing their retirement savings.

79.    Defendants' acts and/or omissions render the cash balance formulas unenforceable.

## COUNT III

### Failure to Provide Adequate Summaries of Material Modification
### ERISA §§ 102(a), 104(b)(1), 29 U.S.C. §§ 1022(a), 1024(b)(1), and 29 C.F.R. § 2520.104b-3

80.    Plaintiff re-alleges all paragraphs above as if fully set forth herein.

81.    ERISA Section 102(a), 29 U.S.C. § 1022(a), also provides:

> A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section [104(b)(1), 29 U.S.C. §] 1024(b)(1) of this title.

82.    ERISA Section 104(b)(1), 29 U.S.C. § 1024(b)(1), generally provides that a plan administrator must provide to each participant, and to each beneficiary who is receiving benefits under the plan, a summary of material modifications ("SMM") not later than 210 days after the end of the plan year in which the change is adopted.

83.    29 C.F.R. § 2520.104b-3 governs in greater detail the timing and content of the required SMMs.

84.    Upon information and belief, Defendants did not provide to participants timely and sufficient SMMs as required by ERISA Sections 102, 104(b)(1), 29 U.S.C. §§ 1022(a), 1024(b)(1), and 29 C.F.R. § 2520.104b-3, thereby violating those provisions.

85.    The failure of the Plan's SMMs to timely and fully disclose revised Plan provisions that negatively impacted the benefits participants reasonably expected to receive violates ERISA Sections 102, 104(b)(1), 29 U.S.C. §§ 1022, 1024(b)(1) and 29 C.F.R. § 2520.104b-3. These acts and/or omissions prejudiced or likely prejudiced Plaintiff and the Plan participants by precluding their understanding of the impact of the cash balance formula and/or preventing them from further supplementing their retirement savings.

86.    Defendants' acts and/or omissions render the cash balance formulas unenforceable.

### Count IV

### Plan Transition Offset Creates Impermissible Backloading ("Wear-Away")

### (For Violation of ERISA Section 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), and 26 U.S.C. § 411(b)(1))

87.    Plaintiff re-alleges all paragraphs above as if fully set forth herein.

88.    Upon the Plan's conversion from a final average pay formula to the Cash Plan, a participant's accrued benefit was determined as the actuarial equivalent of the participant's credit balance as of the determination date. Cash Plan ¶ 4.5.

89.    A participant's credit balance under the Cash Plan was the sum of the Prior Service Credit, calculated as a lump sum value of a benefit calculated under the prior plan as of January 1, 1989, and a Salary Based Credit Balance, increased quarterly based on the participant's income and a designated interest rate. Cash Plan ¶¶ 4.1-.3.

90.    The new Cash Plan also established a guaranteed minimum benefit for participants equal to their accrued benefit determined as of December 31, 1990 ("Dec. 1990 Guaranteed Benefit"). Cash Plan ¶ 7.1(b).

91.    Under the express terms of the Cash Plan, the formula for determining a participant's accrued benefit included consideration of the Dec. 1990 Guaranteed Benefit, creating a period of time for some participants during which their accrued benefit remained unchanged and their rate of benefit accrual went to zero.  The benefit accrual by these participants would only resume when their credit balance resulted in a benefit greater than the Dec. 1990 Guaranteed Benefit.

92.    Because any accrual rate is infinitely greater than zero, a zero accrual rate followed by any future accrual violates the 133 1/3 percent rule, ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), 26 U.S.C. § 411(b)(1).

93.    Pursuant to 26 C.F.R. § 1.411(b)-1(b)-1(b)(2)(ii)(B), the 133 1/3 percent rule is violated by the possibility that a Plan's benefit formula could yield zero accrual in one or more years, followed by an accrual rate greater than zero.  The Internal Revenue Service has recently endorsed its long-standing position that a zero accrual rate that is followed by any future accrual is a *per se* violation of ERISA's anti-backloading standards.

