50% or 100% (as elected by the Participant under this Plan) of the monthly payments the Participant was receiving at death.    Upon Notice to the Administrator, the survivor annuity shall commence on the first day of the month following the date of the Participant's death and end with the payment due for the month in which such Surviving Spouse or Beneficiary dies.    The rules of Section 7.2(c) apply to the annuity described in this Section.

(d)    Level Income Option. With respect to individuals who were Participants in this Plan on January 1, 1997 and with respect to individuals who become Pariticipants after January 1, 1997 but before October 1, 1998, the Credit Balance (but only the amount accrued prior to October 1, 1998 for an individual becoming a Participant after January 1, 1997)) may be received in the form of a Level Income Option, which provides that if benefit payments commence prior to the date on which Social Security benefits could first become payable (for this purpose age 62 or age 65) a benefit which is still the Actuarial Equivalent of the Participant's Lump Sum Accrued Benefit, will be payable in a larger amount until the date Social Security benefits could first become payable and thereafter in a smaller amount, so that the amount payable to the Participant prior to the availability of Social Security benefits will be approximately equal to the sum of the annual payment under the Plan and Social Security benefits thereafter.    The Level Income Option may be elected and applied to any annuity benefit described in this Section 7.3.    The Level Income Option only applies to the benefit payable to the Participant and shall not affect the amount to which a Surviving Spouse or other Beneficiary would otherwise be entitled.

(e)    Voluntary Cash Outs.  The Credit Balance may be received in the form of a single cash payment in an amount equal to the Participant's Lump Sum Accrued Benefit Amount. Any Final Salary Benefit or annuity benefit under the Chase Plan (not converted to a Credit Balance) may also be received in the form of a single cash payment, which must be the Actuarial Equivalent of the Participant's Accrued

44

CBPJPMC00000525

Benefit, but only if the monthly payment under the Participant's Final Salary Benefit would not exceed $100.00 at Normal Retirement or in the case of an individual who was, on December 31, 1996, a member of the Chase Plan, $100 at Normal Retirement.

(f)     Code Section 401(a)(9).  If the Participant dies after the Annuity Starting Date, the remaining portion of a benefit, if any, must continue to be distributed at least as rapidly as under the method of distribution being used prior to the Participant's death.

**7.4    Special Rules for Voluntary Cash Outs**

(a)     Payment of a Participant's voluntary cash out described in Section 7.3(e) shall be made as soon as administratively feasible after receipt of proper Notice to the Administrator, provided, such Accrued Benefit is otherwise properly payable.

(b)     A Participant may elect by Notice to the Administrator to have such distribution transferred in whole or in part to an Eligible Retirement Plan.

**7.5    Special Rules**

(a)     If a Beneficiary dies before the Participant's Annuity Starting Date, the Participant shall be entitled to receive the benefit he/she would have received if he/she had not elected to receive a Joint and Survivor Benefit.

(b)     If a Participant dies before his/her Annuity Starting Date, the Beneficiary shall not be entitled to receive any benefit payments under the Joint and Survivor Benefit. But see Sections 7.6 and 7.7.

45

CBPJPMC00000526

(c)     The amount of the benefit payable to a non-Spouse Beneficiary under the Joint and Survivor Benefit must satisfy the incidental death benefit requirement imposed by Code Section 401(a)(9).

(d)     Once a benefit is in pay status, the Participant or his or her Beneficiary or Surviving Spouse may not elect a different form of distribution.

**7.6     Death Benefit**

(a)     No Surviving Spouse.  If a Participant dies before his/her Annuity Starting Date and there is no Surviving Spouse or if the election described in Section 7.6(c) has been properly made, such Participant's Beneficiary or Beneficiaries shall receive a single cash payment equal to the vested Lump Sum Accrued Benefit Amount as of the date of such death plus Interest Credit on the Credit Balance of the Account until the date immediately preceding the Date of Distribution.  No amount shall be due with respect to the annuity benefit described in Section 4.6.  Payment shall be made as soon as administratively feasible after receipt of the proper Notice to the Administrator, but in no event later than five years after the Participant's death.

(b)     QPSA for Surviving Spouse.  Subject to waiver rules in paragraphs (d) and (f) below, and the involuntary cash out rule in Section 7.9, if a Participant dies before his/her Annuity Starting Date, and there is a Surviving Spouse, such Surviving Spouse shall receive a single life annuity for his/her lifetime which is the Actuarial Equivalent of the Participant's vested Lump Sum Accrued Benefit Amount (a "Credit Balance Qualified Pre-Retirement Survivor Annuity" or "Credit Balance QPSA"); provided that, in the case of a Participant who would have qualified for a benefit under Section 4.6 but for his/her death, the Surviving Spouse in lieu of such benefit may elect to receive for his/her life 50% of the annuity benefit described in Section 4.6.  (If such election is made, the benefit payable to the Surviving Spouse shall be payable to such Spouse commencing on the earliest date provided for in the Chase Plan for the benefit described in

46

CBPJPMC00000527

Section 7.2 in the Chase Plan and shall be subject to such reduction for early commencement of payment as provided for in the Chase Plan or the Chase Lincoln First Bank, N.A. Retirement Plan, as applicable.). The Credit Balance QPSA may commence as early as the first day of the month following the date of the Participant's death, but no later than the date that would have been the Participant's Normal Retirement Date, and shall end with the payment due for the month in which such Surviving Spouse dies; provided, however, that such QPSA shall not commence prior to the date the Participant would have reached his/her Normal Retirement Age without the spouse's consent given in a Notice to the Administrator. See waiver rules in paragraphs (d) and (f) below.

(c)     Alternative to QPSA.  Subject to the waiver rules in paragraph (d) below, the spousal consent rules in Section 7.8, and the involuntary cash out rule in Section 7.9, a Participant may elect at any time that, in lieu of a Credit Balance QPSA, to have his/her vested Credit Balance paid in a single sum to a Beneficiary or Beneficiaries other than a Surviving Spouse. Such designation shall be made by Notice to the Administrator. (This right does not apply to the benefit described in Section 4.6.)

(d)     QPSA Notice.   Within the applicable period (as defined below), the Plan Administrator shall notify each Participant of his/her rights with respect to the Credit Balance QPSA (or the Section 4.6 benefits) in comparable terms and manner as provided for in the notice regarding the QJSA as described in Section 7.7. The applicable period for a Participant is the period which ends last:

(i)     the period beginning with the first day of the Plan Year in which the Participant attains age 32 and ending with the close of the Plan Year in which the Participant attains age 35;

(ii)     a reasonable period after the person becomes a Participant; or

47

(iii)      a reasonable period ending after paragraph 7.6(d) first applies to the Participant;

provided that if a Participant incurred a Severance Date before attaining 35, the applicable period shall be a reasonable period ending after such Severance Date, provided that a designation of a Beneficiary prior to the date that a Participant has a Spouse shall be void as of the date of the Participant's marriage; and provided, further, that a designation of a Beneficiary (other than a Spouse) with spousal consent prior to age 35 shall be a void as of the beginning of the Plan Year in which the Participant attains age 35. As used in this paragraph, the term reasonable period means the period beginning one year before and ending one year after the occurrence of the event specified above.

(e)      Special Rules for Multiple Beneficiary Designations If multiple Beneficiaries are properly designated, but are not classified as "primary" or "secondary, "each surviving Beneficiary shall share equally in all amounts payable to such Beneficiaries, unless the Participant has specified the appropriate shares to be paid to such Beneficiaries. If a Beneficiary predeceases the Participant, then such Beneficiary's share shall be divided equally among the remaining Beneficiaries of the same class. If properly designated Beneficiaries are classified as "primary" or "secondary" but multiple Beneficiaries are designated within a class, then each Beneficiary in the same class shall share equally in all amounts that become payable to such class, unless the Participant has specified the appropriate shares to be paid to the Beneficiaries in such class.

(f)      Post-Death Waiver of QPSA. In the event that a married Participant (i) dies prior to his/her Annuity Starting Date, (ii) is survived by a Surviving Spouse, and (iii) has not executed a valid Credit Balance QPSA waiver, such Surviving Spouse may nonetheless elect, by giving Notice to the Administrator within 90 days after

48

such death, to waive the Credit Balance QPSA in favor of the single cash payment described in paragraph (a) above. (If such election is made, no QPSA under Section 4.6 (as described in Section 7.6(b)) shall be available to such Surviving Spouse.) Payment cannot be made without the Surviving Spouse's consent prior to the date the Participant would have reached his/her Normal Retirement Age. If not already paid, payment shall be made no later than the date the Participant would have reached Normal Retirement Age. Such Surviving Spouse may elect to have such payment transferred to an Eligible Retirement Plan.

7.7    **QJSA Waiver Rules**

(a)    A Participant has the right at any time during the 90 day period ending on the Annuity Starting Date (the "election period") to waive the QJSA in favor of an alternative form of benefit described in Section 7.3 (a "QJSA waiver"), to revoke an existing QJSA waiver, or to subsequently execute a new QJSA waiver, by giving Notice to the Administrator during such election period. No QJSA waiver shall be valid unless:

        (i)    the Participant has been properly notified pursuant to paragraph (b) below, and

        (ii)    the QJSA waiver complies with the spousal consent rules in Section 7.8.

(b)    The Plan Administrator shall notify each Participant of his or her rights with respect to the QJSA in the following manner. At least thirty days, but not more than ninety days prior to his Annuity Starting Date, each Participant must be furnished with a written explanation given in nontechnical language regarding:

        (i)    the terms and conditions of the QJSA;

49

(ii)　　the Participant's right to waive the QJSA in favor of an alternative form of benefit and the effect of such a QJSA waiver;

(iii)　　the right of the Participant's spouse to consent, and the necessity of such written spousal consent, to any QJSA waiver; and

(iv)　　the Participant's ability to revoke such a QJSA waiver (and the effect thereof).

Such notice shall also contain a general explanation of the financial effect of the QJSA waiver including information regarding the benefits a Participant would receive under the QJSA stated as an arithmetic or percentage reduction from a single life annuity or other alternative form of benefit. The notice shall also inform the Participant of the availability of the information described in paragraph (c) below and the manner in which the Participant may obtain such information.

(c)　　Upon a Participant's written request, the Plan Administrator will furnish a written explanation in nontechnical language of the terms and conditions of the QJSA, and the financial effect for the particular Participant, in terms of dollars per annuity payment, of any election to waive a QJSA. Such explanation shall be sent by personal delivery or first class mail within 30 days of such written request. The Plan Administrator need only respond to one such request by each Participant.

### 7.8　　Spousal Consent Rules

(a)　　A QJSA waiver under Section 7.7 and a QPSA waiver under Section 7.6 may be made only with the consent of the Participant's spouse that: (i) is in a written Notice to the Administrator, (ii) designates a specific Beneficiary or Beneficiaries, including any class of beneficiaries or any contingent beneficiaries that may not

be changed without spousal consent, (iii) acknowledges the effect of such waiver, and (iv) is witnessed by a Plan representative or notary public.

