**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANNA W. HUMPHREY, individually and on behalf of all others similarly situated,<br>    *Plaintiff* | } } } } | |
| v. | } } | CIVIL ACTION NO. H-05-758 |
| UNITED WAY OF THE TEXAS GULF COAST, a Texas non-profit corporation, and UNITED WAY OF THE TEXAS GULF COAST CASH BALANCE PLAN<br>    *Defendants* | } } } } } } | |

**OPINION AND ORDER**

Pending before the court in this ERISA case are cross motions for summary judgment (Docs. 41 & 57). Having considered these motions, the various responses and replies thereto, the complete record before the court, and all applicable legal standards, and for the reasons articulated below, the court ORDERS that Plaintiff's motion for summary judgment (Doc. 41) is GRANTED, and that Defendants' motion for summary judgment (Doc. 57) is DENIED.

**I. RELEVANT FACTS**

    A.    <u>The United Way of the Texas Gulf Coast Cash Balance Plan</u>

Until 1996, Defendant United Way of the Texas Gulf Coast ("United Way") sponsored Defendant United Way of the Texas Gulf Coast Cash Balance Plan ("the plan") as a traditional defined benefit pension plan ("89 Plan" or "Prior Plan"). A defined benefits pension plan calculates its participant's pension by multiplying a percentage of the participant's pay by his years

1

of service. One valuable benefit under the 89 Plan was the Early Retirement Pension (the "ERP").[1]
This provision allowed qualified participants age 55 or older to collect their pensions free of actuarial reduction. In other words, a participant could retire up to ten years early and still receive full benefits.

During the mid 1990's, United Way grew concerned about its ability to fund its pension obligations. Based on the recommendation of its actuaries, it chose to switch to a Cash Balance Plan ("96 Plan" or "New Plan"). The New Plan differed substantially from the 89 Plan. Under the New Plan, participants were given a hypothetical account to which their employer could contribute credits. Two types of credits were available: contribution credits, which are a percentage of a participant's salary, and interest credits, which are the interest earned on the participant's account balance. For participants in the Prior Plan, the 96 Plan provided that their accrued benefits would become the opening balances in their accounts. Like the 89 Plan, the 96 Plan allowed qualified participants to take early retirement. The original version of the 96 Plan, executed

---

[1] Section 5.3 of the 89 Plan provides, in relevant part, as follows:

> Early Retirement Pension: Any Participant who retires after satisfying the requirements for early retirement set forth in Section 4.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date in a monthly amount equal to one-twelfth (1/12) of the sum of (a) plus (b), where (a) is an amount equal to one and twenty-five hundredths percent (1.25%) of his Pension Compensation Base multiplied by the years of Credited Service actually earned by the Participant at his Early Retirement Date and (b) is fifty-four hundredths of one percent (.54%) of his Pension Compensation Base in excess of the Maximum Social Security Wage Base, multiplied by the Participant's total years of Credited Service which would have been earned at Normal Retirement Date, not to exceed thirty-five (35) years. The amount computed under Section 5.3(b) is multiplied by the Accrued Benefit Fraction and then reduced by one-one hundred eightieth (1/180) thereof for each of the first sixty (60) months and one-three hundred and sixtieth (1/360) thereof for each of the next sixty (60) months by which the commencement of his pension precedes his Normal Retirement Date. If the starting date of the pension precedes his Normal Retirement Date by more than one hundred twenty (120) months, the amount of the pension will be an amount which is the Actuarial Equivalent of the pension payable one hundred twenty (120) months preceding his Normal Retirement Date.

(89 Plan § 5.3, Doc. 4 Ex. 1). Unless otherwise noted, the court cites to the docket entry of the motion to which the exhibits are attached rather than the docket entry number of the exhibits themselves.