94.    Since the Dec. 1990 Guaranteed Benefit is an express provision of the Cash Plan, the benefit floor it established would have the same effect on participants' rates of benefit accrual even if it had been in effect for all other plan years.

### VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

A.     Certifying this action as a class action;

B.     Declaring:

      1.     That the Plan Administrator did not provide Plaintiff and Class with an advance notice of a significant reduction in the rate of future benefit accruals that complied with ERISA § 204(h), 29 USC § 1054(h), as to content, timing and/or method of distribution, so that the Plan amendments implementing the Cash Plan, the 1993 Chemical Plan, the 1997 Chase Plan and subsequent Plan amendments implementing cash balance formulas did not become effective (First Count);

      2.     That the summary plan descriptions summarizing the new cash balance formulas violated ERISA Sections 102, 104(b)(1), 29 U.S.C. §§ 1022, 1024(b)(1), and 29 C.F.R. § 2520.102-2 (Second Count);

      3.     That the Plan Administrator did not provide the summaries of material modifications of the cash balance formulas required by ERISA Sections 102(a), 104(b)(1), 29 U.S.C. §§ 1022(a), 1024(b)(1), and 29 C.F.R. § 2520.104b-3 (Third Count); and

      4.     That the Cash Plan is impermissibly backloaded, in violation of the 133 1/3 percent rule, ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), 26 U.S.C. § 411(b)(1) and 26 C.F.R. § 1.411(b)-1(b)-1(b)(2)(ii)(B) (Fourth Count).

C.     Enjoining Defendants from enforcing the Plan's unlawful amendments or amendments that never became effective;

D.     Ordering Defendants to reform the Plan to cure all ERISA violations;

E.     Ordering Defendants to recalculate the accrued benefits of Plaintiff and all Class

- 24 -

members based on the greater of the benefit formula sought to be amended in violation of ERISA §§ 204(g) or 204(h), or the pre-amendment formula, after these provisions are reformed to cure all ERISA violations;

F.    Ordering Defendants to pay all pensioners, their beneficiaries and/or estates the difference between the amount of pension paid to them heretofore, and the benefit that should have been paid based on the Plan as reformed to cure all heretofore-listed ERISA violations, with interest compounded monthly;

G.    Awarding Plaintiff

1.    His costs, disbursements and expenses herein pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g), or as otherwise authorized by law;

2.    Reasonable attorneys' fees pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine, or as otherwise authorized by law; and

H.    Awarding the Class such other and further relief as the Court may deem just, proper and equitable.

Dated: August 17, 2007                           Respectfully submitted,


                                       KIRBY McINERNEY & SQUIRE, LLP


                                       _____
                                       Peter S. Linden (PL8945)
                                       Alice McInerney (AM5484)
                                       Andrew T. Watt (AW1271)
                                       830 Third Avenue
                                       New York, New York 10022
                                       (212) 371-6600
                                       Fax: (212) 751-2540

**KELLER ROHRBACK L.L.P.**
Lynn L. Sarko
Derek W. Loeser
Amy Williams-Derry
Karin B. Swope
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**EDGAR PAUK (EP 1039)**
144 East 44th Street, Suite 600
New York, New York 10017
(212) 983-4000

*Attorneys for Plaintiff*

Exhibit 1

REDACTED

**CHEMICALBANKING**
Corporation

277 Park Avenue
New York, NY 10172

July 25, 1990

Dear Colleague:

I am pleased to announce some very positive changes to our pension plan, which will take effect on January 1, 1991.

When new pension laws and regulations prompted us to modify our retirement plan, we decided to go beyond the bare minimum mandated by law. We saw it as an opportunity to improve and simplify our existing pension plan.

The revised plan will cost the Corporation slightly more than we now spend on employee retirement benefits. However, we think the additional expense will be well justified, given the benefits that the revised plan provides.