(b)    Spousal consent to a QJSA waiver must also designate a form of benefit payment that may not be changed without spousal consent.

(c)    No spousal consent shall be required if: (i) the Participant has no spouse, (ii) the spouse cannot be located and an affidavit of inability to locate the spouse is given in a written Notice to the Administrator, or (iii) under any other circumstances permitted by Code Section 417 and regulations thereunder.

(d)    Once a spouse has properly consented to a Participant's election under the Plan, the spouse may not revoke such consent unless the Participant agrees in writing.  Nonetheless, a spousal consent shall be valid only with respect to the spouse who gave such written consent. Any elections made by a Participant (and properly consented to by the spouse) shall remain valid after a divorce unless the Participant remarries, makes another proper election, or a qualified domestic relations order described in Code Section 414(p) applies and provides otherwise.

### 7.9    Involuntary Cash Outs

Notwithstanding any other provision of this Plan, if any Participant, Surviving Spouse or other Beneficiary is entitled to a vested Accrued Benefit under the Plan, the present value of which is not in excess of $5000 (or such higher amount as may be permitted under the Code), such benefit will be paid as soon as reasonably practicable in a single sum payment in full discharge of all obligations of the Plan with respect to such Participant, Surviving Spouse or other Beneficiary. (The increase from $3500 from $5000 was effective under this Plan January 1, 1998.) In determining present value, the Actuarial Equivalent will be calculated on the basis of assumptions set forth in Appendix V, including the use of the 30-year Treasury securities rate for distribution as provided in Section 4.5.

51

CBPJPMC00000532

**7.10    Qualified Domestic Relations Orders**

If the Plan Administrator receives a court order dividing benefits under the Plan and determines that such court order is a Qualified Domestic Relations Order ("QDRO") within the meaning of Code Section 414(q): (i) the date the Plan Administrator determines that such order is a QDRO shall be treated as the Participant's "earliest retirement date" for purposes of Credit Balance benefits and such benefits shall be payable on the date specified in such QDRO, or as soon as practical thereafter and, and (ii) any benefit accrued payable solely as an annuity shall also commence on the date specified in such QDRO; provided that such benefits shall not commence prior to the date the Participant could have commenced receiving such annuity under the applicable Plan provision to such benefit if he/she had separated from service.

## ARTICLE VIII

### Dates of Distribution

**8.1    Earliest Permissible Distribution Dates**

(a)    Subject to the remainder of this Sections, a Participant's vested Accrued Benefit shall not commence prior to the termination of his/her employment with the Company, all Participating Companies and all Affiliated Companies. A Participant's vested Final Salary Benefit shall not commence earlier than the dates (and subject to any adjustments for early payment) set forth in former Sections 9.3, 9.4, 9.5, 9.6 and 9.7 A Grandfathered Participant's vested benefit under Section 4.6 shall not commence earlier than (i)for the benefit described in Section 4.6 (a), the dates set forth in Section 6 of the Chase Plan with respect to the payment of the benefit described in Section 7.2 of the Chase Plan and (ii)for the benefit described in Sections 4.6(b) and 4.6(c), the dates set forth in Chase Lincoln First Bank N.A. Retirement Plan  (as applicable to such benefits)). . Solely for purposes of a distribution, the definition of an Affiliated Company is modified to substitute fifty-one percent for eighty percent.

CBPJPMC00000533

(b)     If a Participant dies before his/her Annuity Starting Date under this Article VIII, the vested Accrued Benefit of such Participant, if any, shall commence at the times and in the forms set forth in Section 7.6.

(c)     Notices of elections and applications for Plan benefits shall become effective only when made on a Notice to the Plan Administrator; and the Plan Administrator may delay payment of a benefit until said notices of elections and applications for Plan benefits are received by the Plan Administrator. Upon receipt of a proper Notice to the Plan Administrator requesting a distribution of benefits, benefits shall commence within a reasonable period following such receipt or, if later, the date specified in the Notice.

(d)     For purposes of this Article VIII, if a purchaser or a transferor (which must not be an Affiliated Company) purchases or acquires from an Employer or an Affiliated Company the assets used by such Employer or an Affiliated Company in a trade business or the stock of any Affiliated Company and assumes this Plan or accepts a transfer of assets and liabilities from this Plan to a qualified plan maintained by the purchaser or transferor with respect to the Accrued Benefit of a Participant, then such Participant shall not be treated as having (i) terminated employment under this Plan or (ii) in the case of a transfer of assets and liabilities, an Accrued Benefit under this Plan. If such purchaser or transferor does not assume the Plan or accept a transfer of assets and liabilities to a qualified plan maintained by the purchaser or transferor with respect to the Accrued Benefit of a Participant, such Participant who is subsequently employed by such purchaser or transferor shall not be treated as having retired or incurring a Severance Date. The Participant must terminate employment with such purchaser or transferor, or any other employer considered part of the controlled group of such purchaser or transferor before becoming eligible for a distribution with respect to his/her Accrued Benefit; provided that, in such circumstances, a portion of the Accrued Benefit may be distributable but only if and to the extent that, as a result of a "Qualified

53

CBPJPMC00000534

Transaction," defined below, a distribution of the benefit accrued under the Prior Plan as of December 31, 1992 plus Interest and Transition Credits thereon would have been made under the terms of the Prior Plan. A Qualified Transaction shall mean a sale or transfer of stock or assets used in a trade or business, after which neither an Employer nor any Affiliated Company retains an interest in the purchased or transferred business of 50% or more, measured by value or voting power.

8.2    Credit Balance Dates of Distribution

(a)    A Participant who has terminated employment as an Employee may elect at any time to receive a distribution of the portion of his/her vested Accrued Benefit attributable to the Credit Balance by giving Notice to the Administrator. For Severance Dates prior to January 1, 1993, the terms of the Prior Plan shall govern distributions. For a participant in the Chase Plan who incurs a Severance Date prior to January 1, 1997, the terms of the Chase Plan shall govern the timing and form of distribution.

(b)    Once a Participant makes a proper election, such portion of the vested Accrued Benefit attributable to the Credit Balance will be paid or payment will commence as soon as administratively practical following receipt of the Notice to the Administrator, or if later, on the date set forth in such election, but not later than such Participant's Normal Retirement Date.

(c)    If a Participant elects to defer the distribution of his/her Credit Balance until a date certain by giving a Notice to the Administrator, the distribution of such benefit may not be deferred beyond such date certain, but distribution may be accelerated to an earlier date than originally elected.

54

CBPJPMC00000535

**8.3    Grandfathered Participant**

In lieu of any other benefit, a Grandfathered Participant may elect to receive his/her (i) benefit described in Section 4.6(a) at such dates as specified by Section 6 of the Chase Plan with respect to the payment of the benefit described in Section 7.2 of the Chase Plan and (ii) the benefit described in Sections 4.6(b) and 4.6(c) at such dates specified by the Chase Lincoln First Bank N.A. Retirement Plan (as applicable to such benefits). The benefit of any Grandfathered Participant shall be subject to any reduction for payment prior to the Normal Retirement Date (i)for the benefit described in Section 4.6(a), as set forth in the Chase Plan with respect to the payment benefit described in Section 7.2 of the Chase Plan and (ii)for the benefit described in Sections 4.6(b) and 4.6(c) as set forth in the Chase Lincoln First Bank N. A. Retirement Plan (as applicable to such benefits).

**8.4    Failure to Make an Election**

(a)    Subject to Section 8.4 below, if a Participant fails to elect by Notice to the Administrator to commence receiving benefits under the Plan, his/her vested Accrued Benefit under the Plan must commence not later than the 60th day after the close of the Plan Year in which the latest of the following events occurs:

(i)    the Participant attains Normal Retirement Age, or

(ii)    the Participant terminates employment with the Company, all Participating Companies and all Affiliated Companies, or

(iii)    the tenth anniversary of the year in which the Participant commenced participation in the Plan.

CBPJPMC00000536

**8.5    Latest Permissible Distribution Dates**

(a)(i)    Notwithstanding Sections 8.1 through 8.4 above, unless otherwise provided by law, distribution of each Participant's vested Accrued Benefit must commence, in accordance with Code Section 401(a)(9) and regulations thereunder, no later than the Required Beginning Date; provided, that with respect to a Participant who is not a five percent owner, commenced distributions in accordance with Code Section 401(a)(9) as then in effect prior to January 1, 1997 and had not terminated employment, then such Participant had a one time option during 1998 to have the payment of such minimum benefits suspended until he or she is otherwise required to again commence distribution pursuant to the Required Beginning Date rules; provided further that a Participant who became 70 ½ on or after December 31, 1996, may elect to receive his/her Accrued Benefit at any time thereafter.

(a)(ii)    Effective January 1, 1997, this Section 8.5 (a)(ii) shall be applicable solely with respect to a Grandfathered Participant described in Section 4.6 or a Participant with a Frozen Minimum Benefit based on a final pay benefit formula. (This Section has no application to the Credit Balance or any other cash balance benefit.) In the case of any such Participant whose employment terminates in a calendar year after the calendar year in which the Paricipant attains age 70 ½ and whose retirement benefit commences to be distributed after April 1 of the calendar year following the calendar year in which the Participant attains age 70 1/2, the Participant's benefit derived from the final pay benefit formula shall be increased in accordance with the Actuarial Equivalent assumptions used for calculating lump sums in Appendix V to take into account the period of the deferral of benefit following April 1 of the calendar year following the calendar year in which the Participant attained age 70 ½ to the extent required by applicable Treasury Regulations. Any actuarial increase provided under the preceding sentence for a Plan Year shall be reduced by any benefits accrued by the Participant for such plan year under a final pay forumula, so that the Participant shall receive the greater of (i)any actuarial increase provided under the preceding sentence or (ii) the benefits accrued by the Participant for such period under any final pay formula.

(b)    A Participant, who commences receiving distributions from the Plan while an Employee under this Section 8.5, may elect any form of benefit set forth in Article VII, provided,

CBPJPMC00000537

however, that, in accordance with Code Section 401(a)(9) and the regulations thereunder, such distributions shall not be paid over a period that exceeds (i) the life of such Participant, (ii) the lives of such Participant and his/her Beneficiary, (iii) the life expectancy of the Participant, or (iv) the joint life expectancy of the Participant and his/her Beneficiary. For this purpose, the life expectancy of a Participant and his/her spouse may not be recalculated. Such distributions must also comply with the incidental death benefit requirements of Code Section 401(a)(9)(G) and regulations thereunder.

(c)    A Participant who commences receiving minimum distributions under this Section 8.5, and subsequently incurs a Severance Date may elect a new form of benefit with respect to his/her vested Accrued Benefit attributable to Article IV (but not with respect to his/her vested Accrued Benefit attributable to former Article V (the Final Salary Benefit).