December 15, 1995, provides that participants electing early retirement will collect an ERP consisting of what they would have been entitled to under the 89 Plan *plus* what they are entitled to under the 96 Plan.[2]  On April 2, 1997, this language was amended in part to provide as follows:

> <u>Early Retirement Pension</u>: Any Participant [who] retires after satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.  The Early Retirement Pension shall be equal to the ***greatest of*** (a), (b), or (c), where (a) is equal to the value of the Participant's Account Balance, (b) is equal to the value of the Participant's Prior Plan Account converted to an annuity on the basis of the actuarial factors specified in the Prior Plan, and (c) is equal to the Actuarial Equivalent of the Participant's Accrued Benefit under this Plan, increased until his Normal Retirement Age by an amount equal to (i) the actual Interest Credit, for the period between his termination of Service and his Annuity Starting Date; and (ii) the Interest Credit in effect at the time of his Annuity Starting

---

[2]  Section 6.5 of the original version of the 96 Plan provides as follows:

> <u>Early Retirement Pension</u>: Any participant who retires after satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.  The Early Retirement Pension shall be equal to (1) ***plus*** (2), where (1) is equal to (a) reduced by (b), and (a) is the Normal Retirement Pension based on the Participant's Prior Plan Account earned under the Prior Plan, and (b) is one-one hundred eightieth (1/180) thereof for each of the first sixty (60) months and one-three hundred sixtieth (1/360) thereof for each of the next sixty (60) months by which the commencement of his pension precedes his Normal Retirement Date; and (2) is the Actuarial Equivalent of the Normal Retirement Pension based on the Participants Accrued benefit earned under this plan from and after January 1, 1996, increased until his Normal Retirement Age by an amount equal to (i) the actual Interest Credit in effect for the period between his termination of Service and his Annuity Starting Date and (ii) the Interest Credit in effect at his Annuity Starting Date and his attainment of Normal Retirement Age (the "Estimated Pension").  If the starting date of the pension precedes his Normal Retirement Date by more than one hundred twenty (120) months, the amount of Early Retirement Pension will be an amount which is the Actuarial Equivalent of the Estimated Pension payable one hundred twenty (120) months preceding his Normal Retirement Date.

> Notwithstanding any provision of the Plan to the contrary, any Participant who retires on or after the Effective Date [defined as 1/1/96] shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto ***plus*** the pension earned under this Plan.

> The Early Retirement Pension is payable on a five-year certain and for life annuity basis, except as may be provided in Section 6.8.

(96 Plan § 6.5, Doc. 41 Ex. 2) (emphasis added).

3

> Date, for the period between his Annuity Starting Date and his attainment of Normal Retirement Age.

(1st Am. to 96 Plan, Doc. 41 Ex. 7) (emphasis added). According to Defendant, this amendment created what the industry describes as a "wear away" provision, which prevents a participant from acquiring new benefits for a period of years after the plan is changed.[3] Despite the change in this first paragraph, the second paragraph of the plan remained the same, i.e., it continued to guarantee every plan participant who elected to receive an Early Retirement Pension "at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto *plus* the pension earned under this Plan."[4] The "plus" language in the second paragraph remained in effect until 2002, when the 96 Plan was amended for the last time to provide,

> <u>Early Retirement Pension</u>: Any Participant who retires after

---

[3] In other words, a participant will not accrue any new benefits until he has "worn away" his benefits under the old plan.

[4] Section 6.5 of the 96 Plan, including the April 2 amendment, provides as follows:

> <u>Early Retirement Pension</u>: Any Participant [who] retires after satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date. The Early Retirement Pension shall be equal to the *greatest of* (a), (b), or (c), where (a) is equal to the value of the Participant's Account Balance, (b) is equal to the value of the Participant's Prior Plan Account converted to an annuity on the basis of the actuarial factors specified in the Prior Plan, and (c) is equal to the Actuarial Equivalent of the Participant's Accrued Benefit under this Plan, increased until his Normal Retirement Age by an amount equal to (i) the actual Interest Credit, for the period between his termination of Service and his Annuity Starting Date; and (ii) the Interest Credit in effect at the time of his Annuity Starting Date, for the period between his Annuity Starting Date and his attainment of Normal Retirement Age.
>
> ***Notwithstanding any provision of the Plan to the contrary***, any Participant who retires on or after the Effective Date shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto *plus* the pension earned under this Plan.
>
> The Early Retirement Pension is payable on a five-year certain and for life annuity basis, except as may be provided in Section 6.8.