The revised plan will offer a pension similar to the one you would have received under the existing plan. But it is easier to understand, easier to administer, and is designed to provide you with regular, semi-annual statements about the benefits you are accumulating. As in the past, Chemical pays the entire cost of this plan. And once you have completed five years of service, if you leave Chemical for any reason, you may take your accumulated pension benefit with you in cash.

This month you will receive a brochure describing the revised retirement plan, and in late summer you will receive a more complete description of it. Once you get to know this plan, I think you will be very pleased with the change.

As developments occur in our operating environment -- new laws, new benefit trends and innovations in plan design -- Chemical remains committed to offering a benefits package responsive to your needs. In doing so, we can continue to attract and retain the best available talent--talent that is essential to helping us succeed in this competitive industry.

Sincerely,

RECEIVED

JUL 2 6 1990

Patrick J. Scollard
Chief Administrative Officer

Exhibit 2

REDACTED



RECEIVED

JUL 31 1990

July 30, 1990

Dear Fellow Employee:

As announced earlier this month, Chemical is changing its retirement plan to help you meet your retirement planning needs. We're making sure the Plan continues to provide similar benefits at retirement. The Plan, called Cash Plan, continues at no cost to you; the Corporation is footing the entire bill.

One of the special advantages of Cash Plan is that it is clear-cut and easy to understand. Once you are eligible to participate, Chemical will establish a retirement account in your name. In many ways, this account resembles a savings account: credits to the account are made, interest accrues and you receive periodic statements showing the growth of your benefit throughout your career with Chemical.

Over the next few months, you will be hearing a lot more about Cash Plan. To get started, a brochure is enclosed that provides an overview of how the Plan works. In late summer, you will receive a brochure that describes the Plan in more detail. Finally, in December, we will send you a personal statement—showing the opening balance in your Cash Plan account and all credits and interest to your account through June 30, 1990. Early next year, we will distribute another statement—updating your balance through year-end 1990.

Read the enclosed materials carefully. Beginning August 1st and through August 15th, you can call the special Cash Plan Hotline at (212) 820-4544 from 9:00 a.m. to 5:00 p.m. Monday through Friday and ask benefits specialists any questions you have about the Plan.

Sincerely,

Mark J. Schneiderman

**CHEMICALBANKING**
Corporation

Exhibit 3



**CASH PLAN**
FOR RETIREMENT

**CHEMICAL BANKING**
Corporation

JPMC00001733

## HELPING YOU MEET YOUR RETIREMENT PLANNING NEEDS

As a Chemical employee, you are entitled to a variety of benefits that extend your compensation far beyond your regular paycheck. Each benefit helps you meet a particular financial need—for example, to pay medical or dental bills, to replace income if you are sick or injured and unable to work or to reduce the cost of having someone care for your children while you are at work.

Cash Plan for Retirement is a program that, along with the Chemical Savings Plan, helps you accumulate funds for your retirement. Once you are eligible for Cash Plan, you automatically become a participant and your retirement funds will start to grow—at no cost to you. In addition, because Cash Plan is easy to understand, you can monitor your benefit and watch it grow throughout your career with Chemical. You can receive your benefit when you retire or leave the Company after completing five years of service. And you can choose to take your benefit as a single cash payment or in monthly installments that continue for the rest of your life.

Earlier this summer, you received a booklet highlighting the new Plan. You may recall that the biggest change with Cash Plan is in the *way* your pension benefit is calculated. Instead of using a complicated formula and Social Security offset, Cash Plan benefits resemble a savings account. This brochure provides more details about Cash Plan, including examples showing how it works for employees with different salary levels and years of service.

### GETTING STARTED

Cash Plan will begin January 1, 1991. When it goes into effect, the Plan will be retroactive to January 1, 1989.

Generally, you will participate in Cash Plan on the first of the month that coincides with or follows completion of a year of service. If you are employed with Chemical Banking Corporation when Cash Plan goes into effect, and you are an active participant in the Chemical Retirement Plan, your participation continues automatically under Cash Plan.