(d)    Notwithstanding any other Plan provision to the contrary, no distribution shall be made under the Plan which (i) commences on a date later than the date permitted under Code Section 401(a)(9), or (ii) is distributed over a period of time greater than the period permitted under Code Section 401(a)(9).    Code Section 401(a)(9) and regulations thereunder are incorporated herein by reference.

8.6    **Payments to Individuals on Long-Term Disability**

A Participant who becomes eligible for benefits in excess of 24 months under the Disability Plan after January 1, 1997 as a result of a total and permanent disability certified by the Social Security Administration (if not eligible for said certification, so certified by the third party claims administrator or insurer) may elect to receive the portion of his/her Accrued Benefit described in Article IV at any time after such certification; provided that accruals under Article IV shall cease. The portion of his or her Accrued Benefit described in former Article V or in Section 4.6 shall be distributable after satisfying the age and service requirements set forth in former Section 5.2(a) or 5.2(c) or the Chase Plan or the Chase Lincoln First Bank N.A. Retirement Plan, as applicable.

57

CBPJPMC00000538

**8.7    Payments Due Infants and Incompetents**

If any Participant or Beneficiary who is entitled to receive payments hereunder is incapable of receiving or disbursing the same by reasons of age, illness, infirmity, or any other incapacity of any kind, the Plan Administrator upon receipt of satisfactory evidence of incapacity may direct the Trustee to apply such payment directly for the comfort, support, and maintenance of such Participant, or Beneficiary or to pay the same to any responsible person caring for the Participant or Beneficiary who is determined by the Plan Administrator to be qualified to receive and disburse such payments for the benefit of such individual; and the receipt by such person shall be a complete acquittance for the payment of the benefit. Payments pursuant to this Section shall be a complete discharge to the extent thereof of any and all liability of the Employer, the Plan Administrator, the Trustee and the Trust Fund.

**8.8    Eligible Rollover Distribution**

A Participant or Beneficiary who is the Participant's Surviving Spouse or a former spouse who is an alternate payee within the meaning of Section 414(p) of the Code may elect to have any portion of his or her Accrued Benefit which constitutes an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan as specified in a Notice to the Administrator.

## ARTICLE IX
### Fiduciaries

**9.1    The Benefits Fiduciary Committee.**

(a)    The members of the Benefits Fiduciary Committee shall have the authority jointly to control and manage, as a named fiduciary, the operation and administration of the Plan, subject to the provisions of Sections 9.2, 9.3, 9.4 and 9.5 hereof. The members of the Benefits Fiduciary Committee shall be designated by the Board to serve until the next annual organization meeting of the Board and until their successors are designated and qualified. The term of members of the Benefits Fiduciary Committee may be renewed from time to time without limitation as to the number of renewals. Any member of the Benefits Fiduciary Committee may resign upon not less than 60 days notice, or be removed by the Board at any time. Any

CBPJPMC00000539

instrument or document signed on behalf of the Benefit Committee by any member of the Benefits Fiduciary Committee may be accepted and relied upon as the act of the Benefits Fiduciary Committee.

(b)     The Benefits Fiduciary Committee shall have authority to direct the Trustee or any other funding agency with respect to any payments or disbursements from the Plan. The Benefits Fiduciary Committee shall also have full discretionary power to construe and interpret the provisions of the Plan and to determine any questions of fact and eligibility for benefits, including participation, which may arise under the Plan.  Any such construction or interpretation shall be conclusive and binding on any Participating Company, any employee of an Participating Company, any Participant and any Beneficiary thereof.   Any reference to the "Plan" herein shall be deemed to include, unless the context clearly requires otherwise, the Declaration of Trust and any other documents or instruments comprising a part of the Plan.

(c)     The Benefits Fiduciary Committee shall have no responsibility for the management or control of the assets of the Plan.

**9.2     Plan Investment Management Committee.**

(a)     The Plan Investment Management Committee or any other person or persons or entity or entities designated by the Board shall be the named fiduciary with respect to appointment of a trustee or trustees to act under the Plan and an investment manager or managers to invest Plan assets. An appointment authorized under this Section 9.2 shall be upon such terms and conditions as the Plan Investment Management Committee may determine, provided that, without the express approval of the Board, the Plan Investment Management Committee shall not enter into any agreement under this section which does not provide for the termination thereof by the Plan Investment Management Committee upon reasonable notice to the other party or parties to the agreement.   Any instrument or document signed on behalf of the Plan Investment Management Committee by any member of the Plan Investment Management Committee may be accepted and relied upon as the act of the Plan Investment Management Committee.

59

CBPJPMC00000540

(b)    The Plan Investment Management Committee shall cause to be established an investment policy and a funding policy for the Plan giving regard to the objectives of the Plan, the short and long run financial needs thereof, and such other factors as they deem appropriate.

**9.3    Named Fiduciaries.**    Collectively, the Benefits Fiduciary Committee and the Plan Investment Management Committee shall be referred to herein as the "Named Fiduciaries" and the provisions hereof shall constitute a formal allocation of responsibilities among Named Fiduciaries.

**9.4    Administrator.**    The head of the Human Resources Department of the Bank or any other person or persons designated by the Board shall be the Plan Administrator.    The Plan Administrator shall have the powers and duties set forth in the Plan and those of an administrator under ERISA and shall have the powers under the Plan required in order to carry out such duties. Without limitation of the foregoing, the Plan Administrator shall have the duty to furnish, publish and file as and to the extent required by ERISA, summary plan descriptions, plan descriptions, annual reports (including any financial statements), summary annual reports, and reports of Participants' benefits rights, and to maintain records with respect to the foregoing, and to deal with any qualified domestic relations orders under Section 414(p) of the Code, and shall have the right to retain qualified public accountants and enrolled actuaries in order to carry out his or her duties in accordance with ERISA.

**9.5    Board of Directors.**    The fiduciary responsibilities of the Board shall be limited to:

(a)    designation and removal of the Benefit Fiduciary Committee, in accordance with the provisions of Article IX hereof,

(b)    designation and removal of the Plan Investment Management Committee, of in accordance with the provisions of Article IX hereof, and

60

        (c)      designation and removal of the Administrator of the Plan, in accordance with the provisions of Article IX hereof.

9.6    **Power of Delegation** . The Named Fiduciaries and the Board shall have the power to designate one or more persons, other than a Named Fiduciary, to whom the Named Fiduciaries may delegate, and among whom the Named Fiduciaries may allocate, specified fiduciary responsibilities (other than trustee responsibilities as defined in Section 405(c)(3) of ERISA) under the Plan. Any such designation shall be in writing and shall specify the person or persons so designated, and the terms of the delegation. Without the express approval of the Board of Directors, the Named Fiduciaries shall not enter into any delegation under this section which does not provide for the termination thereof by the Named Fiduciaries upon reasonable notice to such person or persons. Without limiting the generality of the foregoing, the Named Fiduciaries shall have the power to delegate, in accordance with the foregoing provisions of this subsection, to one or more persons the authority: (a) to determine the amount of benefits due to any person under the Plan, (b) to execute, in the name and on behalf of a Named Fiduciary, any direction for payment of any benefit under the Plan, (c) to maintain records and accounts and to have custody of the documents, the preservation of which is deemed necessary or convenient in the efficient operation of the Plan, and (d) to determine the form of any benefit payment the form of which is required under the Plan to be established by a Named Fiduciary.

9.7    **Reports of the Named Fiduciaries.** The Named Fiduciaries hereunder shall report, not less often than annually, to the Compensation and Benefits Committee of the Board (or other such persons as the Board may designate) on the performance of their responsibilities and those of the Trustee and of any other persons appointed pursuant to this Section. Such reports shall contain such information, in such detail, as said Committee shall require.

9.8    **Service in Various Fiduciary Capacities.** Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan, and any fiduciary may serve as such in addition to being an officer, employee, agent or other representative of a party in interest.

CBPJPMC00000542

**9.9    Ministerial Plan Services.**  A Named Fiduciary or any other fiduciary may designate any employee of the Bank or other Employer or any other person to perform any ministerial services in the administration of the Plan.  A fiduciary shall furnish any such person with such framework of policies, interpretations, rules, practices and procedures as the Fiduciary shall deem necessary or appropriate.   A fiduciary may rely on any information, data, statistics, reports or analyses furnished by any such person.  Without limitation of the foregoing, the fiduciary may designate any person or persons or office to receive on behalf of the fiduciary any claim or notice or provide on behalf of the fiduciary any notice or communication.

**9.10    Power to Make Rules and Retain Services.**   Any Named Fiduciary or Administrator shall have the authority to make such rules and regulations and to retain such clerical, legal, accounting, actuarial and other services as it may deem necessary or appropriate in the exercise of its authority hereunder.   Each Committee may appoint from among its member such subcommittee with such powers as the applicable Committee shall determine and may authorize one or more of its member, or any agent, to act on its behalf.  Such Named Fiduciary may be also delegate to other powers to act on behalf of the Committee.

**9.11    Expenses.**  Any Named Fiduciary may defray the reasonable expenses which it may incur in the administration of the Plan from the assets of the Plan unless such expenses shall be paid by the Company or other Employer.

**9.12    Manner of Exercise of Authority.**  The Named Fiduciaries shall exercise their authority consistently with the requirements of ERISA.

**9.13    Indemnity.**  The Bank hereby covenants and agrees to indemnify each member of the Benefit Fiduciary Committee and the Plan Investment Management Committee, as well as any Plan fiduciary who is or was, during the period that he or she was performing fiduciary functions, an employee of the Company or any Affiliated Company (collectively, a "Covered Fiduciary") and to keep and hold such person harmless from and against any and all damages, costs, liabilities, expenses, actions, claims, demands and accounts whatsoever which such person may

CBPJPMC00000543

incur, whether jointly or severally, individually or as a fiduciary, by reason of or in any manner arising, directly or indirectly, from any action taken as a Covered Fiduciary or by reason of any omission to act while serving as a Covered Fiduciary, except with respect to any act or omission which constitutes gross negligence or willful misconduct. No action taken or omitted to be taken by any Covered Fiduciary on the advice of counsel (who may be counsel to the Bank) shall be regarded as an act or an omission constituting gross negligence or willful misconduct for the purposes of this indemnification, and any Covered Fiduciary may rely upon such advice, including, without limitation, advice with respect to the effectiveness of such person's appointment and of any delegation or allocation to such person of fiduciary responsibilities or powers, and with respect to the scope of such responsibilities or powers. This indemnification shall extend to each Covered Fiduciary upon such person's acceptance of appointment as a Covered Fiduciary and shall be effective in respect of any and all acts or omissions of such Covered Fiduciary during such person's period of service as a Covered Fiduciary.