(96 Plan Incorporating 1st Am. to 96 Plan, Doc. 41 Ex. 12) (emphasis added).

> satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date. The Early Retirement Pension shall be equal to the ***greater of*** (a) or (b), where (a) is equal to the Actuarial Equivalent of the Participant's Account Balance, and (b) is equal to the Prior Plan Accrued Benefit with reduction for early commencement in accordance with the provisions of the Prior Plan.
>
> Notwithstanding any provision to the contrary, any participant who retires on or after the Effective Date and elects to receive his benefit as a single lump sum, such lump sum shall not be less than the Actuarial Equivalent of the Prior Plan Accrued Benefit.

(02 Plan § 6.5, Doc. 41 Ex. 4). To date, no notice of the 2002 amendment has been provided to the plan beneficiaries, despite having stripped them of the benefits due under the 96 Plan.

 B. <u>Ann W. Humphrey</u>

Plaintiff Ann W. Humphrey ("Humphrey") is the beneficiary of the pension benefits of Fredrick B. Blackmer ("Blackmer"), deceased. Before his retirement, Blackmer worked at the Center for the Retarded, Inc. ("CRI"), a participant in United Way's Cash Balance Plan. After more than 25 years of service, Blackmer elected early retirement at age 63. In January 2004, he received a lump sum distribution of $40,700.25 directly into his IRA account.

Before his retirement, Blackmer had already disputed the amount of his pension and exhausted his administrative remedies. (*See* Blackmer Letters, Doc. 41 Exs. 33, 35-38). At the administrative level, the dispute centered on two issues. First, how to calculate Blackmer's opening balance based on his participation in the 89 Plan; and second, whether interest earned on his opening balance should be included. The dispute did not, in the beginning, involve whether the benefits under the 89 Plan should be added to the benefits under the 96 Plan; the plan never disputed that Blackmer's ERP should be calculated by adding the amount of his pension under the Prior Plan to the amount of his pension under the New Plan. The plan found that under the 89 Plan, Blackmer's

5

opening balance should be calculated as the present value, on December 31, 1995, of a $302.82 per month, lifetime annuity payable at the normal retirement age of sixty-five. (*See* Doc. 41 Ex. 35). It also found that interest earned on this sum should be counted towards the pension earned under the Prior Plan, not the 96 Plan. (*Id*.) Blackmer disagreed with both of these conclusions. He claimed that under the New Plan his opening balance should be calculated as the present value, on December 31, 1995, of a $302.82 lifetime annuity payable immediately, and that interest paid on that sum should be credited towards his pension under the New Plan. The plan affirmed its decision.

On appeal, the plan asserted for the first time that the "greater of" methodology, rather than the "plus" methodology, was the proper calculation. It claimed, further, that the benefits already distributed represented this "greater of" amount. Lee James ("James"), the actuary who participated in the administrative decision on Blackmer's claim, and Debra King ("King"), United Way's Vice-President of Finance, both testified that the plan had always calculated the ERP as the "greater of" the pension earned under the 89 Plan or the 96 Plan, not the sum of these two pensions. (James Dep., dated Dec. 7, 2005, at 37-39, Doc. 41 Ex. 58; King Dep., dated Dec. 20, 2005, at 29-30, Doc. 41 Ex. 60). Indeed, United Way maintains that the "plus" language in the 96 Plan was a "scrivener's error," and that the "greater of" methodology had always been the intended and correct calculation under the 96 Plan.

This lawsuit followed in which Plaintiff seeks to enforce the "plus" methodology of the second paragraph of section 6.5.

C.    Class Certification and Notification

In addition to seeking enforcement of the "plus" methodology, Humphry also moved for class certification, proposing that the class be defined as:

> All Participants or Former Participants (as those terms are defined in the Plan), and beneficiaries of such Participants or Former Participants, who (1) as of 12/31/95, had accrued a pension under the Prior Plan (as defined in the Plan), (2) were or hereafter are eligible for an Early Retirement Pension under the Plan ("ERP"), and (3) either received an ERP or are eligible to receive an ERP or hereafter become eligible to receive an ERP.