Like the prior plan, Chemical Banking Corporation pays the full cost of your participation in Cash Plan for Retirement.

### HOW CASH PLAN WORKS—AN OVERVIEW

Once you are eligible to participate in Cash Plan, Chemical establishes a retirement account in your name. If you were a participant in the Chemical Retirement Plan on December 31, 1988, your Cash Plan account begins with a *prior service balance* based on the benefit you earned under the prior plan. In addition, once you start to participate in Cash Plan, Chemical adds *salary-based credits* each quarter determined by your base salary and years of service. And, your account earns *interest credits.*

All credits to your account are expressed as dollars. This makes it easy to understand exactly how much your retirement benefit is worth.

### PRIOR SERVICE BALANCE

If you were a participant in the Chemical Retirement Plan on December 31, 1988, your Cash Plan account will begin with a *prior service balance.* This balance is based on the dollar value of your benefit under the Retirement Plan as of December 31, 1988. By starting your Cash Plan account with a prior service balance, Chemical preserves your benefit under the prior Plan formula and combines it with your benefits under the Cash Plan for Retirement.

For example, assume your employment with Chemical began September 15, 1980. So, by December 31, 1988, you had been working with Chemical for more than eight years. Based on your age (37) and annual earnings ($25,000), the value of your benefit under the Retirement Plan at the end of 1988 was $3,800. As a result, effective January 1,

1989; $3.800 is credited to your Cash Plan account as your prior service balance.

Your prior service balance is calculated based on the 1.75% prior Plan formula. If you participated in the Retirement Plan before April 1, 1976 and were eligible for the alternate 2% formula, your prior service balance will be calculated under both formulas—and your Cash Plan account will start with the *greater* amount.

There are two factors regarding the calculation of your prior service balance that may affect you:

- *First,* your prior service balance is calculated using your *credited service.* Your credited service begins when you become a participant in Chemical's Retirement Plan and extends to January 1, 1989.

For employees who joined Chemical in 1988 or after, credited service generally begins after one year of employment. But if you joined Chemical before 1988, different rules affected when you began participating in the Retirement Plan. For example, suppose you joined Chemical in 1980 at age 22. At that time, in order to participate in Chemical's Retirement Plan, you had to be age 25 with one year of service. So your credited service would not have begun until you reached age 25.

- *Second,* your prior service balance is calculated using your Social Security earnings. Chemical will use your actual Social Security earnings if those are available. Otherwise, Chemical will estimate your Social Security earnings in order to compute your benefit under the prior formula.

## IF YOU PARTICIPATED IN A PREDECESSOR PLAN

If you participated in the retirement plan of a company that is now part of Chemical, special rules may apply in determining your prior service balance.

If you were participating in the Texas Commerce Bancshares (TCB) Retirement Plan on January 1, 1988, or the Horizon Bancorp Retirement Plan on January 1, 1990, the following provisions apply:

- Your prior service balance will be calculated under Chemical's prior Plan formula as if your prior service with TCB or Horizon had been with Chemical. However, service that did not count under your predecessor plan also will not count for this purpose.
- When you retire or leave Chemical for any reason, you will receive the *greater* of your Cash Plan account balance as of your termination date or the benefit you earned under your predecessor plan as of the merger date.

If you are a former employee of Chemical Financial Services Company (CFSC) or Sunamerica, your prior service balance will be calculated as follows:

the benefit you earned under your predecessor plan through the plan merger date (July 1, 1985 for CFSC; January 1, 1986 for Sunamerica)

plus

the benefit you earned under the Chemical Retirement Plan from the merger date through January 1, 1989.