## ARTICLE X
### Claims Procedure

**10.1    Submission of Claims.** Any Participant or any other person entitled to benefits under the Plan ("claimant"), or his or her duly authorized representative, may make a claim for a Plan benefit by filing such claim in writing with the Administrator. For this purpose, any claim relating to the right to participate shall be deemed a "claim" for these purposes. Such claims shall be considered by the persons or the department or office designated by the Benefit Fiduciary Committee for such purpose.

**10.2    Process for Denying a Claim.** In the event that a claim is denied, in whole or in part, a claimant shall be furnished with notice of the decision by the Administrator within a reasonable period of time after the filing of the claim. Such notice of the decision shall be in writing and shall state the specific reason(s) for the denial, the specific provision(s) of the Plan on which the denial was based, additional material or information necessary (if any) for the claimant to perfect the claim as well as an explanation of why such material or information is necessary, and an

63

CBPJPMC00000544

explanation of the claim review procedure set forth in Section 10.3. In the event that notice of the denial of a claim is not furnished within a reasonable period of time, the claim shall be deemed to have been denied for purposes of permitting the claimant to appeal the decision. For purposes of this Section, a period of time will be deemed unreasonable if it exceeds 90 days after receipt of the claim, provided that where special circumstances make a longer period for decision necessary or appropriate, decisions may be postponed, upon written notice to the claimant, for an additional 90 days.

**10.3    Appeal of Denial.** A claimant shall have a reasonable opportunity to appeal a denial of a claim to the Benefit Fiduciary Committee. Such appeal shall be made, in writing, by the claimant or his or her duly authorized representative. The claimant or his or her representative may review pertinent documents and submit issues and comments in writing. A claimant must make a request for such review within a reasonable time, but in no case will he or she be required to make such a request within less than 60 days after receipt by him or her of written notice of the denial of his or her claim.

**10.4    Final Review.** A decision shall be rendered by the Benefit Fiduciary Committee within 60 days after the receipt of the request for review, provided that where special circumstances make a longer period for decision necessary or appropriate, decision may be postponed on written notice to the claimant, for an additional 60 days, but in no event shall decision be rendered more than 120 days after the receipt of such request for review. Any decision by the Benefit Fiduciary Committee shall be in writing and shall set forth the specific reason(s) for the decision and the specific Plan provision(s) on which the decision is based.

CBPJPMC00000545

## ARTICLE XI

## Trust Fund

### 11.1    Declaration of Trust

The Company has executed a Declaration of Trust under which the Company will act as Trustee of the Trust Fund.  The Declaration of Trust contains such provisions as the Company deems appropriate, including, but not by way of limitation, provisions with respect to the powers and authority of the Trustee as to the administration of the Trust Fund and the authority of the Company to amend the Declaration of Trust, to terminate the Trust created thereunder, and to settle the accounts of the Trustee on behalf of all persons having an interest in the Trust Fund.  The Declaration of Trust provides that the Trustee shall follow the directions of the Benefits Fiduciary Committee in making payments of benefits under the Plan.

### 11.2    Incorporation as Part of the Plan

The Declaration of Trust shall be deemed to form a part of the Plan, and any and all rights or benefits which may accrue to any person under the Plan shall be subject to all the terms and provisions of the Declaration of Trust.

### 11.3    Participating Companies

Each Participating Company other than the Company shall, upon becoming a Participating Company, be bound by all the provisions of the Declaration of Trust and the Plan and shall confirm the authority of the Company and each Fiduciary described in Article IX to exercise on behalf of such Participating Company all the rights and powers reserved to the Company and the applicable Fiduciary in said Declaration of Trust and the Plan including, without limiting the generality thereof, the right to amend the Declaration of Trust and Plan, to approve the accounts of the Trustee and to direct distributions from the Trust Fund.  The Trustee shall evidence its acceptance of such instrument.

### 11.4    Plan Expenses

65

CBPJPMC00000546

All expenses that arise in connection with the administration of the Plan and the Declaration of Trust (whether external service providers or otherwise) including, but not limited to, the compensation of the Trustee and of any actuary, accountant, counsel, investment managers or advisers or other person appointed by the Administrator, the Company or the Trustee shall be paid from the Trust Fund unless paid directly by the Company at its election. The Administrator will allocate among the Participating Companies the appropriate share of expenses to be paid by each Participating Company.

## ARTICLE XII
### Amendment of the Plan

**12.1    Plan for Exclusive Benefit of Participants.**  The Board may amend the Plan at any time and any amendment may be made retroactive; provided, however, that except as specified in Section 12.3 and Article XIV, it shall be impossible under any provision of the Plan or any amendment thereto for any interest, ownership or control over the assets of the Trust Fund to vest in the Company, or in any other Participating Company, or for any part of the Trust Fund (other than such part as may be required to pay taxes, administration expenses or fees) to be used for or diverted to purposes other than for the exclusive benefit of Participants or their Beneficiaries, nor shall any amendment reduce the amount of any then Accrued Benefit of a Participant, and further, provided, that no amendment shall eliminate, reduce, or result in prohibited employer discretion with respect to, any protected benefit under Section 411(d)(6) of the Code.

**12.2    Amendments.**  Subject to the foregoing limitations, the Board shall have the power to amend the Plan in any manner which it deems desirable, including increasing or diminishing future accruals to be made hereunder, changing any provision relating to the administration of the Plan, and changing any provision relating to the distribution or payment, or both, of any of the assets of the Trust Fund.  Subject to Section 12.1, the Plan may be amended also retroactively or otherwise. The Board may designate a committee of the Board, an officer of the Bank or both to exercise its authority hereunder to modify or amend the Plan (or its related Trust) and acts by such committee or such officer shall be treated as acts by the Board.  Any amendment shall be binding and

66

conclusive on each other Participating Company without any action on its part.

**12.3    Return of Contributions**

(a)    If a contribution by a Participating Company is conditioned on initial qualification of the Plan as to such Participating Company under Section 401 of the Code, and if the Plan does not so qualify, then Section 12.1 shall not prohibit the return of the contribution to such Participating Company at the direction of the Committee within one year after the date of denial of initial qualification of the Plan.

(b)    If a contribution by a Participating Company is made by a mistake of fact, then such contribution may be returned, at the direction of the Committee, within one year after payment, notwithstanding Section 12.1.

(c)    All contributions by a Participating Company to the Plan are conditioned on their deductibility under Section 404 of the Code.  If a deduction under Section 404 of the Code for a contribution by a Participating Company is disallowed by the Internal Revenue Service, then such contribution may be returned (to the extent of the disallowance), at the direction of the Committee, within one year of the disallowance, notwithstanding Section 12.1.

## ARTICLE XIII

### Merger or Consolidation of Plan

**13.1    Benefit Requirements.**  In the event of any merger or consolidation of the Plan with, or transfer in whole or in part of the assets and liabilities of the Plan to, any other plan of deferred compensation maintained or to be established for the benefit of all or some of the Participants of this Plan, the assets of this Plan applicable to such Participants shall be transferred to such other plan only if each Participant would (if the other plan then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit such Participant would have been entitled to receive immediately before the merger, consolidation or transfer (if this Plan had then terminated).

67

# ARTICLE XIV

## Termination of the Plan

**14.1**   **Voluntary.**  The continuance of the Plan and the payment of contributions under the Plan are entirely voluntary and are not assumed as contractual obligations of any Employer.   The Company (for itself and the other Employers) reserves the right, by action of the Board, to terminate the Plan in whole or in part at any time and for any reason.

**14.2**   **Termination**

    (a)   In the event of termination of the Plan, assets of the Plan allocable to affected Participants shall be allocated to affected Participants in accordance with law and the terms of this Plan.  Any such allocated amounts shall be applied in the manner determined by the Plan Administrator to the payment of benefits to the persons entitled thereto.

    (b)   In the event of termination or partial termination of the Plan, the Accrued Benefit credited to affected Participants on the date of such termination or partial termination, to the extent not already vested, shall be fully vested and nonforfeitable to the extent funded as of such date; provided, however, that in the event of the termination of the Plan a Participant shall not have recourse toward satisfaction of any nonforfeitable benefits other than from the Trust Fund and the PBGC.

    (c)   Any assets remaining in the Trust Fund after the full satisfaction of all liabilities under the Plan shall be returned to the Company.

**14.3**   **Section 401(a)(4) - Restriction on Benefits and Distribution**

    (a)   In the event of a termination of the Plan, benefits and distribution shall be restricted for any Restricted Employee or Restricted Former Employee as set forth below.

68

CBPJPMC00000549

(b)     In the event of a termination of the Plan, benefits of a Restricted Employee or Restricted Former Employee shall be limited to a benefit that is nondiscriminatory under Section 401(a)(4) of the Code.

(c)     Annual payments to any Restricted Employee or Restricted Former Employee shall be limited to an amount equal to the payments that would be made on behalf of such Employee under a single life annuity that is the Actuarial Equivalent of the sum of the Employee's Accrued Benefit and other benefits (other than a Social Security supplement described in Regulation 1.411(a)-7(c)(4)(ii), if any), under the Plan and the amount the Participant is entitled to receive under a Social Security supplement. Notwithstanding the foregoing, this paragraph (c) shall not apply if:

   (i)      after the payment to the Restricted Employee or Restricted Former Employee of all benefits (if any) and his Accrued Benefit, the value of the assets of the Plan equal or exceeds 110 percent of the value of all current liabilities as defined in Section 412(l)(7) of the Code, or

   (ii)     the value of the benefits (including, Accrued Benefits) for a Restricted Employee or Restricted Former Employee is less than one percent of the value of current liabilities before distribution, as defined in Section 412(l)(7) of the Code.

(d)     For the purpose of this Section 14.3.

   (i)      "Restricted Employee or Restricted Former Employee" means a group of Employees or former Employees consisting of the 25 highest paid Employees or former Employees.  For these purposes, compensation shall include all remuneration from an Employer.

   (ii)     "Benefit" means, solely for purposes of this Section 14.3, loans in excess of the amounts set forth in Section 72(p)(2)(A) of the Code, any periodic

69

CBPJPMC00000550

income, any withdrawal values payable to a living Employee and any death benefits not provided for by insurance on an Employee's life.

## ARTICLE XV

### Miscellaneous Provisions

**15.1** **Construction.**

All questions pertaining to the construction, regulation, validity and effect of the provisions of the Plan shall be determined in accordance with the laws of the State of New York except as superseded by ERISA. The headings and subheadings contained herein are inserted for convenience of reference only.

**15.2** **Employment Status and Rights.**

The adoption and maintenance of the Plan shall not be deemed to constitute a contract between any Participating Company and any Employee or Participant, or to be consideration for or an inducement or condition of, the employment of any person. Nothing herein contained shall be deemed to give to any Employee or Participant the right to be retained in the employ of a Participating Company or to interfere with the right of a Participating Company to discharge any Employee or Participant at any time.