The court certified the class under class definition proposed by Plaintiff finding that (1) Humphry had satisfied the class certification prerequisites of Rule 23(a) and (2) class certification under Rule 23(b) was appropriate because the plan had acted on grounds applicable to the class as a whole and that monetary damages were incidental to the declaratory relief sought, i.e., that the plan should calculate ERP benefits under the 96 Plan according to the "plus" methodology. The court also ordered that notice be provided to the class.

Subsequent to the court's certification of the Humphry class, a dispute arose concerning which Participants qualified as class members under the Court's class definition. The Court held a Rule 16 Conference on October 12, 2007, to discuss class composition issues. After staying the case pending mediation, which proved unsuccessful, the court clarified the class composition as follows: (1) Participants who have received an ERP are part of the class; (2) Participants who have received a deferred vested ERP are part of the class; (3) active or former Participants who are currently eligible or may become eligible to elect an ERP are part of the class; (4) active or former Participants who accrued benefits under the two Plans but who are no longer eligible to elect an ERP are not part of the class; and (5) Participants who have received either a Normal Retirement Pension or a Late Retirement Pensions are not part of the class.

The cross motions for summary judgment are now ripe for ruling.

**II. LAW**

A. Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at1075). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary

judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1988).

    B.    <u>Standard Applicable to ERISA Claims</u>

Where an ERISA plan grants the plan administrator discretion to construe its terms, the court reviews the plan administrator's construction for abuse of discretion. *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997) (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). A two-step approach is often employed. *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 637 (5th Cir. 1992). First, the court must determine the correct interpretation of the plan. *Id.* To do so, the court considers the following: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Id.* at 638. If the court concludes that the plan administrator's interpretation is incorrect, the court must then determine whether the administrator abused its discretion by examining "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Id.*

Nevertheless, the Fifth Circuit recognizes that eligibility for benefits under an ERISA plan is governed, in the first instance, by the plain meaning of the plan's language. *See e.g. Gosselink v. American Telephone & Telegraph, Inc.*, 272 F.3d 722, 726 (5th Cir. 2001). Ordinary principles of contract interpretation, including the four-corners rule, govern the interpretation of an ERISA plan. When the plan administrator interprets the plan in a manner inconsistent with the plain meaning of its terms, the plan administrator abuses its discretion. *Baker v. Metropolitan Life Ins. Co.*, 364 F.3d 624, 630 (5th Cir. 2004).

## III. ANALYSIS

Defendants' motion for summary judgment makes three arguments: (1) that the Summary Plan Description ("SPD") controls over conflicting terms in the Plan and supports the plan administrator's ("PA") interpretation; (2) that the PA did not abuse its discretion; and (3) that the doctrine of scrivener's error justifies reforming the plan to fit Defendants' interpretation. Success under any one Defendants' theories would defeat Plaintiff's claim for plan benefits and, by extension, her other claims. The court finds that none of Defendants' arguments are satisfactory and that summary judgment in Plaintiff's favor is warranted.

    A.    <u>The effect of the SPD</u>

The SPD does not entitle the Defendants to summary judgment on Humphrey's claims. In answering the question, "What will happen to my old pension under the Cash Balance Plan?", the SPD explains:

> The present value of your accrued pension, determined under the terms of the Pension Plan, will become your beginning account balance under the Cash Balance Plan. After December 31, 1995, you will begin accruing benefits under the Cash Balance Plan formula, at the contribution rate selected by your Employer. You will *not* continue to accrue a pension benefit under the old formula of the

> Pension Plan. **You will not lose any part of your accrued pension as of December 31, 1995 as a result of the change to the Cash Balance Plan.**