## SALARY BASED CREDITS

Each quarter, your account receives *salary*-based credits equal to a percentage of your base salary, based on your years of service with Chemical at the beginning of that quarter. These credits begin after you complete your first year of employment and then increase after you complete 10 and 20 more years of service:

| When you Complete This Many Years of Service | Chemical Credits This Much of Your Base Salary Each Year* |
|---|---|
| 1 to 10 | 5% |
| 11 to 20 | 6% |
| 21 or more | 7% |
| *credited quarterly | |

### EXAMPLE

Assume you joined Chemical on September 15, 1980. In 1989, your annual base salary was $25,000. Quarterly salary-based credits to your account in 1989 total $1,250 (5% of $25,000).

JPMC00001735

Because you will have completed 11 years of service on September 15, 1991, the quarterly credits will increase to 6% of base salary on October 1, 1991, the beginning of the next calendar quarter.

## DEFINING BASE SALARY

For purposes of determining these salary-based credits, base salary is your regular base pay plus shift differential pay. It excludes overtime pay, commissions, bonuses, special pay and Flexcredits. For 1989 and 1990, regular base pay for each quarter is a prorated amount based on your annual rate of pay for those years. Beginning in 1991, regular base pay is the actual amount paid for the quarter, subject to any Internal Revenue Service (IRS) limits on the level of salary that can be considered for purposes of determining Cash Plan credits.

## COUNTING SERVICE

In determining the level of your salary-based credits, *all* service with Chemical counts—even service before your participation in any Chemical retirement plan. For example, you may have 25 years of total service on January 1, 1989 but, due to eligibility requirements when you joined Chemical, only 18 years of credited service. Since all service counts for purposes of determining Cash Plan salary-based credits, you would receive 7% credits beginning January 1, 1989.

### INTEREST CREDITS

Your account receives interest credits each quarter. In fact, you will receive interest credits in two ways.

*First* you will receive interest credits quarterly on the salary-based credits Chemical makes to your account. This interest is based on the total value of all credits to your account at the start of the quarter. Each December, Chemical will announce the interest rate for the coming year. That rate equals the average one-year Treasury-bill rate for the prior September, October and November—*plus 3%*—to a 15% maximum.

For 1989 and 1990, credits to your account receive interest credits as follows:

|  | Average One-Year Treasury Bill Rate | Cash Plan Rate | |
|--|--|--|--|
|  |  | Annual Rate | Quarterly Rate* |
| 1989 | 8.2% | 11.2% | 2.69% |
| 1990 | 8.0% | 11.0% | 2.64% |

*quarterly rate compounded for four quarters equals the annual rate

*Second,* if your account begins with a *prior service balance,* this portion of your account also earns quarterly interest credits—at a rate equal to 125% of the regular rate. For example, if the annual regular rate is 11%, the rate applied to your prior service balance is 13.8% (11% times 1.25).

Since the regular interest rate is 11.2% in 1989 and 11% in 1990, the interest rate on your prior service balance in these years is:

|  | Annual Rate | Quarterly Rate* |
|--|--|--|
| 1989 | 14.0% | 3.33% |
| 1990 | 13.8% | 3.28% |

*quarterly rate compounded for four quarters equals the annual rate

Each December, when the new interest rate for salary-based credits is announced for the coming year, Chemical will also announce a new interest rate for your prior service balance—which will equal 125% of the regular interest rate.

### PERSONAL STATEMENTS

One of the advantages of Cash Plan is that it provides a visible benefit. So, twice each year, you will receive a personal statement showing the current value of your Cash Plan account. By comparing statements, you can watch your benefit grow from year to year. In December, your first personal statement will show the growth in your Cash Plan account from January 1, 1989 through June 30, 1990. Then, starting next year, you will receive

3

JPMC00001736

semi-annual statements tracking your account growth.

## VESTING

Becoming vested in your Cash Plan account means you acquire permanent ownership of your retirement benefit—whether or not you continue to work for Chemical. You become vested in the full value of your Cash Plan account after you complete five years of service.