**15.3** **Source of Benefit Payments.**

All benefits payable under the Plan shall be paid or provided for solely from the Trust Fund held by the Trustee. However, if an annuity contract or group annuity contract is or has been purchased to fund all or part of benefits of some or all Participants, then the source of payment of the affected benefits to the Participant shall be such an annuity contract or group annuity contract.

**15.4** **Non-Assignability.**

Except to the extent required by law, no benefit payable out of the Fund to any person (including any Participant or Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate,

70

CBPJPMC00000551

sell, transfer, assign, pledge encumber or charge the same shall be void; no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized under the Plan. In the event that the Committee receives a domestic relations order, it shall determine, in accordance with procedures determined by it, whether the order is a "Qualified Domestic Relations Order," as defined in Code Section 414(p). If the order is a Qualified Domestic Relations Order, the terms of such order shall be followed by the Plan, notwithstanding the foregoing provisions of this Section 15.4. In the event that the Plan Administrator determines that an overpayment of all or any portion of an Accrued Benefit has occurred, such Plan Administrator may take such steps as he may deem appropriate to recover such overpayment, including but not limited to, reducing benefits in pay status.

15.5    **Appendices.**

The following appendices are part of this Plan -- Appendix I - XI

CBPJPMC00000552

**APPENDIX I, as Amended**

Maximum Benefits
Section 415

This Appendix is intended to impose a maximum limit on the benefits payable under this Plan to comply with the requirements of Code Section 415. Accordingly, Code Section 415 and the regulations thereunder, as amended from time to time, are incorporated in this Appendix to override inconsistent provisions of this Plan, if any. In all events, if a benefit in pay status has been limited by Code Section 415, there shall be no further increases under this Plan because of changes to Code Section 415, including but not limited to periodic indexing of the dollar limitations under Code Section 415.

1.1    Code Section 415 Limits Generally.  (a) Notwithstanding anything herein to the contrary, the amount of the annual benefit payable to a Participant under the Plan, and any other defined benefit plan (whether or not terminated) of an Employer or an Affiliated Company (the "Annual Benefit") shall not exceed the lesser of:

(i)    the primary limit imposed by Code Section 415(b), and

(ii)    with respect to benefits in pay status under this Plan prior to January 1, 2000, in combination with the 401(k) Savings Plan of The Chase Manhattan Bank, the combined limit imposed by Code Section 415(e).

(b)    "Annual Benefit" means the annual benefit payable in the form of a single life annuity, a Joint and 50% Survivor (Spouse) Annuity or the Joint and Survivor Benefit (if the joint annuitant is the Participant's Surviving Spouse and the benefit payable to the Surviving Spouse is at least 50%, but not greater than 100% of the benefit payable to the Participant). For any other form of benefit, the dollar limit in Section 1.2(a) shall be applied by converting the

CBPJPMC00000553

form of benefit payable to an actuarially equivalent single life annuity, commencing at the same age using (i) the Actuarial Equivalent assumptions of the Plan or (ii) 5 percent and the mortality assumptions specified in Appendix V for lump sums, whichever results in the greater benefit; , provided, however that in determining the actuarially equivalent straight life annuity for a benefit form subject to Section 417(e) of the Code, such actuarial equivalent shall be determined using only the Actuarial Equivalent assumptions specified in Appendix V for lump sums; further provided, however that no actuarial adjustment is required for the value of ancillary or incidental benefits. "Annual Benefit" does not include employee contributions, rollover contributions or assets transferred from a qualified plan that was not maintained by an Employer or an Affiliated Company.

(c)     For purposes of this Appendix I, in determining what is an Affiliated Company, the phrase "more than 50%" shall be substituted for the phrase "at least 80%" in each place it appears in Code Section 1563(a)(1).

1.2     <u>Primary Limit under Code Section 415</u>.    (a) Under the primary limit imposed by Code Section 415(b), the maximum Annual Benefit payable to a Participant may not exceed the lesser of:

(i)     $90,000 increased annually during the Participant's employment to reflect the cost-of-living adjustment set forth in Code Section 415(d)(1)(A) but only for the year in which such adjustment is effective, or

(ii)     100 percent of the Participant's average annual Total Compensation (as defined below) for the Participant's three highest paid consecutive Plan Years while an active Participant ("highest three year average compensation");

provided, however, that the primary limit on the Annual Benefit payable to a former Participant shall be increased after the Employee's separation from service but before his or her benefit is in pay status to reflect post-separation increases in the cost-of-living, as provided by Code Section 415(d)(1)(A) and (B) and the regulations thereunder; provided, further, that if such former Participant receives his or her benefit from the Supplemental Retirement Plan of Manufacturers Hanover Trust Company and Certain Affiliated Companies in a single lump sum, the cost-of-living adjustment set forth in the first proviso shall not be made.

CBPJPMC00000554

(b)    For purposes of this Appendix I, "Total Compensation" means compensation determined in accordance with Code Section 415(c)(3) but including salary reductions under Code Section 132(f).

1.3    Reduction of Primary Limit for Former Participants with Less than Ten Years. (a) If a former Participant has less than 10 years of participation (as defined in Code Section 415(b)(5) and as modified by Code Section 415(b)(5)(D), the maximum Annual Benefit payable under Section 1.2(a) shall be reduced by multiplying such dollar amount by a fraction in which the numerator is the actual number of years, or parts thereof, of participation in the Plan (and predecessor plans), and the denominator is ten (but not less than 1/10).

(b)    If a former Participant has less than 10 years of service (as defined in Code Section 415(b)(5)), the maximum Annual Benefit payable under Section 1.2(b), shall be reduced by multiplying the amount by a fraction in which the numerator is the actual number of years, or parts thereof, of such service, and the denominator is ten (but not be less than 1/10). Likewise, the denominator of the defined benefit fraction in Section 1.8 shall be reduced by the same fraction but years of service shall include future years of service occurring before the Participant's Normal Retirement Age.

1.4    Impact of Early and Late Commencement of Benefits. (a) If a Participant's Annual Benefit commences before the Participant's social security retirement age, but on or after age 62, the dollar limit in Section 1.2(a) shall be reduced (after adjustment under Section 1.3, if any) as follows:

(i)    If the social security retirement age is 65, the reduction shall be 5/9 of one percent per month for each month by which benefits commence prior to the month the Participant attains 65; and

(ii)    If the social security retirement age exceeds 65, the reduction shall be 5/9 of one percent for each of the first 36 months and 5/12 of one percent for each of the additional months (up to 24 months) by which benefits commences prior to the month the Participant attains social security retirement age.

(b)    If a Participant's Annual Benefit commences before he or she reaches 62, the dollar limit in Section 1.2(a) shall be the actuarial equivalent of an Annual Benefit commencing at age 62 as determined above, using (i) the Plan's interest rate and mortality assumptions for

CBPJPMC00000555

early retirement reductions (if any) or (ii) a 5 percent interest rate and the mortality assumptions specified in Appendix V for lump sums, whichever creates the smaller defined benefit dollar limitation, in accordance with Treasury Regulations.

(c)    For benefits based on a final pay benefit formula, if a Participant's Annual Benefit commences after social security retirement age, the dollar limit in Section 1.2(a) shall not be adjusted for such delay. With respect to a Credit Balance and other cash balance benefits, if a Participant's Annual Benefit commences after social security retirement age, the dollar limit in Section 1.2(a) shall be the actuarial equivalent of an Annual Benefit commencing at social security retirement age (after adjustment under Section 1.3, if any) using (i) the interest credit rate or (ii) a 5 percent interest rate, whichever results in the lesser defined benefit dollar limitation, in accordance with Treasury Regulations.

(d)    Social security retirement age means the age used as the retirement age under section 216(1) of the Social Security Act, which is presently 65 for a person born before 1938, age 66 for a person born between 1938 and 1954, and age 67 for a person born after 1954.

1.5    Special $10,000 Rule.    If a Participant has never participated in a defined contribution plan, a welfare benefit plan described in Code Section 419(e), or an individual medical account described in Code Section 415(1)(2) maintained by an Employer or an Affiliated Company, the primary limit set forth in Section 1.2 shall not prevent such Participant from receiving an Annual Benefit of up to $10,000 multiplied by a fraction in which the numerator is the actual number of years, or parts thereof, of service (as defined in Code Section 415(b)(5), and the denominator is ten (but not less than 1/10).

1.6    TEFRA Code Section 415 Grandfather.    In the case of an individual (i) who was a participant of the Prior Plan, Chase Plan or the MHT Plan before January 1, 1983, and (ii) had an accrued benefit that would otherwise exceed Section 1.2, the primary limit under Code Section 415(b) for such individual shall be equal to such accrued benefit. For this purpose "accrued benefit" means the individual's accrued benefit on December 31, 1982 under the terms and conditions of the Prior Plan or the MHT Plan and the Code Section 415 limits as effective on July 1, 1982, disregarding any cost-of-living adjustments occurring after July 1, 1982.

1.7    TRA 86 Code Section 415 Grandfather.    In the case of an individual (i) who was a participant of the Prior Plan, Chase Plan or the MHT Plan on January 1, 1987, and (ii) had an accrued benefit that would otherwise exceed Section 1.2, the primary limit under Code Section 415(b) for such individual shall be equal to such accrued benefit. For this purpose "accrued

CBPJPMC00000556

benefit" means the individual's accrued benefit on December 31, 1986 under the terms and conditions of the Prior Plan or the MHT Plan and the Code Section 415 limits effective on May 5, 1986 (including any adjustment made under Section 1.5), disregarding any cost-of-living adjustments occurring after May 5, 1986.

1.8    Combined Fraction Limit.    (a)  For benefits in pay status prior to January 1, 2000 under this Plan, Chase Plan, MHT Plan or any other predecessor plan, the sum of a Participant's defined benefit fraction (as defined below) and defined contribution fraction (as defined below) shall not exceed 1.0 in any Plan Year. For this purpose:

   (1)  "Defined benefit fraction" means a fraction, the numerator of which is the sum of the Participant's projected annual benefits under all defined benefit plans (whether or not terminated) of the Employer and Affiliated Companies, and the denominator of which is the lesser of 125 percent of the dollar limit in effect for the Plan Year under Code Section 415(b)(1)(A) (including any adjustments to such limitation under Sections 1.3, 1.6 and 1.7) or 140 percent of highest three year average compensation (as defined in Section 1.2).

   (2)  "Defined contribution fraction" means a fraction, the numerator of which is the sum of the annual additions(as determined under Code Section 415(c) for the year in which such annual additions were credited) credited to the account of a Participant in all years up to the close of the current year under one or more defined contribution plans (whether or not terminated) maintained by any Affiliated Company (whether before or after it became an Affiliated Company), including any amounts credited to a welfare benefit fund or an individual medical account described in Code Sections 419(e) and 415(1)(2) respectively, and the denominator of which is the sum of the maximum aggregate amounts for the current and all prior years of service with any Affiliated Company (regardless of whether a defined contribution plan was maintained by such employer). The maximum aggregated amount in any year is the lesser of 125 percent of the dollar limit in effect under Code Section 415(c)(1)(A) or 25 percent of the Participant's Total Compensation for such Year.