(SPD to 96 Plan at 6, Doc. 41 Ex. 3) (emphasis in original). First, the SPD does not directly address the issue presented by this case, i.e., whether participants in the Prior Plan continue to accrue new benefits under the Cash Balance Plan. Moreover, it is not clear that the SPD does, in fact, conflict with the plan's language. The last sentence specifically guarantees that a participant will *not* lose *any* accrued pension because of the switch from the Prior Plan to the 96 Plan. Second, the legal rule giving precedence to the SPD when it conflicts with the plan is rooted in cases recognizing a plan participant's right to rely on the language in the SPD. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991). In this case, Defendants are asking the court to declare that plan participants have no right to rely on the actual plan documents.[5] This result is contrary to ERISA's policy in providing strict disclosure regarding plan documents. Additionally, the authority construing language in an SPD over language in the plan is typically done in favor of the employee, not the plan's drafter. The SPD does not support the Defendants' conclusion that the "greater of" methodology controls the calculation of benefits under the plan.

B. <u>Review of the PA</u>

It is undisputed that the 96 Plan grants the PA the discretion to construe its terms. From 1996 to 2002, Section 6.5 of the 96 Plan stated "<u>[n]otwithstanding any provision of the Plan to the contrary</u>, any Participant who retires on or after the Effective Date shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under

---

[5] The court notes that the SPD instructs readers that any conflict will be resolved in favor of the legal plan documents, not the SPD.

the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto <u>plus</u> the pension earned under this Plan." The plain language of this provision entitles a qualified ERP-recipient to at least (A) the pension earned under Prior Plan <u>plus</u> (B) the pension earned under the 96 Plan. The PA's calculation using the "greater of" (A) or (B) is in direct conflict with the plain language of the plan. Because eligibility for benefits under an ERISA plan is governed, *in the first instance*, by the plain meaning of the plan language, *see Gosselink,* 272 F.3d at 726, the PA's contrary interpretation was an abuse of discretion. *See Baker*, 364 F.3d at 630.

Assuming *arguendo* that the full *Wilbur* analysis is necessary, the court still finds that the PA abused its discretion by not giving effect to the plain language of the second paragraph of section 6.5. With respect to the first *Wilbur* question, the PA has not interpreted the plan in a legally correct manner. It has not given the 96 Plan a uniform construction. In the administrative proceedings, the plan stated that the pension earned under the 96 Plan must be "added to" the pension under the Prior Plan. On appeal, the plan contends that the "plus" language is a mistake and that it has "always" interpreted the "plus" as "greater of." Moreover, substituting "greater of" for "plus" is not consistent with a fair reading of the plan. The court must effectively disregard the second paragraph of section 6.5 to support the plan's "greater of" methodology. Finally, with respect to costs, the plan has offered evidence that using the "plus" methodology advocated by Humphrey would result in $8,474,000 in additional benefits owed to persons Humphrey contends are members of the Class. (*See* Chiu Aff. at 2, Doc. 120 Ex. 1). As net assets of the plan, as of January 1, 2006, equal approximately $37,285,840 (*see id.* at 2-3), the additional benefits sought would give rise to substantial, unanticipated costs to the plan. However, the court has recently narrowed the scope of the class definition, which would substantially lower the benefits owed. Also,

the court is unpersuaded that these costs are "unanticipated." The plain language of the 96 Plan expressly provides that qualified Participants are entitled to an ERP calculated by adding the pension under the Prior Plan to the pension under the 96 Plan. *See, e.g., Kennedy v. Electricians Pension Plan, IBEW #995*, 954 F.2d 1116, 1123-24 (5th Cir. 1992) (finding that an additional $2 million in benefits owed under a plan with assets worth approximately $36.5 million was "substantial," but not "unanticipated" where the defendants' interpretation of the disputed plan provision was contrary to its plain meaning and unfair). Thus, the court finds that disregarding the plain language of the second paragraph of section 6.5 was not the legally correct interpretation of the 96 Plan.