## A MINIMUM BENEFIT

If you are a participant in the Chemical Retirement Plan on January 1, 1991, your benefit under the Plan as of that date will be your *minimum* benefit under Cash Plan. When you leave Chemical, the value of that benefit will be compared with your Cash Plan account—and you will receive whichever is *greater.*

## REEMPLOYMENT

*If you are vested* when your employment with Chemical ends and you are later rehired, you can resume participating in Cash Plan.

*If you are not vested* when you leave Chemical and are reemployed at a later date, you will be eligible to participate in Cash Plan a year after your reemployment date. In general, if you are gone for fewer than five years:

* your period of employment prior to leaving will count toward vesting, and
* the account balance you forfeited when you left will be restored.

Keep in mind, other rules may apply, depending on the circumstances of your departure and reemployment. These rules are detailed in the formal Plan document and will be included in the "Summary Plan Description" you will receive early in 1991.

## PAYMENT OPTIONS

Under Cash Plan, you have a variety of payment options—whether you leave the Company for retirement or any other reason (provided, of course, you are vested in your benefit). If your account value exceeds $3,500, you can choose a *lump-sum payment* of your account, or you can choose monthly payments. If your account value is $3,500 or less, you will automatically receive a lump-sum payment.

Note that if you choose monthly payments, they will continue for life—even if your account balance is exhausted. And, if you elect one of the payment options described below that provides continuing payments after your death to your spouse or other beneficiary, payments will continue for the lifetime of the beneficiary, regardless of your account balance.

*If you are not married,* the normal form of payment is a *life annuity,* which provides monthly benefits for your lifetime only.

*If you are married,* the normal form of payment is a *50% qualified joint and survivor annuity.* This means you will receive a monthly benefit for life and, after your death, your spouse will receive half of your monthly benefit amount for his or her lifetime. Under this option, the payments you receive will be somewhat smaller than they would be under a life annuity because they are paid over two lifetimes—yours and your spouse's.

Although you can choose a different form of payment, any other election will require your spouse's written, notarized consent. Your spouse must also consent in writing to your designation of a beneficiary other than your spouse.

Other payment options available include:

* a *contingent joint and survivor annuity,* which is similar to a qualified joint and survivor annuity, except that you choose the percentage of your benefit (50%, 66⅔%, 75% or 100%) that continues to your beneficiary after your death.
* a *straight life annuity,* which provides the same monthly benefit to you for life.

JPMC00001737

- an *increasing life annuity,* which provides a monthly benefit to you for life that starts lower than a straight life annuity and increases over time.
- a *5-, 10- or 15-year certain annuity,* which provides a reduced monthly benefit to you for life with a guaranteed payment period (of 5, 10 or 15 years, depending on the option you choose). If you die before the guaranteed payment period ends your beneficiary receives your monthly benefit for the balance of the guaranteed period.

## ILLNESS OR DISABILITY

If you become ill or injured and cannot work while an active Cash Plan participant, your participation in the Plan continues. If you are receiving salary continuation payments under Chemical's Salary Continuation Program, salary-based credits and interest credits to your Cash Plan account will continue for as long as your salary continues. Once your salary stops, salary-based credits will no longer be added to your account, but interest credits will continue—for a period of up to six months from date of disability.

If you are receiving benefits under Chemical's Long Term Disability (LTD) Plan, salary-based credits and interest credits to your Cash Plan account continue. Salary-based credits to your Cash Plan account are based on your annual salary prior to your disability. In addition, the period during which you receive LTD benefits counts for purposes of determining your level (5%, 6% or 7%) of credits. For example, if during your disability, you complete 11 years of service, credits to your account will increase to 6% at the start of the next calendar quarter.

## IN THE EVENT OF YOUR DEATH

The full value of your Cash Plan account will be paid to your beneficiary if you are vested and die—whether you are an active or former employee at the time of your death—provided you have not begun to receive Plan benefits. If you were eligible

for the survivor income benefit under the prior Plan arrangement, your beneficiary will receive a survivor benefit under Cash Plan that equals or exceeds the amount that would have been available under the prior provision.