CBPJPMC00000557

(3)     "Projected annual benefit" means the Annual Benefit as defined in Section 1.1 that the Participant would be entitled to under the Plan, or any other defined benefit plan, if the Participant were to continue to participate in the Plan until his or her Normal Retirement Age (or current age, if later), and the Participant's Total Compensation for the current Plan Year and all other relevant factors used to determine benefits under the Plan, or any other defined benefit plan, were to remain constant for all future years.

(b)    If the Participant's defined benefit fraction and defined contribution fraction would otherwise exceed 1.0, the Participant's benefit accruals under this Plan shall be reduced to the extent necessary to prevent such combined fraction from exceeding 1.0 in the following order:

(A)     first, the Participant's Final Salary Benefit for the period prior to January 1, 1997, if any, accruals or the benefit described under Section 4.6 for the Plan Year shall be reduced, and if such reduction is not sufficient, then;

(B)     second, the Participant's Credit Balance accruals for the Plan Year shall be reduced, and if such reduction is not sufficient, then;

(C)     third, the Participant's accruals under the 401(k) Savings Incentive Plan of The Chase Manhattan Bank shall be reduced.

1.9    TEFRA Combined Fraction Grandfather.  If a Participant's defined contribution fraction plus defined benefit fraction for the last year beginning before January 1, 1983 would otherwise exceed 1.0, then the numerator of the defined contribution fraction shall be permanently reduced, in accordance with applicable regulations, by an amount so that the sum of the defined benefit fraction and defined contribution fraction does not exceed 1.0 for such year.

1.10    TRA 86 Combined Fraction Grandfather.  With respect to the sum of a Participant's defined contribution fraction plus defined benefit fraction for the last year beginning before January 1, 1987, in accordance with applicable regulations, an amount shall be

I-6

permanently subtracted from the numerator of the defined contribution fraction (not exceeding such numerator) so that the sum of the defined benefit fraction and defined contribution fraction computed under Code Section 415(e)(1) (determined as if the Code Section 415(e)(1) which are effective for the first year beginning after December 31, 1986, were in effect for such year) does not exceed 1.0 for such year.

1.11    <u>Application to other Plans</u>.  With respect to the Chase Plan, MHT Plan, Prior Plan and any other predecessor plan with which the Plan has been merged, if a benefit from one of such plans has been limited by Code Section 415, there shall be no further increases under such plans as a result of changes to Code Section 415, including periodic indexing of the dollar limitations under Code Section 415.

I-7

CBPJPMC00000559

## APPENDIX II

### MHT Plan Transaction Rules

This Appendix describes transactions set forth in the MHT Plan which impacts the calculation of service, vesting and benefits under this Plan including the frozen benefits described in Section 5.5; provided that, in the event of any inconsistency between this Appendix and the MHT Plan with respect to the matters described herein, the MHT Plan shall control; provided, further, that the benefit accruals set forth in the MHT Plan ceased as of December 31, 1992.

2.1    Acquisition of CIT. (a) Every Eligible Employee (as defined in the MHT Plan) who was a participant of the Retirement Plan for Employees of C.I.T. Financial Corporation and Certain of its Subsidiaries as such plan existed immediately preceding July 1, 1986 (the "C.I.T. Plan"), became a participant of the MHT Plan on July 1, 1986.

(b)    Every Eligible Employee (as defined in the MHT Plan) who was employed by The C.I.T. Group ("C.I.T.") on July 1, 1986 and who was not a participant of the C.I.T. Plan on July 1, 1986 became a participant of the MHT Plan on the earlier of (i) the date he or she would have become a participant of the C.I.T. Plan if the provisions thereof had remained in effect, or (ii) upon satisfaction of the eligibility requirements under the MHT Plan as then in effect.

(c)    As provided in Article III, a Member's (as defined in the MHT Plan) service with C.I.T. prior to July 1, 1986 are be counted in accordance with the rules of the MHT Plan towards the Member's Years of Service (as defined in the MHT Plan) under the MHT Plan.

(d)    As provided in Article III, a Member's benefit service on account of service with C.I.T. prior to July 1, 1986 are counted in accordance with the rules of the MHT Plan towards the Member's Years of Benefit Service under the MHT Plan; provided, however, that this provision shall not result in the crediting of any day of service towards more than one Year of Benefit Service (i.e., there shall be no double-counting as a result of this section).

(e)    See benefit formula for C.I.T. in Section 7.1(e) of MHT Plan.

(f)    With respect to any Member who was (i) actively employed by C.I.T. and a member of the C.I.T. Plan on June 30, 1986, and (ii) age 54 with 9 years of benefit service

CBPJPMC00000560

under the C.I.T. Plan on June 30, 1986, such Member's normal retirement benefit may be paid in one of the optional forms pursuant to the provisions of sections 8.2 and 8.3 of the C.I.T. Plan as in effect on June 30, 1986, provided such Member files an appropriate election with the Committee. Absent such an election, the Member's Plan benefit will be distributed pursuant to the general provisions of the MHT Plan or this Plan, as the case may be. With respect to any Member of the C.I.T. Plan on June 30, 1986 who does not satisfy the conditions of the first sentence of this paragraph as of June 30, 1986, such Member may elect to have his Plan benefit, to the extent accrued as of June 30, 1986, paid in one of the optional forms pursuant to the provisions of sections 8.2 and 8.3 of the C.I.T. Plan as in effect on such date. All benefits accrued thereafter shall be subject to the general provisions of the MHT Plan, or this Plan, as the case may be.

2.2    Plan Merger with MHCS. (a) Every Eligible Employee who was a participant of the Retirement Plan of Manufacturers Hanover Financial Services, Inc. as such plan existed immediately preceding January 1, 1987, became a participant of the MHT Plan on January 1, 1987.

(b)    A Member's service with Manufacturers Hanover Financial Services, Inc. ("MHCS") prior to January 1, 1987 shall be counted in accordance with the rules of the MHT Plan towards the Member's Years of Service (as defined in the MHT Plan) under the MHT Plan or this Plan, as provided in Article III.

(c)    A Member's benefit service on account of service with MHCS prior to January 1, 1987 shall be counted in accordance with the rules of the MHT Plan towards the Member's Years of Benefit Service under former Section 5.1(b) of the Plan; provided, however, that this provision shall not result in the crediting of any day of service towards more than one Year of Benefit Service (i.e., there shall be no double-counting as a result of this section).

(d)    A Member who was employed by MHCS prior to January 1, 1987, terminates service with MHCS on or after January 1, 1987 and retires on or after his or her Normal Retirement Date (as defined in the MHT Plan) shall have a normal retirement benefit (as defined in the MHT Plan) that is the greater of (i) the benefit computed under the MHT] Plan, or (ii) the benefit that would been payable if such benefit was computed pursuant to the applicable provisions of the MHCS Plan as in effect immediately preceding January 1, 1987, reduced by the Actuarial Equivalent (using the UP 84 mortality table and the interest prescribed by the Pension

CBPJPMC00000561

Benefit Guaranty Corporation with respect to terminations occurring on the date as of which equivalence is being determined) of the normal form of the Member's benefit provided by the vested portion of his or her Flexible Retirement Account as of his or her Normal Retirement Date. The benefit described in Section 2.2(d)(i) or (ii) was frozen as provided in former Section 5.5 of this Plan as of December 31, 1992.

(e)    With respect to any Member both actively employed by MHCS and who was a member of the MHCS Plan on June 30, 1986, and on such date was within one year of eligibility for early retirement under the terms of the MHCS Plan as in effect on June 30. 1986 (i.e., was age 54 and had 9 Years of Benefit Service), such Member's normal retirement benefit may be paid in one of the optional forms pursuant to sections 6.1 and 6.2 of the MHCS Plan as in effect on June 30, 1986, provided such Member has filed an appropriate election with the Committee. Absent such an election, the Member's Plan benefit will be distributed pursuant to the general provisions of the MHT Plan or this Plan, as the case may be. With respect to any Member of the MHCS Plan on June 30, 1986 who does not satisfy the conditions of the first sentence of this paragraph as of June 30, 1986, such Member may elect to have his Plan benefit, to the extent accrued as of June 30, 1986 paid in one of the optional forms pursuant to the provisions of sections 6.1 and 6.2 of the MHCS Plan as in effect on such date. All benefits accrued thereafter shall be subject to the general provisions of the MHT Plan or this Plan, as the case may be.

2.3    Acquisition of Bankers Trust Company. (a) A Member's service with Bankers Trust Company prior to its acquisition is counted in accordance with the Agreement (as defined below) entered into at the time of the acquisition towards the Member's Years of Service (as defined in the MHT Plan) under the MHT Plan or under this Plan as provided in Article III.

(b)    Any Employee (as defined in the MHT Plan) formerly employed by Bankers Trust Company who has been employed by Manufacturers Hanover Trust Company ("MHT") pursuant to Section 9.9 of the Agreement between MHT and Bankers Trust Company dated as of October 31, 1979 (the "agreement"), shall, as of the date of his or her employment by MHT become vested in his or her accrued benefit under the Plan for Pensions of Bankers Trust Company, computed as of the closing date of the purchase and sale of the banking offices described in the agreement (the "closing date").

CBPJPMC00000562

(c)     Such an Employee's accrued normal retirement benefit under the MHT Plan shall be the greater of:

(i)     the accrued normal retirement benefit computed in accordance with the Plan for Pensions of Bankers Trust Company as in effect on the closing date, taking into account the Employee's total years of service and his or her compensation both with MHT and Bankers Trust Company; or

(ii)    the sum of (1) the Employee's accrued normal retirement benefit as of the closing date under the Plan for Pensions of Bankers Trust Company and (2) the Employee's accrued normal retirement benefit under the MHT Plan taking into account only years of service as an Employee following the closing date.

The benefit described in Section 2.3(c)(i) or (ii) was frozen as provided in former Section 5.5 of this Plan as of December 31, 1992.

2.4     Certain Former Employees of Wells Fargo Bank.  Any Employee formerly employed by the Corporate Trust and Corporate Agency departments of Wells Fargo Bank ("Wells") who became an Employee on or after August 18, 1983 as a result of the purchase of certain assets from Wells and for whom assets were transferred to the Plan shall, as of the date of his employment with the Bank or a Related Company (each as defined in the MHT Plan), have each year of service for which credit was given under the Wells Fargo & Company Retirement Plan, as in effect on August 18, 1983 ("Wells Plan"), credited as a Year of Service for purposes of eligibility and vesting under the MHT Plan. Each such year of service under the Wells Plan shall also be credited as a Year of Benefit Service under the MHT Plan for the purpose of determining the Employee's accrued benefit under the MHT Plan as of January 1, 1993.