Turning to the second part of the *Wilbur* inquiry, the court finds that the use of the legally incorrect interpretation, the "greater of" methodology, was an abuse of discretion. As the Fifth Circuit noted in *Wilbur*, "[a]lthough the fact that an administrator's interpretation is not the correct one does not in itself establish that the administrator abused his discretion, 'when [his] interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior.'" 974 F.2d at 638 (quoting *Batchelor v. Int'l Brotherhood of Electrical Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 445 (5th Cir. 1989), *quoting Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir. 1982)). The court has already determined that the use of the "greater of" methodology was in direct conflict with the plain meaning of the 96 Plan, and, thus, a "strong indication of arbitrary and capricious behavior" applies. The Defendants' interpretation would require the court to read the unambiguous language out of the 96 Plan, which would not be internally consistent. Moreover, Defendants' conduct has been less than transparent. Although they now claim it was an integral part of the plan, Defendants

chose not to disclose the wear away provision in the SPD.[6] They also chose to mislead Blackmer during his administrative claim and have never issued a notice to the Plan's participants regarding their amendments to the plan. The court finds that the use of the "greater of" methodology was an abuse of discretion.

    C.    <u>Scrivener's Error</u>

United Way contends that the "plus" language in the 96 Plan is merely a mistake and that the court should reform the ERISA plan accordingly. Scrivener's error, however, is a defense of mutual mistake. *See Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1049-50 (5th Cir. 1971). While the parties dispute whether the "plus" language is a mistake at all,[7] neither dispute that such a mistake would be deemed unilateral, not mutual. Therefore, a traditional scrivener's error defense is not applicable in this case.

Defendants reluctantly concede that scrivener's error is a defense of mutual mistake, but argue that the doctrine should be extended for policy reasons because it would be unduly harsh to uphold this "mistaken" language. The court disagrees. Reforming the plain language of an ERISA plan because of a unilateral mistake by the drafters undermines several core ERISA principles: first, ERISA contains strict requirements for maintaining and administering the *written* plan documents. *See* 29 U.S.C. § 1102(a)(1) (requiring that employee benefit plans be maintained pursuant to a written instrument); 29 U.S.C. § 1104 (requiring that an ERISA plan be administered

---

[6] ERISA regulations require disclosure of the plan's requirements respecting eligibility and "any other conditions which must be met before a participant will be eligible to receive benefits." 29 C.F.R. 2520.102-3(j)(1). In this case, the wear away provision is such a requirement, requiring Participants to wear away their prior pension before they will receive benefits under their current one.

[7] There is credible evidence that the plus methodology was not mistakenly included in the 96 Plan. (*See, e.g.,* Letney Dep., dated Feb. 12, 2006, at 106-108, Doc. 41 Ex. 61) (testifying that she, as the primary drafter, thought that the 96 Plan conformed to United Way's intentions regarding the Early Retirement Pension). Moreover, the many drafts preceding the final version of the 96 Plan all contained either "plus" terminology or the conceptual equivalent.

in accordance with the written documents and instruments governing the plan); *see also Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir. 1989) (noting that the writing requirements were a clear part of Congressional intent to fashion a comprehensive system of federal law designed to strengthen and protect the interests of employees in their expected retirement benefits). When, as here, the written plan document is unambiguous, the court is bound by the plain meaning of its terms, and reformation based on the unilateral mistake of one party is not appropriate. A second fundamental principle in the ERISA context is that drafting errors are strictly construed against the drafter of the plan document. *See Hansen*, 940 F.2d at 982. In *Hansen*, the Fifth Circuit explained:

> Any burden of uncertainty created by careless or inaccurate drafting . . . must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of . . . the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.

*Id.* (construing drafting errors in a summary plan description against the drafter and in favor of the employee). Considering these policies, an extension of the scrivener's error doctrine to allow a plan drafter to reform an unambiguous ERISA plan because of its own unilateral mistake is not appropriate.

    D.    <u>Supplemental Briefing</u>

In supplemental briefing, the Defendants have argued that even if the "plus" language is not disregarded on the basis of mistake, the PA did not abuse its discretion because its interpretation of this provision was legally correct. In particular, the Defendants claim that the "(A)" portion of the equation, "the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto," requires the Participant's Prior Plan account to be actuarially valued as of 12/31/95, not as of the

16

date of the Participant's early retirement. This interpretation is belied by the plain language of section 6.5, other relevant provisions in the 96 Plan, and by the plan's own actions during the administrative proceedings on Blackmer's claims.