## NAMING A BENEFICIARY

Your beneficiary is the person who will receive your Cash Plan account balance in the event of your death. If you are already vested in your retirement benefit, you will be asked to name a beneficiary before the end of 1990. If you are not vested, you will be asked to name a beneficiary after you complete five years of service.

## RECEIVING YOUR ACCOUNT BALANCE

Under Cash Plan, once you are vested, you can take your account with you if you leave Chemical—or you can defer payment of your account up until age 65. If you leave Chemical and defer payment, your *total* account—including your prior service balance—earns interest at the regular interest rate until payment begins.

If you are eligible for a payout from the Plan, you may wish to discuss your options with a financial consultant or tax advisor. The best choice depends on your individual circumstances, including the tax consequences of each option. Keep in mind, a lump-sum payment of your account is subject to ordinary income tax and, if you receive payment before age 59½, an additional 10% tax. If you receive your account balance and roll it over into an individual retirement account (IRA) or another tax-qualified plan within 60 days of distribution, you can defer paying taxes. Annuity payments are subject to ordinary income tax.

## EXAMPLES

Now, let's see how Cash Plan works for different employees. The examples that follow show the details of the first two years of account activity for

5

JPMC00001738

five employees. Remember, in each case, interest is applied quarterly.

Furthermore, to give you an idea of how accounts can grow over a longer period of time, the examples also show projections after 10 years and at age 65. These projections assume continued employment with Chemical at the same salary level, a regular interest rate of 9% each year and an annual prior service balance interest rate of 11.3%.

## EMPLOYEE ONE—RICHARD

*Richard, age 25, is a new Chemical employee. When he becomes eligible for participation in Cash Plan on January 1, 1990 (after a year of service), an account is established with no prior service balance. Since Richard earns $20,000 a year, here is how the account would look:*

| Type of Credit | Balance from Salary-Based Credits | Total |
|---|---|---|
| 1990: Quarterly credits based on salary ($250 per quarter) | $ 1,000 | $ 1,000 |
| Interest on salary-based credits | $ 40 | $ 40 |
| Balance on 12/31/90 | $ 1,040 | $ 1,040 |
| Balance after 10 years | $ 15,712 | $ 15,712 |
| Balance at age 65 | $354,659 | $354,659 |

## EMPLOYEE TWO—MARY

*Mary earns $25,000, was 30 years old at the end of 1988 and had worked at Chemical for five years. Here is how her Cash Plan account would grow:*

| Type of Credit | Prior Service Balance | Balance from Salary-Based Credits | Total |
|---|---|---|---|
| 1989: Credit for service prior to 1/1/89 | $1,642 | — | $ 1,642 |
| Interest on prior service balance | 229 | — | 229 |
| Quarterly credits based on salary ($312.50 per quarter) | — | $1,250 | 1,250 |
| Interest on salary-based credits | — | 51 | 51 |
| Balance on 12/31/89 | $1,871 | $1,301 | $ 3,172 |
| 1990: Interest on prior service balance | 258 | — | 258 |
| Quarterly credits based on salary ($312.50 per quarter) | — | 1,250 | 1,250 |
| Interest on salary-based credits | — | 194 | 194 |
| Balance on 12/31/90 | $2,129 | $2,745 | $ 4,874 |
| Balance after 10 years | | | $ 25,909 |
| Balance at age 65 | | | $396,208 |

6

JPMC00001739

## EMPLOYEE THREE—DON

*Like Mary, Don was also 30 years old and had completed five years of service at the end of 1988. Based on his annual earnings of $40,000, Don's account would grow as follows:*

| Type of Credit | Prior Service Balance | Balance from Salary-Based Credits | Total |
|---|---|---|---|
| 1989: Credit for service prior to 1/1/89 | $2,891 | — | $ 2,891 |
| Interest on prior service balance | 405 | — | 405 |
| Quarterly credits based on salary ($500 per quarter) | — | $2,000 | 2,000 |
| Interest on salary-based credits | — | 82 | 82 |
| Balance on 12/31/89 | $3,296 | $2,082 | $ 5,378 |
| 1990: Interest on prior service balance | 455 | — | 455 |
| Quarterly credits based on salary ($500 per quarter) | — | 2,000 | 2,000 |
| Interest on salary-based credits | — | 310 | 310 |
| Balance on 12/31/90 | $3,751 | $4,392 | $ 8,143 |
| Balance after 10 years | | | $ 42,259 |
| Balance at age 65 | | | $645,638 |

## EMPLOYEE FOUR—SANDRA

*Sandra was 45 years old at the end of 1988, earned $50,000 a year and had worked at Chemical for 10 years. Here is how her Cash Plan account would grow:*

| Type of Credit | Prior Service Balance | Balance from Salary-Based Credits | Total |
|---|---|---|---|
| 1989: Credit for service prior to 1/1/89 | $15,534 | — | $ 15,534 |
| Interest on prior service balance | 2,175 | — | 2,175 |
| Quarterly credits based on salary ($625 per quarter) | — | $2,500 | 2,500 |
| Interest on salary-based credits | — | 103 | 103 |
| Balance on 12/31/89 | $17,709 | $2,603 | $ 20,312 |
| 1990: Interest on prior service balance | 2,444 | — | 2,444 |
| Quarterly credits based on salary ($750 per quarter) | — | 3,000 | 3,000 |
| Interest on salary-based credits | — | 407 | 407 |
| Balance on 12/31/90 | $20,153 | $6,010 | $ 26,163 |
| Balance after 10 years | | | $ 93,613 |
| Balance at age 65 | | | $301,521 |

7

JPMC00001740

## EMPLOYEE FIVE—CHARLES

*Charles earns $45,000, was 50 years old and had worked at Chemical for 20 years at the end of 1988. Here is how his Cash Plan account would grow:*

| Type of Credit | Prior Service Balance | Balance from Salary-Based Credits | Total |
|---|---|---|---|
| 1989: Credit for service prior to 1/1/89 | $39,617 | — | $ 39,617 |
| Interest on prior service balance | 5,546 | — | 5,546 |
| Quarterly credits based on salary ($675 per quarter) | — | $2,700 | 2,700 |
| Interest on salary-based credits | — | 111 | 111 |
| Balance on 12/31/89 | $45,163 | $2,811 | $ 47,974 |
| 1990: Interest on prior service balance | 6,233 | — | 6,233 |
| Quarterly credits based on salary ($787.50 per quarter) | — | 3,150 | 3,150 |
| Interest on salary-based credits | — | 436 | 436 |
| Balance on 12/31/90 | $51,396 | $6,397 | $ 57,793 |
| Balance after 10 years | | | $169,667 |
| Balance at age 65 | | | $301,024 |

4C

## A FINAL WORD

The Cash Plan for Retirement is designed to make it easier for you to plan your financial future. Whether you are close to retirement or just starting your career, Cash Plan offers a number of special advantages. In particular, it provides a straightforward, visible benefit. With easy-to-read personal statements, you can track your benefit as it grows from year to year.

As you think about retirement, remember that Cash Plan is only one source of financial funding that will be available to you. Your personal savings, Social Security and the Chemical Savings Plan are other sources. The combined value of your own contribution to the Savings Plan, Chemical's matching contributions and investment earnings can provide a substantial supplement to your Cash Plan account.

This brochure is designed to highlight Cash Plan to help you understand how it works and the advantages it offers. It is not intended to provide all the details. Complete details can be found only in the formal Plan document, which governs the operation of the Plan and allows the Plan to be amended from time to time. If you have any questions about your benefits under the Plan, call the special Cash Plan hotline Monday through Friday at (212) 820-4544 between 9 a.m. and 5 p.m. eastern time. The hotline will be available from September 19 through September 28.

8

4C

JPMC00001741