2.5     Certain Former Employees of Dollar Dry Dock.  Pursuant to the Agreement to Purchase Assets and Assume Liabilities dated as of January 10, 1986 between Manufacturers Hanover Trust Company and Dollar Dry Dock Savings Bank of New York and the Amendment to Purchase Assets and Assume Liabilities dated as of June 23, 1986 between Manufacturers Hanover Trust Company and Dollar Dry Dock Savings Bank of New York, any Employee who was employed by Dollar Dry Dock on July 13, 1986 and became an Employee on July 14, 1986 pursuant to such amended agreement, has his years of service with Dollar Dry Dock prior to July 14, 1986 taken into account as Years of Service under the MHT Plan for purposes of: (i)

CBPJPMC00000563

determining eligibility to participate in the MHT Plan or this Plan, as provided in Article III, and (ii) determining nonforfeitable rights under MHT Plan or this Plan, as provided in Article III. Such years of service with Dollar Dry Dock prior to July 14, 1986 shall also be taken into account as Years of Benefit Service for purposes of determining eligibility for early retirement benefits and reduced vested benefits under the MHT Plan and this Plan, as provided in Article III, but not for purposes of benefit accrual, provided that such Employee has at least 11 Years of Service with a Participating Company (as defined in the MHT Plan) and Dollar Dry Dock combined. As provided in Article III, years of Service for the period of employment with Dollar Dry Dock are determined in accordance with the rules of the MHT Plan.

2.6    Certain Former Employees of Goldome. (a) Pursuant to the Agreement between Goldome and Manufacturers Hanover Trust Company Relating to the Sale of Certain New York City Metropolitan Area Branches dated as of March 29, 1989, any Employee who was employed by Goldome on November 12, 1989 and became an Employee on November 13, 1989 pursuant to such agreement, had his years of service with Goldome prior to November 13, 1989 (including years of service with any other employer prior to November 13, 1989 which is taken into account under the Goldome Retirement Plan) taken into account as Years of Service under the MHT Plan solely for purposes of: (i) determining eligibility to participate in the MHT Plan and this Plan as provided in Article III, and (ii) determining nonforfeitable rights under of the MHT Plan and as provided in Article III of this Plan, and (iii) for Severance Dates occurring on or after July 1, 1994, determining eligibility for the Benefits described in former Section 5.2(a) or 5.2(c) but only in the event of an Eligible Termination. Years of Service for the period of employment with Goldome shall be determined in accordance with the rules of the MHT Plan and shall be taken into account for purposes of this Plan, as provided for in Article III.

(b)    Pursuant to the Agreement between Goldome and Manufacturers Hanover Trust Company Relating to the Further Sale of Certain New York City Metropolitan Area Branches dated as of November 27, 1990, any Employee who was employed by Goldome on May 27, 1991 and became an Employee on May 28, 1991 pursuant to such agreement, had his or her years of service with Goldome prior to May 28, 1991 (including years of service with any other employer prior to May 28, 1991 which is taken into account under the Goldome Retirement Plan) taken into account as Years of Service under this Plan solely for purposes of: (i) determining eligibility to participate in the MHT Plan or this Plan, as provided in Article III, (ii) determining nonforfeitable rights under of the MHT Plan and this Plan as provided in Article III, and (iii) for Severance Dates occurring on or after July 1, 1994, determining eligibility for the

CBPJPMC00000564

Benefits described in Section 5.2(a) or 5.2(c) but only in the event of an Eligible Termination. Years of Service for the period of employment with Goldome shall be determined in accordance with the rules of the MHT Plan and shall be taken into account for purposes of this Plan as set forth in Article III.

2.7    Certain Former Employees of Dan River.  Any Employee who (i) was employed by Dan River on May 25, 1989, and (ii) became an Eligible Employee on May 26, 1989, shall have his or her years of service with Dan River prior to May 26, 1989 taken into account as Years of Service under  MHT Plan and this Plan, as the case may be, for purposes of: (i) determining eligibility to participate in  MHT Plan and this Plan, as provided in Article III, (ii) determining nonforfeitable rights under  MHT Plan and this Plan as provided in Article III. Years of Service for the period of employment with Dan River shall be determined in accordance with the rules of the MHT Plan and shall be taken into account for purposes of this Plan as set forth in Article III.

2.8    Manufacturers Hanover Mortgage Corporation.  The normal retirement benefit (as defined in the MHT Plan) payable to a Member who terminates service with Manufacturers Hanover Mortgage Corporation after December 31, 1984 and retires on or after his Normal Retirement Date (as defined in the MHT Plan) shall be payable in accordance with Section 5.4(a) of the Stock Purchase Agreement dated as of March 24, 1986 between Manufacturers Hanover Corporation and Fireman's Fund Insurance Company.

2.9    Other Acquisitions    (a)    A Member's service with Dollar Dry Dock, Iselin Jefferson, United California Bank, Ritter Financial Corp. and Lionel D. Edie prior to their acquisition shall be counted in accordance with the agreement entered into at the time of their respective acquisitions towards the Member's Years of Service (as defined in the MHT Plan) under the MHT Plan and accordance with Article III of this Plan.

(b)    A Member's benefit service on account of service with Dollar Dry Dock, Iselin Jefferson, United California Bank, Ritter Financial Corp. and Lionel D. Edie prior to their acquisition shall be counted in accordance with the agreement entered into at the time of their respective acquisitions towards the Member's Years of Benefit Service (as defined in the MHT Plan) under the MHT Plan and former Section 5.1 of this Plan; provided, however, that this provision shall not result in the crediting of any day of service towards more than one Year of Benefit Service (i.e., there shall be no double-counting as a result of this section).

II-6

CBPJPMC00000565

2.10   Acquisitions Prior to 1976.  A Member on January 4, 1976 who had service with either National Bronx Bank, Peoples Industrial Bank, Banco Commerciale, Mortgage Corporation of New York or Standard National Bank of New York prior to the acquisition of any such corporation by Manufacturers Hanover Trust Company, shall be credited with Years of Benefit Service under the MHT Plan for the period of his or her continuous service with such corporation after completing one year of service with such corporation and attaining age 25.

2.11   Sale of Manufacturers Hanover Investment Corporation.  (a)  Pursuant to the Stock Purchase Agreement dated as of January 7, 1988 between Manufacturers Hanover Corporation and Paine Webber Group Inc. each employee of Manufacturers Hanover Investment Corporation ("MHIC") or MH Investment Counsel, Inc. ("Investment Counsel") who remains an employee of MHIC or Investment Counsel immediately after January 29, 1988, and who is not fully vested as of January 29, 1988 under the Plan shall be given Years of Service solely for vesting purposes under the MHT Plan or this Plan, as the case may be, for periods of continuous employment with the Paine Webber Group, Inc., MHIC, or Investment Counsel, as the case may be, after January 29, 1988.

(b)   Benefits payable to an employee of MHIC or Investment Counsel who remains an employee of MHIC or Investment Counsel immediately after January 29, 1988 and who does not make an election to retire under this Plan on or prior to February 29, 1988, shall be payable to such an employee pursuant to the otherwise applicable terms of, and at the time and in the amounts provided under the MHT Plan based upon such employee's Years of Service (including Years of Service under subparagraph (a) of this Section), Years of Benefit Service and salary received from MHIC or Investment Counsel, as the case may be, through January 29, 1988. This Plan has succeeded to this obligation of the MHT Plan.

(c)   Benefits payable to such an employee under the terms of the MHT Plan upon early or normal retirement or upon any other termination of employment shall not be payable until such employee retires or otherwise terminates employment with the Paine Webber Group, Inc., MHIC or Investment Counsel. An employee not eligible to retire under the MHT Plan on or before January 29, 1988 shall be treated as a terminated vested employee upon his termination of employment with MHIC, Investment Counsel or the Paine Webber Group, Inc. This provision also applies to the Plan.

II-7

CBPJPMC00000566

2.12   <u>Sale of Manufacturers Hanover Consumer Services.</u>

(a)   Pursuant to the Stock Purchase Agreement dated as of April 21, 1988 among Manufacturers Hanover Corporation, Manufacturers Hanover Financial Corporation, and Credithrift Financial Corporation, each Employee of Manufacturers Hanover Consumer Services ("MHCS"), or of any company in which MHCS owns or holds any interest and which MHCS controls ("MHCS Company"), on May 31, 1988, who participated in the Plan as of May 31, 1988 (such employees hereinafter are referred to as "MHCS Employees") shall be credited with Years of Service, solely for purposes of vesting under the MHT Plan and, as provided in Article III, under this Plan, for periods of employment after May 31, 1988 with Credithrift Financial Corporation ("Credithrift"), MHCS or any affiliate of Credithrift or MHCS, as if such periods of employment had been with the Bank or another Participating Company (as defined in the MHT Plan).

(b)   Benefits accrued through May 31, 1988 by MHCS Employees under the MHT Plan shall be payable to such MHCS Employees pursuant to the terms of, and at the time and in the amounts provided under, the MHT Plan, subject to this Section, based upon such MHCS Employees' Years of Benefit Service with, and salary received from, MHCS and any MHCS Company through May 31, 1988 (and periods of employment prior to May 31, 1988 with any other employer taken into account under the MHT Plan).

(c)   Benefits accrued under the terms of the MHT Plan by former employees of MHCS or any MHCS Company and any predecessors thereof whose termination of employment occurred prior to May 31, 1988 ("Former MHCS Employees"), to the extent not previously distributed, shall be payable to such Former MHCS Employees (and, in the event of their deaths, their beneficiaries) pursuant to the terms of, and at the time and in the amounts provided under, the MHT Plan. This Plan has succeeded to this obligation of the MHT Plan.

(d)   Any MHCS Employee eligible for an early retirement benefit provided under Section 7.2 of the MHT Plan as of May 31, 1988 shall remain eligible for such benefit upon their termination of employment; every other MHCS Employee shall be eligible for the benefit provided under Section 7.3 of the MHT Plan for benefits commencing prior to such employee's Normal Retirement Date. This Plan has succeeded to this obligation of the MHT Plan.

II-8

CBPJPMC00000567

(e)     No further benefits shall accrue under the MHT Plan (and accordingly, this Plan) to any MHCS Employee or Former MHCS Employee subsequent to May 31, 1988 (unless any such employee is hired after May 31, 1988 by an Employer under this Plan and again becomes eligible to accrue benefits thereunder).

(f)     Benefits payable to an MHCS Employee under the MHT Plan (and accordingly, this Plan) upon early or normal retirement or upon any other termination of employment shall not be payable prior to the date the MHCS Employee retires or otherwise terminates employment with Credithrift, MHCS and any affiliate of Credithrift or MHCS.

(g)     MHCS and each MHCS Company shall cease to be a Participating Company and a Related Company as those terms are defined in the MHT Plan on May 31, 1988.

2.13     Sale of C.I.T. (a) Pursuant to the CIT Stock Purchase Agreement dated as of September 18, 1989 between The Dai-Ichi Kangyo Bank, Limited and Manufacturers Hanover Corporation (the "Stock Purchase Agreement") and applicable law, (i) employees (including employees on disability, layoff, leave of absence or vacation) of The CIT Group Holdings, Inc. ("CIT"), or of any company of which CIT owns, directly or indirectly, 25% or more of the outstanding capital stock, other than a company which is an Investment Holding within the meaning of the Stock Purchase Agreement ("CIT Company") (such employees hereinafter referred to as "CIT Employees") and (ii) former employees of CIT, a CIT Company, or any corporation or other entity that was directly or indirectly owned by CIT at any time on or after May 1, 1984, whose termination of employment occurred before the Closing Date (as defined by the Stock Purchase Agreement) (such former employees hereinafter referred to as "Former CIT Employees"), accrued no further benefits under the MHT Plan as of the Closing Date. Accordingly, they accrued no additional benefits under this Plan.

(b)     No period of service by any CIT Employees and Former CIT Employees with The Dai-Ichi Kangyo Bank, Limited, CIT, any CIT Company, or any affiliate of The Dai-Ichi Kangyo Bank, Limited or CIT subsequent to the Closing Date shall be taken into account for any purpose under the MHT Plan or this Plan.

(c)     Those benefits payable to CIT Employees and Former Employees under annuity contracts purchased by the MHT Plan (which shall be the only benefits payable to CIT Employees and Former CIT Employees subsequent to the transfer of assets from MHT Plan to

CBPJPMC00000568

the qualified defined benefit pension plan established by CIT pursuant to the CIT Stock Purchase Agreement) shall to the extent not previously distributed or transferred to a qualified defined benefit pension plan established by CIT pursuant to the Stock Purchase Agreement, be payable to CIT Employees and Former CIT Employees (and, in the event of their deaths, their beneficiaries) pursuant to the terms of, and at the time and in the amounts provided under, the MHT Plan. On and after the date of the transfer of assets from the MHT Plan to the qualified defined benefit plan established by CIT pursuant to the Stock Purchase Agreement, the MHT Plan and accordingly, this Plan shall have no liabilities or obligations with respect to CIT Employees or Former CIT Employees except as expressly provided in this paragraph (c).

(d)    Benefits provided by such annuity contracts as described in paragraph (c) of this Section to a CIT Employee under the MHT Plan upon early or normal retirement or upon any other termination of employment shall not be payable prior to the date the CIT Employee retires or otherwise terminates employment with The Dai-Ichi Kangyo Bank, Limited, CIT and any affiliate of The Dai-Ichi Kangyo Bank, Limited or CIT.

(e)    CIT and each CIT Company ceased to be a Participating Company and a Related Company on the Closing Date as those terms are defined under the MHT Plan.

II-10

CBPJPMC00000569

## APPENDIX III
### Top-Heavy Provisions

3.1    Top-Heavy Determination.  For any Plan Year commencing in 1984 or thereafter, the Plan is a Top-Heavy Plan (a) if the Plan is not a member of a Required Aggregation Group and the Plan has a Top-Heavy Ratio greater than 60% or (b) if the Plan is a member of a Required Aggregation Group which has a Top-Heavy Ratio of greater than 60%. Notwithstanding the above, if the Plan is a member of a Permissive Aggregation Group with a Top-Heavy Ratio less than or equal to 60 percent it shall not be considered a Top-Heavy Plan.

The following provisions of this Appendix III apply notwithstanding any other provision of the Plan.

**3.2**    Minimum Vesting.  If the Plan is determined to be a Top-Heavy Plan for a Plan Year. a Participant with a Period of Service of 3 years shall be fully vested in his/her Accrued Benefit.

If the Plan subsequently is determined to no longer be a Top-Heavy Plan, then the above vesting shall not apply to any portion of a Participant's Accrued Benefit which is accrued on or after the first day of the first Plan Year in which the Plan is no longer a Top-Heavy Plan.

3.3    Minimum Benefit Accrual.

(a)    If the Plan is determined to be a Top-Heavy Plan for a Plan Year, each Participant who has not separated from service as of the end of the Plan Year and who is not a Key Employee, shall accrue a minimum Annual Benefit in the form of a single life annuity commencing as of the Normal Retirement Date equal to two percent (three percent in any year when the Top-Heavy Ratio is 90 percent or greater) of Top-Heavy Average Total Compensation multiplied by the number of Plan Years during which the Plan was Top-Heavy during a Participant's Years of Service up to a maximum of 10 years.

(b)    A Top-Heavy Plan shall not be treated as meeting the requirements of this Section 3.3 unless the Plan meets such requirements without taking into account any Social Security contributions or benefits.

CBPJPMC00000570

(c)    Notwithstanding the above provisions, this Section 3.3 will not apply to any Participant to the extent that such Participant is covered under any other qualified plan of an Affiliated Company and such other plan provides the minimum allocation or benefit requirement applicable to Top-Heavy plans.

3.4    Adjustment to Combined Plan Limitation.  If the Plan is determined to be a Top-Heavy Plan for any Plan Year, then the limitation provided under Section 2.8 of Appendix I the Plan shall be determined by substituting "100 percent" for "125 percent" wherever it appears in such section.

3.5    Definitions.

(a)    "Determination Date" means the last day of the preceding plan year for any plan year subsequent to the first plan year of a plan. For the first plan year of any plan, Determination Date means the last day of the plan year.

(b)    "Key Employee" means any Employee or former Employee (and the beneficiaries of such Employee or former Employee) who at any time during the Determination Period was an officer of an Affiliated Company with Total Compensation greater than 50% of the amount in effect under Section 415(b)(1)(A) of the Code, an owner (or considered an owner under Section 318 of the Code) of one of the ten largest interests in an Affiliated Company if such individual's Total Compensation exceeds the dollar limitation under Section 415(c)(1)(A) of the Code, a five percent owner of an Affiliated Company, or a one percent owner of an Affiliated Company who has an annual compensation of more than $150,000.  Determination Period" means the plan year containing the Determination Date and the four preceding plan years.  The determination of who is a key Employee will be made in accordance with Section 416(i)(1) of the Code and the regulations thereunder.

(c)    "Permissive Aggregation Group" means each plan in the Required Aggregation Group and any other qualified plan(s) chosen by the  Company which are maintained by an Affiliated Company, if such group of plans would meet the requirements of Sections 401(a)(4) and 410 of the Code.

(d)    "Required Aggregation Group" means (i) each qualified plan of an Affiliated Company in which at least one Key Employee participates and (ii) any other qualified

III-2

CBPJPMC00000571

plan of an Affiliated Company which enables any plan described in (i) to meet the requirements of Section 401(a)(4) or Section 410 of the Code.

(e)    "Top-Heavy Ratio" means, with respect to the plans taken into consideration, a fraction, the numerator of which is the sum of the Key Employees' account balances under the applicable defined contribution plans and the present value of Key Employees' accrued benefits under the applicable defined benefit plans, and the denominator of which is the sum of all participants' account balances under the applicable defined contribution plans and the present value of all participants' benefits under the applicable defined benefit plans. Both the numerator and the denominator of this fraction are adjusted so as to include plan distributions made to participants in the five-year period ending on the Determination Date (including distributions under a terminated plan which if it had not been terminated would have been part of a Required Aggregation Group) and in the case of defined contribution plans any contributions due but unpaid as of the Determination Date. The value of account balances and the present value of accrued benefits will be determined as of the most recent valuation date that falls within or ends with the 12-month period ending on the Determination Date. The account balances and accrued benefits of an individual who is not a Key Employee but who was a Key Employee in a prior year shall be disregarded and the account balance of an individual who has not performed any services for any employer maintaining a plan to which this Appendix IV applies at any time during the five years preceding the Determination Date shall also be disregarded. The calculation of the Top-Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Section 416 of the Code and the Regulations thereunder. When more than one plan is being considered, the value of account balances and accrued benefits shall be calculated with reference to the Determination Dates that fall within the same calendar year. Present values shall be based on reasonable actuarial assumptions as to interest and mortality. Effective for Years ending subsequent to December 31, 1986, solely for the purpose of determining the Top Heavy Ratio, the accrued benefits under the applicable defined benefit plans of any Participant who is not a Key Employee shall be determined under the method which is used for accrual purposes for all plans maintained by any Affiliated Company, or, if there is no such method, as if such benefits accrued not more rapidly than the slowest accrual rate permitted under Section 411(b)(1)(C) of the Code.

(f)    "Total Compensation" has the meaning ascribed thereto by Appendix I, Section 1.1(b).

III-3

CBPJPMC00000572

(g)    "Top Heavy Average Total Compensation" means total compensation over any five consecutive Plan Years that procedures the highest average, provided that Plan Years beginning after the last Plan Year in which the Plan was Top-Heavy shall be disregarded.

CBPJPMC00000573

**APPENDIX IV**

Special Effective Dates for Tax Reform Act of 1986 Provisions

4.1     Tax Reform Act of 1986 Provisions.

(a)     Definition of "Employee".  Effective January 1, 1987, Employee shall include any person who is a leased employee within the meaning of Section 414(n)(2) of the Code (other than a leased employee described in Section 414(n)(5) of the Code).

(b)     Definition of "Salary" or "Eligible Compensation".  Effective January 1, 1989, Salary or Eligible Compensation shall not include any amount in excess of $200,000 as adjusted for cost of living in accordance with Section 415(d) of the Code. To reflect the appeal of Section 414(q)(6) effective January 1, 1997, the family aggregation rules of Section 414(q)(6), as modified by Section 401(a)(17) of the Code, shall not apply when determining the Salary of an employee.

(c)     Section 2.1: "Eligible Employee".  Effective January 1, 1987, Eligible Employee shall not include any person who is a leased employee within the meaning of Section 414(n) of the Code.

(d)     Section 3.1(h): Years of Service.   Section 3.1(i) regarding leased employees is effective January 1, 1987.

(e)     Article IV and Former Article V: Protected Benefits.  Effective January 1, 1989, (1) accrued benefits, (2) optional forms of benefit, and (3) early retirement benefits or a retirement-type subsidy may not be subject to employer discretion, reduced, or eliminated.

(f)     Former Section 5.5: Frozen Integrated Plan Formula.  The integrated normal retirement benefit under the MHT Plan equal to: 2% of final average salary for each of the first 20 years of benefit service, plus 1% of final average salary for each additional year of benefit service up to a maximum of 40 years of benefit service, reduced by .4% of covered compensation for each year of benefit service up to a maximum of 35 years of benefit service, and further reduced by the actuarial equivalent of the normal form of the participant's benefit provided by the vested portion of his flexible retirement allocations, is effective January 1, 1989 through December 31, 1993 based on definitions of covered compensation, final average salary,

CBPJPMC00000574