First, nothing from the face of section 6.5 supports Defendants' recent interpretation that the Actuarial Equivalent of the Prior Plan pension must be valued as of 12/31/95. The 12/31/95 date is the effective date of the conversion from the Prior Plan to the 96 Plan, and the date modifies the formula to be used, not the valuation of the pension.

Second, other provisions of the 96 Plan confirm that the date of distribution is the date upon which the pension under the Prior Plan is to be valued. The third paragraph of section 6.5 states, "The Early Retirement Pension is payable on a five-year certain and for life annuity basis, except as may be provided in Section 6.8." Section 6.8 addresses optional forms of payment and states that, if a Participant elects an optional lump sum, it must be the Actuarial Equivalent of the normal form of the Participant's pension. "Actuarial Equivalent" is defined under the 96 Plan as follows:

> With respect to any pension hereunder, a payment or payments equal in value at date of determination to such pension when determined actuarially on the basis of the mortality table and interest rate described in Temporary Treasury Regulation Section 1.417(e)-IT(d)(2) and (3), such interest rate to be the rate in effect at the beginning of the Plan Year of the distribution . . .

(96 Plan § 1.1, Doc. 41 Ex. 2). Thus, if a lump sum is chosen, the Actuarial Equivalent must be valued as of the date of "payment" or "distribution."

Third, it is undisputed that Blackmer received solely the Actuarial Equivalent of his Prior Plan pension valued at the date it was distributed, February 1, 2004. Thus, the plan's own actions undermine the position it now asserts on appeal.

17

Finally, the court notes that the new arguments posed by Defendants appear disingenuous given their prior briefing on this matter. The plan went to great lengths to show that the "plus" language was a scrivener's error and that it had "always" used the "greater of" method of calculating benefits under the plan. Indeed, the plan amended the provisions of section 6.5, without notice to the plan participants, to align with this interpretation. The court is unpersuaded by any of the arguments raised by Defendants' supplemental briefing.

## IV. CONCLUSION

The plain language of the 96 Plan requires that a qualified participant's ERP benefit be calculated by adding the benefits under the Prior Plan and the 96 Plan. The plan's decision to use a formula in direct contravention of this plain language was an abuse of discretion. Accordingly, it is hereby

ORDERED that Plaintiff's motion for summary judgment (Doc. 41) is GRANTED; and it is further

ORDERED that Defendants' motion for summary judgment (Doc. 57) is DENIED.

The court DECLARES that the ERP payable under the 96 Plan must be no less than (A) the pension earned under the Prior Plan as of December 31, 1995, which is the five-year certain and life annuity payable at age 64, determined in accordance with the formula in effect under the Prior Plan as of December 31, 1995 and the Participant's pay and service through that date, "plus" (B) the pension earned under the 96 Plain, determined using all Contribution Credits and Interest Credits allocated to the Class member's Account Balance, including the Interest Credits on the Class member's opening Account Balance (denoted in the 96 Plan as the Prior Plan Account), **or** (2) a lump sum that is the Actuarial Equivalent of this sum, as determined using the 96 Plan's actuarial

assumptions (i.e., interest rate and mortality table) for determining the Actuarial Equivalent.

The court ORDERS Defendants to compute the ERP payable to each Class member in accordance with the foregoing declaration and, if the ERP has already been distributed, pay the Class Member the difference between that amount and the amount computed in accordance with the court's declaration, plus pre-judgment interest at a rate to be determined upon further briefing by the parties.

Nothing in this Order precludes Humphrey from seeking to recover from Defendants her costs and reasonable attorneys' fees, as permitted under ERISA § 502(g), 29 U.S.C. § 1132(g). Any such request must be made via a timely filed motion and brief to the court.

Signed at Houston, Texas, this 28th day of March, 2008.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE