```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
FRANK BILELLO, individually and on       :
behalf of all others similarly           :
situated,                                :
                          Plaintiff,     :      07 Civ. 7379 (DLC)
                                         :
             -v-                         :
                                         :      OPINION AND ORDER
JPMORGAN CHASE RETIREMENT PLAN,          :
JPMORGAN CHASE DIRECTOR OF HUMAN         :
RESOURCES, as administrator of the       :
JPMorgan Chase Retirement Plan,          :
                          Defendants.    :
----------------------------------------X
```

Appearances:

For Plaintiff and the Proposed Class:

Lynn L. Sarko
Amy Williams-Derry
Derek W. Loeser
David S. Preminger
Karin B. Swope
Gretchen S. Obrist
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Alice McInerney
Peter S. Linden
Kirby McInerney LLP
825 Third Avenue
New York, NY 10022

Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087

Edgar Pauk
144 East 44th Street, Suite 600

New York, NY 10017

For Defendants:

Thomas C. Rice
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

Meryl R. Kaynard
JPMorgan Chase Legal Department
One Chase Manhattan Plaza, 26th Floor
New York, NY 10081

DENISE COTE, District Judge:

Plaintiff Frank Bilello, on behalf of himself and all others similarly situated, brings this lawsuit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and the Internal Revenue Code ("I.R.C."). Bilello was an employee of JPMorgan Chase & Co. ("JPMC") and predecessor banks, including Chemical Banking Corporation ("Chemical"), from 1960 until his retirement in 2008. Billelo's complaint concerns Chemical's 1991 conversion from a traditional defined-benefit retirement plan to a cash balance retirement plan, as well as aspects of subsequent plan amendments issued by Chemical and its successors, including JPMC. This Opinion allows Bilello to file a corrected second amended complaint ("SAC"), and grants in part the defendants' motion to dismiss that pleading. The result of this motion practice is that the plaintiff's principal remaining claims are those that assert that defendants had an obligation

to warn plan participants that the conversion to a cash balance plan would mean that some workers would experience periods of zero benefit accrual.

BACKGROUND

Previous Opinions issued in this matter have explained the types of retirement plans at issue and traced the timeline of their development at Chemical Bank and its successors.[1]  While familiarity with those Opinions is assumed, the information necessary to address the pending motions is repeated here, beginning with a description of cash balance plans and Chemical's conversion to such a plan.

1. Cash Balance Plans

Since the mid-1980s, hundreds of companies have converted their pension plans for employees to cash balance plans, sparking controversy and litigation.  Campbell v. BankBoston, N.A., 327 F.3d 1, 7 (1st Cir. 2007).  Under a cash balance retirement plan, a hypothetical account is established in each

---

[1] These Opinions include Bilello v. JPMorgan Chase Retirement Plan, 592 F. Supp. 654 (S.D.N.Y. 2009) ("Statutory Standing Opinion"), which addressed whether Bilello, who had received a lump-sum distribution of his pension benefit, had standing to sue as a "participant" under ERISA; Bilello v. JPMorgan Chase Retirement Plan, 607 F. Supp. 2d 586 (S.D.N.Y. 2009) ("SOL Opinion"), which addressed the statute of limitations; and Bilello v. JPMorgan Chase Retirement Plan, 2009 WL 1108576, No. 07 Civ. 7379 (DLC) (S.D.N.Y. Apr. 24, 2009) (the "April 24 Opinion"), which decided whether Counts 3 and 7 of Bilello's amended complaint stated a claim.

participant's name to keep track of his accrued benefit.
Typically, the account contains "pay credits," representing a
percentage of the participant's salary that is periodically
deposited into the account, as well as "interest credits," which
apply a common interest rate to the account balances.  See Hirt
v. The Equitable Retirement Plan for Employees, Managers, and
Agents, 533 F.3d 102, 105 (2d Cir. 2008).  Pay credits cease to
accumulate once an individual's employment ends, but interest
credits continue to be allocated until benefits are distributed.
See, e.g., Esden v. Bank of Boston, 229 F.3d 154, 160 (2d Cir.
2000).  Cash balance plans may offer employees the option of a
lump-sum payout upon termination of employment in lieu of an
annuity, although any such payout must be worth at least as
much, in present terms, as the annuity payable at normal
retirement age.  Id. at 163.

Because a cash balance account earns interest, much of an
employee's pension benefit will be earned in his or her initial
years of service -- the more time there is until retirement, the
more time there is for the account to grow.  Campbell, 327 F.3d
at 7.  "[E]ven though early additions to the pension account may
be based on a percentage of a much smaller salary, the effects
of time mean that these additions will contribute to the final
total much more than larger additions to the account entered
closer to retirement."  Id. at 7-8.

In contrast, under a traditional defined-benefit pension plan, benefits are usually calculated based on years of service to a company and the average of the highest salary, which often occurs at the end of an employee's tenure. Id. at 7. Unlike a cash balance system, a traditional defined benefit pension plan will yield its greatest increases in benefits as an employee approaches retirement. Id. at 7-8.[2] This arrangement has contributed to the controversy surrounding transitions from traditional defined-benefit to cash-balance plans, as older workers, nearing retirement, find that their expectation of a

---

[2] The First Circuit has summarized the rationales explaining why a company might switch from a traditional defined benefit plan to a cash balance plan:

> Cash balance plans favor younger workers, while traditional defined benefit plans favor experienced employees who plan on staying with one company. Cash balance plans are also more portable than annuity-based plans, because they can be taken as a lump sum upon leaving the company. Thus, a move to a cash balance plan is one way for a company to attract younger and more mobile workers. Furthermore, if a company has an older workforce, a cash balance plan may be a cheaper plan to administer. Under a traditional plan, the largest benefits are earned in the years immediately preceding retirement. Because there is little time for interest to accrue, an annuity purchased to secure those benefits will be more expensive. Cash balance plans award benefits earlier in an employee's career, and so they may be less expensive for employers.

Campbell, 327 F.3d at 8.

substantial increase in benefits has been thwarted.  Id. at 8.
Despite these differences between the two plans, cash-balance
plans are treated as defined benefit plans (as opposed to
"defined contribution" plans, such as 401(k) accounts), under
ERISA.  Hirt, 533 F.3d at 105.

An additional source of controversy is the "wear-away"
effected by many conversions to a cash balance formula.
Campbell, 327 F.3d at 8.  Certain conversions to cash balance
plans create "wear-away" by preventing employees' pension
benefits from growing until their benefits calculated under the
cash-balance plan equal their accrued benefits under the
traditional defined-benefit plan.  Id.  As Bilello alleges
occurred in this lawsuit, it may take several years for a cash
balance account to catch up with the pre-conversion balance in a
traditional defined benefit account.  Wear-away also most
detrimentally affects older workers, who cease accruing benefits
altogether just when they may have expected to experience the
period of greatest accrual, at the end of their career.  Id.
Despite these effects on the benefits of workers nearing
retirement, the Second Circuit has held that cash-balance plans
do not violate ERISA's prohibition against age discrimination.
Hirt, 533 F.3d at 110.

2. The Chemical Retirement Plan's Conversion and Mergers

There are essentially five ERISA plans now at issue in this litigation, beginning with Chemical's first cash balance retirement plan.  Chemical converted its conventional defined benefit retirement plan (the "Pre-1989 Plan") into a cash balance plan on January 1, 1991, retroactive to January 1, 1989 (the "1989 Plan").  Chemical announced the conversion to its employees in July 1990.  In 1992, Chemical issued a Summary Plan Description ("SPD") describing the 1989 Plan.[3]  The next year, Chemical's retirement plan merged with that of Manufacturers Hanover Trust ("MHT"), following the 1991 merger of the two companies.  The result was the 1993 Chemical Plan (the "1993 Plan"), effective January 1, 1993.  A 1994 SPD described the 1993 Plan.

Chemical next merged with the Chase Manhattan Corporation ("Chase") in 1996, and the two companies' plans were merged effective January 1, 1997 (the "1997 Plan").  Chase then merged with J.P. Morgan in 2000, creating JPMC.  J.P. Morgan's cash balance pension plan merged into Chase's cash balance plan effective January 1, 2002 (the "2002 Plan").  A July 1, 2004 merger with Bank One Corporation resulted in a merger of the

---

[3] ERISA requires the periodic distribution of an SPD, as described in ERISA § 104, 29 U.S.C. § 1024.  Requirements for the content of an SPD are described in ERISA § 102(a), 29 U.S.C. § 1022(a).

JPMC and Bank One plans effective January 1, 2005 (the "2005 Plan").  The 2005 Plan is administered by defendant JPMorgan Chase Director of Human Resources (the "Plan Administrator").

3. Procedural History of this Lawsuit

Following the denial of class certification in the related In re J.P. Morgan Cash Balance Litigation, No. 06 Civ. 732 (S.D.N.Y. filed Jan. 31, 2006), for claims relating to retirement plans in place before 2002, Bilello filed this action on August 17, 2007, challenging the 1989 conversion to a cash balance plan and the subsequent plans arising from the retirement plan mergers of Chemical and its successors Chase and JPMorgan Chase.  Discovery has not yet begun in this two-year-old lawsuit, in which multiple rounds of briefing have addressed the viability of the original and first amended complaint ("FAC").  Five weeks after defendants moved to dismiss the complaint on November 16, 2007, instead of filing an opposition to defendants' motion, Bilello filed the FAC, which includes nine class-wide (Counts 1-9) and two individual counts (Counts 10-11) alleging violations of ERISA.

Defendants renewed their motion to dismiss with new briefing filed on February 25, 2008 that sought dismissal of all counts of the FAC pursuant to Rules 8(a), 12(b)(1), and 12(b)(6), Fed R. Civ. P.  With the motion to dismiss still

pending, this action was reassigned to this Court on October 21, 2008 as related to In re J.P. Morgan Cash Balance Litigation.

An Opinion and Order of January 6, 2009 denied defendants' motion to dismiss the FAC to the extent that it argued that Bilello lacked statutory standing as an ERISA participant because he received a lump-sum distribution of his pension benefit upon retirement.  Statutory Standing Opinion, 592 F. Supp. 2d at 660-67.  Aside from a collateral estoppel argument, which it rejected, the Statutory Standing Opinion did not address the remainder of defendants' arguments for dismissal. Id. at 667-69.  An Opinion of March 9 declined to certify the statutory standing issue for interlocutory appeal.  Bilello v. JPMorgan Chase Retirement Plan, 603 F. Supp. 2d 590, 595 (S.D.N.Y. 2009).

On April 10, 2009, another Opinion addressed defendants' argument that the statute of limitations barred Bilello from pursuing the nine class-wide counts in the FAC.  SOL Opinion, 607 F. Supp. 2d 586.  Counts 1, 2, 4 and 6 were dismissed entirely and Counts 3, 7, and 8 were dismissed in part.  Id. at 600.  An Order filed the same day rejected defendants' arguments that the plaintiff's claims should be dismissed for failure to exhaust administrative remedies, having considered supplemental briefing provided by the parties on the subject.  Two weeks later, Count 3 and the remainder of Count 7 were dismissed for

failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.  April 24 Opinion, 2009 WL 1108576, at *6.  The plaintiff then moved for reconsideration of the SOL Opinion on April 27, and the motion was fully briefed on May 18th.

The litigation next returned to the issue of standing. Defendants submitted a letter on April 15 addressing the Second Circuit's decision in Kendall v. Employees Retirement Plan of Avon Products, 561 F.3d 112 (2d Cir. 2009).  Kendall concerned the constitutional standing of a plaintiff bringing suit under ERISA.  Citing federal courts' obligation to establish the existence of federal constitutional jurisdiction before proceeding to consider the merits of a case, Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006), an Order of April 20 requested supplemental briefing on Bilello's Article III standing to bring each of the counts of the FAC, including those counts dismissed by the SOL Opinion.  In the briefing regarding the impact of Kendall, which was fully submitted on June 3, the parties agreed that Bilello lacked standing to pursue Counts 2-5 and 9 of the FAC, and an Order of June 8 accordingly dismissed those counts.[4]

On May 27, the same day that Bilello filed his opposition brief regarding Kendall, he moved for leave amend.  Defendants

_____

[4] Counts 5 and 9 had not yet been dismissed from the action. Counts 2 to 4 had previously been dismissed for other reasons.

have opposed plaintiff's request, and the motion was fully briefed on July 2, 2009.  A telephone conference was held with the parties on July 15, 2009 in which the plaintiff agreed that the current briefing represented his final request to amend the complaint, aside from any future request that may arise because of facts unearthed in discovery.  During the telephone conference, the plaintiff requested that he be allowed to substitute language describing an omission in lieu of language describing concealment in the complaint, which principally affects the allegations raised in Count 12.  He submitted the SAC the following day.  As defendants did not object to the correction, this Opinion will address the corrected version. Currently pending, therefore, are plaintiff's motion for reconsideration of the SOL Opinion, plaintiff's motion for leave to amend, the parties' supplemental briefing regarding Bilello's constitutional standing, as well as several arguments concerning Counts 6, 10, and 11 from defendants' February 25, 2008 motion to dismiss.

### DISCUSSION

While the question of constitutional standing is a primary one, Alliance For Environmental Renewal, Inc., 436 F.3d at 85, the motion for leave to amend pursuant to Rule 15(a), Fed. R. Civ. P., will be addressed first, because it shapes the pleading that will be subject to subject-matter jurisdiction and statute

of limitations analysis.  Both issues also arise as part of the
defendants' argument that leave to amend should be denied
because the proposed amendments would be futile.

Four reasons motivate Bilello's application to file the
SAC: to add the concrete impact on Bilello of the conversion to
a cash balance plan; to cure statute of limitations and Rule 8
deficiencies in Counts 1, 7, and 8 identified by prior Opinions;
to add a class-wide breach of fiduciary duty allegation against
the Plan Administrator; and to withdraw Counts 2-5 and 9, which
have since been dismissed.  Defendants' opposition argues that
plaintiff has already had ample opportunity to develop his
pleading, and that the proposed amendments (except for Counts 10
and 11, on which its opposition is silent) would be futile.

1. Amendment

Rule 15 instructs that leave to amend pleadings "shall be
freely given when justice so requires."  Fed. R. Civ. P. 15(a);
Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009).  Owing to
the rule's "policy in favor of granting leave to amend," Jaser
v. New York Property Ins. Underwriting Ass'n, 815 F.2d 240, 243
(2d Cir. 1987), a motion to amend should be denied only for such
reasons as "futility, bad faith, undue delay, or undue prejudice
to the opposing party."  Holmes, 568 F.3d at 334 (citation
omitted).  A court should not deny the right to amend on grounds

12

of mere delay absent a showing of bad faith or undue prejudice.
Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n.6
(2d Cir. 1987).  An amendment causes undue prejudice where it
would "(i) require the opponent to expend significant additional
resources to conduct discovery and prepare for trial; (ii)
significantly delay the resolution of the dispute; or (iii)
prevent the plaintiff from bringing a timely action in another
jurisdiction."  Block v. First Blood Assocs., 988 F.2d 344, 350
(2d Cir. 1993).  "[A]mendment of a pleading as a matter of
course pursuant to Rule 15(a) is subject to the district court's
discretion to limit the time for amendment of the pleadings in a
scheduling order issued under Rule 16(b)."  Kassner v. 2nd
Avenue Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).

     Bilello's application, made nearly two years after the
filing of the complaint, and three-and-a-half years after the
related case was filed, shows signs of significant delay.  While
plaintiff asserts that defendants' delinquent provision of
pension benefit calculation worksheets, and the fact that those
worksheets proved difficult to decipher, justify this delay, he
received the worksheets in September 2007, months before he
filed the FAC, long before the parties engaged in rounds of
briefing addressed to the adequacy of the FAC, and almost two
years before this application.  If the plaintiff wished to amend
his complaint based on the worksheets, he should have given

notice of that desire in the Fall of 2007, before the parties and Court spent precious resources addressing a deficient pleading. [5]

The delay weighs heavily against the amendment.  On the other hand, certain factual and legal developments justify Bilello's application at this juncture.  Discovery has not yet begun and no scheduling order setting a deadline for amendment of the pleadings has issued.  The proposed amendments do not alter the legal theories under which Bilello is pursuing relief, with the exception of the newly added Count 12.  The proposed SAC also responds to the Second Circuit's recent decision in Kendall.  Barring futility of the proposed amendment, which is addressed below, granting leave to amend here appropriately fulfills Rule 15(a)'s directive to grant leave to amend "freely."

Bilello is not entitled, however, to present legal theories "seriatim" through repeated amendment.  State Trading Corp. of

_____

[5] Moreover, Bilello's argument that he should be granted leave to amend because this is the first request he has made after receiving judicial guidance in the form of Opinions addressing defendants' motion to dismiss misstates the law.  A court may subject such a request to greater scrutiny; waiting to amend until a party receives an adverse decision is a factor against, not in favor of, granting leave.  State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d Cir. 1990) ("[w]hen the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactly").

India, 921 F.2d at 418.  A telephone conference was held with the parties on July 15, in which Bilello assured the Court that the SAC, if accepted, would be his final pleading.

Defendants also argue that leave to amend should be denied because each of the counts in the proposed SAC would be subject to dismissal.  Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003).  A proposed amendment would be futile if it could not withstand a motion for judgment on the pleadings.  Id.  The same standard applies to a motion to dismiss and a motion for judgment on the pleadings.  Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, (2009) (citation omitted).  This rule "does not require 'detailed factual allegations,'" id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555); see also Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 555 U.S. at 557).

A court considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted).  To survive such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 555 U.S. at 570).  This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted).

The Supreme Court in Iqbal summarized the "[t]wo working principles that underlie" Twombly: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950.  Applying this second principle "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

The discussion that follows addresses each of the seven claims in the SAC that the plaintiff contends should survive: Counts 1 and 6 (the backloading claims), Counts 7 and 8 (the notice claims), Count 12 (the breach of fiduciary duty claim), and finally, Counts 10 and 11 (the individual claims).  Where there is an issue of subject matter jurisdiction over the claim, that issue is addressed first, followed by any attack on the timeliness of the claim, and concluding with any issue of whether the count states a claim.

2. Counts 1 and 6: The Backloading Claims

Counts 1 and 6 both allege that the 1989 Plan and its successors violated ERISA's anti-backloading provision and specifically ERISA's "133 1/3% Rule," which provides that no later annual rate of accrual can be more than one-third greater than any earlier rate for an individual plan participant.  ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B).[6]  This rule protects younger and shorter-term employees by assuring that benefit accruals are not disproportionately accumulated in the later years of a career.  As explained in the House Report on ERISA:

---

[6] The 133 1/3% Rule is one of three rules with which a plan may comply to demonstrate that it is not backloaded.  The parties agree that the 133 1/3% Rule is the only one of the three with which the plans at issue in this lawsuit may possibly comply because the cash balance plans at issue are career-average plans.  See, e.g., Esden, 229 F.3d at 167 n.18.

> The primary purpose of [minimum accrual
> rates] is to prevent attempts to defeat the
> objectives of the minimum vesting provisions
> by providing undue "backloading," i.e., by
> providing inordinately low rates of accrual
> in the employee's early years of service
> when he is most likely to leave the firm and
> by concentrating the accrual of benefits in
> the employee's later years of service when
> he is most likely to remain with the firm
> until retirement.

Id. (quoting H.R. Rep. No. 93-807 (1974), reprinted in 1974
U.S.C.C.A.N. 4639, 4688). Where pay credits increase with years
of service or age, there is a risk of backloading unless a plan
includes a minimum interest rate. See Esden, 229 F.3d at 167
n.18.

Count 1 alleges that Bilello has been deprived as of today
of an additional benefit of almost $3,000 because the 1997, 2002
and 2005 Plans failed to specify a minimum interest rate of
5.21% -- the minimum that Bilello alleges was necessary to avoid
violating the 133 1/3% Rule -- and thereby allowed an interest
rate of less than 5.21% to be applied to his account in at least
the years 2003, 2004, 2005, and 2008.

Under the 1997 Plan, pay credits applied to a participant's
account at a rate that increased over time, beginning with 4%
for an employee with one to three years of service and
increasing up to 14% for an employee with over 26 years of
service. The 2002 and 2005 Plans grandfathered Bilello under
this pay schedule. Plaintiff alleges that the increase in pay

credits, standing alone, would violate the 133 1/3% Rule
because, for example, an 8% pay credit (earned by employees with
11-15 years of service) would create a rate of benefit accrual
200% higher than an employee with one to three years of service
and the corresponding 4% rate of benefit accrual.

To counteract the backloading caused by increasing pay
credits, plaintiff alleges that the plans could have provided
for a minimum interest rate of 5.21%.  Because a cash-balance
plan projects interest credits to a participant's retirement
age, the interest credits will make up a proportionally higher
percentage of a more junior employee's account balance.  A
sufficiently high interest rate, therefore, can offset
backloading.  The 2002 Plan also failed to apply the 5.21%
minimum interest-crediting rate.  The 2005 Plan adopted an
interest-crediting rate of 4.5%, which is alleged to have been
insufficient to cure the backloading experienced by those like
Bilello who were grandfathered under the 1997 4% to 14% pay
credit schedule.

Count 6 asserts that the 1989 Plan created wear-away, which
caused another violation of the 133 1/3% Rule.  For at least the
years 1991 through 1996, Bilello accrued no additional
retirement benefits despite working full time.  When Bilello
began to accrue benefits again in 1997 or later, those benefits

were necessarily more than 133 1/3% greater than the prior
year's (zero) accrual, violating the 133 1/3% Rule.

Wear-away is alleged to have occurred because 1) the 1989
Plan's "minimum benefit" feature provided for a minimum benefit
equal to the greater of the participant's accrued benefit under
the Pre-1989 Plan determined as of December 31, 1990 or the
benefit accrued under the cash balance plan starting in 1989,
and 2) for various reasons, the opening balance under the cash-
balance plan was about $30,000 smaller (when expressed as a lump
sum) than the benefit accrued under the Pre-1989 Plan.  As a
result, the accrued benefit under the cash balance plan did not
exceed Bilello's Pre-1989 Plan benefit, determined as of
December 31 1990, until 1997 at the earliest.

a. Subject Matter Jurisdiction

Defendants argue that Counts 1 and 6, as formulated in the
SAC, lack sufficient allegations of injury-in-fact to
demonstrate constitutional standing.  To establish
constitutional standing under Article III, "a plaintiff must
have suffered an injury in fact that is distinct and palpable;
the injury must be fairly traceable to the challenged action;
and the injury must be likely redressable by a favorable
decision." Ross v. Bank of America, N.A. (USA), 524 F.3d 217,
222 (2d Cir. 2008) (citation omitted).  In certain situations,
"[t]he actual or threatened injury required by Art. III may

exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." <u>Kendall</u>, 561 F.3d at 118 (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975)).  "[T]he standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  <u>Id.</u>

"As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing that he has suffered a concrete injury, or is on the verge of suffering one."  <u>Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.</u>, 433 F.3d 181, 198 (2d Cir. 2005). In a proposed class action, "the named class plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." <u>Id.</u> at 199 (citation omitted).

Bilello's SAC incorporates calculations performed by an ERISA expert to make clear that Bilello personally experienced backloading in the two ways alleged in Counts 1 and 6.  Count 1 alleges that the cash balance formulas in the 1989, 2002, and 2005 Plans created "backloading" because they did not specify a minimum interest rate that would prevent the rate of benefit accrual exceeding 133 1/3% of any previous year's rate of

accrual.  Without the protection from a minimum interest rate of 5.21%, Bilello alleges that his account was $2,996.35 less than it should have been.  These allegations satisfy the injury-in-fact requirement, as Bilello has alleged that his own benefits were backloaded because the Plans' interest rates were too low.

Defendants also argue that Bilello's claim for relief is too speculative.  They point out the cash balance plans could be reformed by changing the pay credit schedule, rather than imposing a minimum interest rate.  Any benefit to Bilello that might come from reforming the pay credit schedule would be uncertain, so defendants conclude that Bilello's argument that he would have greater benefits under a modified plan based on a minimum interest rate is too speculative.  This is unpersuasive. Defendants may not undermine the fact that Bilello has alleged a concrete injury based on the lack of a minimum rate by suggesting another remedy they have not adopted.  Count 1 therefore survives defendants' motion to dismiss.

Bilello has also alleged direct injury in Count 6.  Bilello has alleged that he experienced individualized harm from the 1989 Plan's minimum benefit feature, which created wear-away, deprived him of any accrual for at least six years, and resulted in a violation of the 133 1/3% Rule when the accrual of benefits resumed.  The proposed amended Count 6, like Count 1, will not be rejected on subject matter jurisdiction grounds.

b.  Statute of Limitations

Defendants also argue that Counts 1 and 6 are subject to the same statute of limitations problems as the versions of the counts that appeared in the FAC.  The SOL Opinion, of which the plaintiff seeks reconsideration, dismissed both on statute of limitations grounds.

The SOL Opinion applied a six-year statute of limitations to the class-wide counts, based on federal common law.  SOL Opinion, 607 F. Supp. 2d. at 592; see also Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan, --- F.3d ---, No. 08-1611-cv, 2009 WL 1964972, at * 1 (2d Cir. July 9, 2009).  Under federal common law, "courts generally apply the discovery rule to determine when an ERISA cause of action accrues" and "a plaintiff's claim accrues when he discovers or with reasonable diligence should discover[] the injury that gives rise to his claim."  SOL Opinion, 607 F. Supp. 2d at 592. (citation omitted).  In the context of a claim for benefits under an ERISA plan, the Second Circuit first articulated in Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan, 201 F.3d 44, 48 (2d Cir. 1999), that a plaintiff's claim "accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff -- regardless of whether the plaintiff

has filed a formal application for benefits." Id.; SOL Opinion, 607 F. Supp. 2d at 592-593.[7]

The defendants' motion to dismiss Counts 1 and 6 as barred by the statute of limitations is denied. The SAC contains no basis for concluding that Bilello would have discovered the interest rates employed and the consequent backloading of his benefits as alleged in Count 1 more than six years before the filing of this lawsuit. Count 6 points to a period of at least six years where Bilello accrued no benefits. Defendants have not shown (or even argued) that Bilello knew, or should have known, more than six years prior to the filing of the complaint of the wear-away he experienced between 1991 and at least 1996. Bilello explains that he did not have "any indication" how his

---

[7] Bilello argued in the context of his reconsideration motion that the statute of limitations standard articulated here should be recast as an "average participant" standard whereby a claim accrues when an average participant would have discovered the grounds for his or her claims. He believed that such a reformulation would save Count 1 and 6 as they appeared in the FAC from dismissal since the average participant in an ERISA plan could not be expected upon reading a plan amendment or SPD to understand the claims pleaded there; to wit, that there was a risk of backloading and that ERISA prohibits backloading. Because Counts 1 and 6 as pleaded in the SAC are timely under the well established jurisprudence for measuring the timeliness of a claim, there is no need to discuss further whether a different standard should be invented and applied when a plaintiff complains about a risk of injury rather than an actual injury. Risk-of-injury claims are vulnerable on standing grounds, making it unlikely that a court will have to address the statute of limitations.

benefit had actually been calculated until he analyzed the
calculation worksheet the defendants provided to him in
September 2007.  With this document, he learned that it took at
least until 1997 for his cash balance account to catch up with
his balance under the Pre-1989 Plan as of January 1, 1991.

    c. Other Arguments that Counts 1 and 6 Fail to State a Claim

        i. Count 1

    Defendants argue that Count 1 fails to state a claim as to
any of the three Plans on which its backloading claim is
premised.  The SAC alleges that Bilello lost benefits in 2003,
2004, 2005 and 2008 to which he was entitled because the 2002
and 2005 Plans failed to apply a sufficiently high interest-
credit rate to participants like Bilello who were grandfathered
into those plans under the 1997 Plan's 4% to 14% pay credit
schedule.

    Defendants are correct that Bilello has failed to state a
claim based on the 1997 Plan.  Since Bilello alleges that he
suffered an injury only in years covered by the 2002 and 2005
Plans, any claim based on a backloading violation by the 1997
Plan per se must be dismissed.  Under ERISA, after an amendment,
only the amended plan is considered for backoading purposes.
ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B); Langman v.
Lamb, 328 F.3d 68, 71 (2d Cir. 2003) (anti-backloading provision
"applies to how a given plan operates at a given time").  His

allegations that the pay credit scale in the 1997 Plan created the potential for backloading (absent a minimum interest rate) when it was grandfathered into the 2002 and 2005 Plans is treated solely as necessary background information to explain Bilello's claim that the 2002 and 2005 Plans violated the 133 1/3% Rule.

Defendants argue that Count 1 does not state a claim with regard to the 2002 and 2005 Plans for other reasons.  They contend that the 5.21% minimum interest rate on which Count 1 is premised is based on a flawed understanding of which 1997 Plan participants were grandfathered into the later plans. Plaintiff's 5.21% minimum interest rate calculation is based on the increase in pay credits under the 1997 Plan as a participant moved from 4% to 8%.  This transition, though, occurred under the 1997 Plan's pay credit schedule for employees moving from 1-3 years of service to 11-15 years of service.  As explained in the 2003 SPD for the 2002 Plan, to be grandfathered under the 1997 Plan's pay credit scale, a participant either had to be forty years old and vested (generally requiring five years of service) or have fifteen years of service.  Since all grandfathered participants, defendants argue, necessarily had at least five years of service, none of them would experience the dramatic increase in pay credits from 4% to 8%, and an interest

rate less than the 5.21% minimum interest rate on which Count 1 is premised would have sufficed to offset backloading.

The defendants' motion to dismiss Count 1 to the extent it is premised on the assertion that the 2002 and 2005 Plan violated the 133 1/3% Rule is denied.  Bilello has adequately alleged that he suffered damages in four of the years that followed the implementation of these two plans due to a violation of the rule.  While the defendants may prevail on a motion for summary judgment, their attack on the plaintiff's methodology for calculating his injury is premature.[8]

ii. Count 6

Defendants argue, following both Circuit Courts of Appeal to have considered this specific issue, that Count 6 fails to state a claim because it is based on an impermissible calculation that incorporates benefits accrued under the Pre-1989 Plan to find backloading.  The issue is whether it must be assumed in analyzing a backloading claim that the cash balance plan has been in effect for all plan years, and that participants never earned a balance under the Pre-1989 Plan and never experienced wear-away.

The defendants' argument rests on ERISA § 204(b)(1)(B)(i), 29 U.S.C. § 1054(b)(1)(B)(i), which will be referred to as the

---

[8] Bilello has not yet responded to the defendants' contention that his calculations underlying his Count 1 claim are flawed.

"Plan Amendment Provision," and which follows ERISA's statement
of the 133 1/3% Rule.  It provides that where there is a plan
amendment, the current plan is treated as "in effect for all
other plan years" in judging whether there has been a violation
of the 133 1/3% Rule.  <u>Id</u>.  The rule provides, in relevant part:

>     A defined benefit plan satisfies the
> requirements of this paragraph of a
> particular plan year if under the plan the
> accrued benefit payable at the normal
> retirement age is equal to the normal
> retirement benefit and <u>the annual rate at
> which any individual</u> who is or could be a
> participant <u>can accrue the retirement
> benefits</u> payable at normal retirement age
> under the plan for any later plan year <u>is
> not more than 133 1/3 percent of the annual
> rate at which he can accrue benefits</u> for any
> plan year beginning <u>on or after</u> such
> particular plan year <u>and before such later
> plan year</u>. For purposes of this
> subparagraph--
> (i)   <u>any amendment</u> to the plan which is in
>       effect for the current year <u>shall be
>       treated as in effect for all other plan
>       years</u>.
> (ii)  any change in an accrual rate which
>       does not apply to any individual who is
>       or could be a participant in the
>       current year shall be disregarded.

<u>Id.</u> (Emphasis supplied.)  As a consequence of the Plan Amendment
Provision, the 133 1/3% Rule "applies to how a given plan
operates at a given time."  <u>Langman</u>, 328 F.3d at 71.

        Interpreting the Plan Amendment Provision, the Second
Circuit Court of Appeals in <u>Langman</u> held that the 133 1/3% Rule
does not apply to across-the-board changes to benefit rates

applied to all current employees, as in the case of a plan
amendment.  Id. at 71.  In that situation, only the new formula
is considered.[9]  Id.  Citing Langman, the Ninth and Third
Circuits have each found that cash balance plans were not
backloaded because of wear-away.  Hurlic v. Southern California
Gas Co., 539 F.3d 1024, 1033-35 (9th Cir. 2008); Register v. PNC
Fin. Svcs. Group, 477 F.3d 56, 71-72 (3d Cir. 2007).

Both Hurlic and Register reviewed conversions to cash
balance plans in which wear-away occurred as the result of
protecting or grandfathering an employee's benefit earned under
a prior plan.  Assuming that the cash balance plan was in effect
for all years, Hurlic and Register concluded that no participant
would have earned a benefit under any prior plan and that as a
result no backloading had occurred, even though the prior plan's
benefit was protected or grandfathered under the plan
conversion, and even though that conversion created the wear-
away.  Hurlic, 539 F.3d at 1035; Register, 477 F.3d at 72 ("If
we treat the amended plan as in effect for all other plan years,
as Congress directs us to do, appellants never would have
accrued a benefit under the old plan and would have started to
accrue benefits under the cash balance formula from the
beginning of their employment").

---

[9] The Second Circuit has not directly addressed the impact of
wear-away on backloading calculations.

The plain language of the Plan Amendment Provision compels the finding that Count 6 fails to state a claim.  The benefits amassed by plan participants under the Pre-1989 Plan are irrelevant for purposes of measuring backloading once there has been a plan amendment; the cash balance plan is considered in effect for all plan years.  When only the 1989 Plan's benefit accrual formulae are considered, no backloading through wear-away has occurred.  The existence of wear-away simply becomes irrelevant to the application of the 133 1/3% Rule.

Plaintiff advances three reasons to reject this reading of the Plan Amendment Provision and the rulings in Hurlic, Register, and by several district courts.  Plaintiff first responds that the minimum benefit feature protecting a plan participant's rights to benefits accrued under the pre-conversion plan is part of the 1989 Plan and its successors. Each of these plans protected the Pre-1989 Plan balance.  As a result, the argument goes, that balance should be considered for calculating the cash balance plans' compliance with the 133 1/3% Rule.  Plaintiff's argument ignores the implications of the Plan Amendment Provision.  As the Hurlic court observed, in rejecting this very argument, "[q]uite simply, the Plan, as amended, does not determine a participant's benefits by aggregating two formulas." Hurlic, 539 F.3d at 1034.  The Hurlic court noted that the cash-balance plan explicitly referred to the

30

grandfathered benefit as the benefit accrued under a _prior_ plan, rather than as a benefit accrued under a formula still in effect.  _Id._ at 1035.  The court continued, "[b]ecause Congress has directed us to treat the amended plan as if it was in effect for all other plan years, we must assume that, for purposes of applying the 133-1/3 percent rule, there was never a prior plan under which Plaintiffs accrued benefits."  _Id._ (citation omitted).  The same is true here.[10]

The plaintiff next relies on _Esden_, 229 F.3d at 167 n.18, as compelling a finding that, since the 1989 Plan and its successors protected the Pre-1989 Plan balance, the Pre-1989 Plan balance and subsequent wear-away should be considered for calculating the cash balance plans' compliance with the 133 1/3%

---

[10] Both _Hurlic_ and _Register_ rejected the argument that Treasury Regulation 26 C.F.R. § 1.411(b)-1(a)(1) was implicated by the wear-away effected by the adoption of cash balance plans.  The regulation provides that

> A defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula. In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods [one of which is the 133 1/3% Rule].

_Id_.  As the court in _Register_ observed, this regulation requires aggregation of benefits when there are multiple benefit formulas under a single plan.  _Register_, 477 F.3d at 72.  Because of the Plan Amendment Provision, "once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 1/3 test."  _Id._; _Hurlic_, 539 F.3d at 1033-34.

rule.  Esden's analysis of the 133 1/3% Rule does not support
this reading.

Esden held that a plan could not use a minimum 5.5%
interest rate for the purposes of complying with the anti-
backloading rules but actually pay out lump-sum benefits at a
statutory 4% discount rate.  Id. at 157.  The court held that
the plan tried to "have it both ways" by representing that
participants were accruing interest at a 5.5% minimum rate
(necessary to avoid a backloading violation) but projecting
benefits at a rate of only 4% per year until a participant
reached normal retirement age, possibly to avoid using a
discount in excess of the prescribed applicable rate and
violating ERISA § 204(g) and I.R.C. § 417(e).  Esden, 229 F.3d
at 165-66, 167 n.18.  Esden's analysis addresses interest credit
projection rates and discount rates, and the footnote plaintiff
cites describes the necessity of the minimum interest credit
rate to avoid backloading.  Id. at 167 n.18.  Count 6 concerns
the period of zero accrual, created by the grandfathering of a
benefit accrued under a pre-conversion plan.  It does not
address the relationship between interest and pay credits or the
impact of the discrepancies between projection and discount
rates with which Esden is concerned.

Finally, the plaintiff argues that reliance on the Plan
Amendment Provision to excuse wear-away "perverts" Congress'

purpose in enacting the provision.  The plaintiff reasons that,
since the 133 1/3% Rule was enacted to prevent any increase in
benefits by more than one-third from one year to the next, the
Plan Amendment Provision could only have been intended to permit
plans to adopt amendments that would <u>increase</u> rates of accrual
by more than one-third when compared to the plan that was
replaced.  The plaintiff finds support for this in H.R. Rep. 93-
807,[11] from the fact that wear-away was unknown in 1974 when
ERISA and the Plan Amendment Provision were adopted, and from
the 2006 amendment to ERISA outlawing wear-away.[12]

---

[11] H.R. Rep. 93-807, quoted earlier in this Opinion, explains
that the 133 1/3% Rule is "obviously not intended to place a
limit on the amount of benefit increases for future service that
may be provided under plan amendment."  That the 133 1/3% Rule
does not "place a limit" on benefit increases does not mean that
it prohibits amendments that do not provide for benefit
increases, as occurs where an amendment creates wear-away.
Moreover, it is not evident that this statement from the
legislative history clearly indicates "the stated purpose" of
the Plan Amendment Provision, as Bilello argues, rather than
simply describing one implication of the 133 1/3% Rule.

[12] In 2006, ERISA was amended by the Pension Protection Act of
2006, Pub. L. 109-280 § 701(a)(1), to require that, following a
plan amendment,

> the requirements of this clause are met with
> respect to any participant if the accrued
> benefit of the participant under the terms
> of the plan as in effect after the amendment
> is <u>not less than the sum</u> <u>of</u> --
>
> > (I)  the participant's accrued benefit
> > for years of service before the
> > effective date of the amendment,
> > determined under the terms of the
> > plan as in effect before the
> > amendment, <u>plus</u>

As a matter of statutory construction, when the language of a statute is unambiguous, it is generally inappropriate to resort to arguments based on congressional intent to interpret the provision. <u>Padilla v. Rumsfeld</u>, 352 F.3d 695, 718 (2d Cir. 2003) ("[i]f the plain language is unambiguous, judicial inquiry ends, except in rare and exceptional circumstances, and legislative history is instructive only upon the most extraordinary showing of contrary intentions") (citation omitted).  As for the congressional action in 2006 to address wear-away, this can as easily be read as congressional recognition that the Plan Amendment Provision in effect since ERISA was first enacted does not forbid wear-away.  In any event, the defendants are as able to point to congressional policies in enacting the 133 1/3% Rule that support their reading of the Plan Amendment Provision: because benefit accrual under a traditional defined benefit plan reaches its apex in an employee's final years of service, long-term employees are more

---

            (II) the participant's accrued benefit
                 for years of service after the
                 effective date of the amendment,
                 determined under the terms of the
                 plan as in effect after the
                 amendment.

ERISA § 204(b)(5)(B)(iii), 29 U.S.C. § 1054(b)(5)(B)(iii) (emphasis supplied).  Applicable to plan amendments adopted after June 29, 2005, this provision prohibits wear-away because benefits earned under the new plan up to the date of the amendment must be <u>added</u> to benefits earned under the prior plan.

likely to experience wear-away in the conversion to a cash
balance plan.  See Campbell, 327 F.3d at 8.[13]  The anti-
backloading rules were designed to protect employees in their
"early years of service when [they are] most likely to leave the
firm."  Langman, 328 F.3d at 71 (citation omitted).  Those
employees are less likely to experience wear-away.  The policies
underlying the backloading regulations, therefore, would not
necessarily be furthered by a finding that a backloading
violation was caused by the wear-away that had occurred here.
See Register, 477 F.3d at 72.  The defendants' motion to dismiss
Count 6 is granted.

3. Counts 7 and 8: The Notice Claims

     Counts 7 and 8 address the adequacy of the notices that
defendants provided to plan participants advising them of plan
features and amendments.  Count 7 is addressed to notices of
plan amendment, whereas Count 8's allegations concern SPDs.

     a. Count 7

     Count 7 identifies language in communications regarding the
1989 Plan that the plaintiff deems "misleadingly optimistic and
congratulatory," which allegedly misled participants about the
effect of the 1989 Plan on their rates of benefit accrual.[14]  The

---

[13] Bilello, for example, had been a Chemical employee since 1960.

[14] Count 7 contains many allegations that have already been
dismissed as time-barred or for their failure to state a claim.

SAC alleges that the defendants' communications with participants about the creation of the cash balance plan, described it as having, <u>inter alia</u>, "special advantages" and "very positive changes."  These misleading communications are alleged to have violated ERISA § 204(h), 29 U.S.C. § 1054(h). The defendants assert that "misleading" communications are not actionable as a violation of ERISA § 204(h).

At the time that the 1989 Plan was issued, ERISA § 204(h), 29 U.S.C. § 1054(h), which delineates the requirements for notices distributed in the event of a significant reduction in benefit accrual, required that

> [a] single-employer plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, <u>setting forth the plan amendment and its effective date</u>.

ERISA § 204(h), Pub.L. 99-272, 100 Stat 82 § 11006 (1986) (current version at 29 U.S.C. § 1054(h)) (emphasis supplied). The provision required the disclosure of only the amendment and its effective date, <u>see</u> April 24 Opinion, 2009 WL 1108576, at *4, and did not seek to regulate the content of the

---

These are allegations that the defendants did not provide "advance" notice of the 1989 Plan or written notice "setting forth" the amendments to the 1989 and 1997 Plans.  <u>See</u> SOL Opinion, 607 F. Supp. 2d at 598; April 24 Opinion, 2009 WL 110876 at *5.

communication beyond that.[15]  Plaintiff's allegation that
misleading disclosures regarding the 1989 Plan violated ERISA §
204(h) do not therefore state a claim.  Cf., e.g., Frommert v.
Conkright, 433 F.3d 254, 263 (2d Cir. 2006).

Plaintiff presents no argument or authority that would
permit Count 7's claim that ERISA § 204(h) was violated by
misleading communications concerning the 1989 Plan other than a
selective reading of the April 24 Opinion.  Bilello contends
that the April 24 Opinion held that Count 7 could survive to the
extent that it alleged that the "204(h) notices were misleading
or inaccurate."  Bilello misconstrues the opinion.

As of the time the April 24 Opinion was issued, portions of
Count 7 had already been dismissed as barred by the statute of
limitations.  SOL Opinion, 607 F. Supp. 2d at 598-99.  The
surviving portion alleged that notices distributed in connection
with the 1989 and 1997 Plan violated ERISA because they failed
to warn of a significant reduction in benefit accrual and
inaccurately described the Plans.  April 24 Opinion, 2009 WL
1108576, at *4.  The defendants moved to dismiss that claim on

_____

[15] As explained in the April 24 Opinion, 2009 WL 1108576, at *4,
Congress amended ERISA in 2001 to provide that an amendment must
"be written in a manner calculated to be understood by the
average plan participant and shall provide sufficient
information . . . to allow applicable individuals to understand
the effect of the plan amendment." 29 U.S.C. § 1054(h)(2).  See
also 26 C.F.R. § 1411(d)-6T (1996), 63 Fed. Reg. 68,678 (1998);
Hurlic, 539 F.3d at 1038; Scott v. Admin. Comm. of the Allstate
Agents Pension Plan, 113 F.3d 1193, 1200 (11th Cir. 1997).

the ground that the version of ERISA § 204(h) then in force
required only notice that plan amendments had occurred and their
effective date.  Id.  The April 24 Opinion agreed, and since
Bilello did not contest that the notices distributed contained
the amendment and effective date, granted the motion to dismiss
Count 7 to the extent it was based on a claim that the
defendants had an obligation under ERISA § 204(h) "to spell out
the effects of the amendment."  Id. at *5.

The only portion of Count 7 that remained was the assertion
that the notices of the amendments were "'misleadingly
optimistic and congratulatory' or inaccurate."  As to that
remaining portion of the pleading, the defendants moved to
dismiss pursuant to Rule 8, Fed. R. Civ. P., for the plaintiff's
failure to give fair notice to the defendant of the claim.  Id.
The April 24 Opinion granted that Rule 8 motion.  Id.  Thus, the
April 24 Opinion did not consider whether an adequate pleading
of alleged misleading statements would state a violation of
ERISA § 204(h).  This final portion of Count 7 is now dismissed
for its failure to state a claim.[16]

While a plan's dissemination of misleading information
regarding plan amendments certainly violates ERISA, see, e.g.,
Frommert, 433 F.3d at 271, it is not a violation of ERISA §

[16] Count 7 only describes "misleadingly optimistic and
congratulatory" statements regarding the 1989 Plan.  It does not
identify any such statements for any other plan amendment.

204(h) as it stood at the time the communications about the 1989
Plan were disseminated.[17]  For the reasons explained in the April
24 Opinion, former § 204(h) regulated only the notice a plan
must give of the amendment and its effective date.  April 24
Opinion, 2009 WL 1108576, at *4.

   b. Count 8

   Count 8 alleges that defendants provided participants with
three flawed SPDs in 1992, 1994, and 1999.[18]  According to
Bilello, these SPDs were misleading in their descriptions of
plan features or through omissions, in violation of ERISA § 102,
29 U.S.C. § 1022, and 29 C.F.R. § 2520.102-2.[19]  In essence,
Bilello alleges that the three SPDs each failed to provide
sufficient information for a participant to discern a violation
of the ERISA backloading rules or that the cash balance plan
formula reduces participants' rates of future benefit accrual,
either as they age or in comparison to the Pre-1989 Plan.

---

[17] It is unnecessary to address whether a misleading statement
encompassing the very limited notice requirements in former
ERISA § 204(h), for example, a misleading description of the
effective date of the amendment, might be actionable under that
section, since this is not raised by the allegations in Count 7.

[18] The FAC did not include allegations concerning the 1992 SPD,
and the plaintiff contends that he did not receive this SPD
until defendants moved to dismiss the FAC on February 25, 2008.

[19] Count 8 also alleges a violation of ERISA § 104(b)(1), 29
U.S.C. § 1024(b)(1), which imposes timing requirements for
issuance of the SPD.  Those allegations were previously
dismissed and are not at issue here.

Specifically, Count 8 alleges that all three SPDs misled participants by failing to explain adequately their reduced rates of future benefit accrual based on age.[20]  In addition, the 1992 SPD failed to explain how the 1989 Plan caused wear-away[21] and thereby violated the anti-backloading rules or how it reduced rates of future benefit accrual "as compared to" the Pre-1989 Plan.  As for the 1994 SPD, the SAC alleges that it was deficient because it did not disclose the wear-away feature of the plan and because its description of a minimum annual rate for interest credits as based on the average rate for the one-year U.S. Treasury bills led average plan participants to believe that there was a minimum interest-crediting rate.

> i. Statute of Limitations

Defendants first argue that Count 8's allegations are time-barred because the communications at issue were disseminated more than six years prior to the filing of the lawsuit, and, citing the SOL Opinion, because Bilello "knew or should have

---

[20] The SAC suggests that the 1994 SPD should have explained this negative impact on older participants by providing side-by-side examples of the benefits differently aged participants would receive.  The SAC suggests that the 1999 SPD could have given an example of the benefit accrual an older participant nearing retirement age would experience, instead of providing a single example of a participant's purported benefit accrual over time.

[21] Count 8 explains that the 1992 SPD could have explained the wear-away impact of the 1989 Plan by explaining how participants' opening account balances were calculated and how variable discount rates could impact opening account balances.

known whether any provisions in the [SPDs] were unclear."  SOL
Opinion, 607 F. Supp. 2d at 599.  As the SOL Opinion noted, the
allegations that these notices were misleading (as opposed to
unclear) are not time-barred, and "to the extent that a count
identifies additional information that was necessary to make the
SPD sufficiently accurate and comprehensive, that claim
survives."  Id.  Bilello cannot be charged with the discovery
that he was misled by the notices upon the mere receipt of
allegedly deceptive information.

      ii.  Other Arguments that Count 8 Fails to State a Claim

      Defendants also argue that Count 8 is futile to the extent
that it is based on a claim that the SPDs failed to disclose
alleged reductions in rates of accrual based on age, because the
Hirt decision established that cash balance plans, as a matter
of law, do not reduce the rate of future benefit accrual as
participants age.  Hirt, 533 F.3d at 110.  Those portions of
Count 8 that are premised on a theory of misleading
communications regarding rates of benefit accrual based on age
are dismissed.  The remaining portions of the count asserting
that the SPDs were misleading are not addressed by this motion
and therefore survive.[22]

_____

[22] Count 8 survives to the extent that it alleges that the 1992
and 1994 SPDs misled by failing to explain the phenomenon of
wear-away; that the 1992 SPD misled concerning a reduction in
benefit accrual effected by the 1989 Plan compared to the Pre-

SPDs may not mislead or misinform ERISA plan participants about their plan benefits.  ERISA requires that SPDs "be written in a manner calculated to be understood by the average plan participant [and] be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  ERISA § 102, 29 U.S.C. § 1022(a).  Regulations implementing ERISA further explain that

> [t]he format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries.  Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.

29 C.F.R. § 2520.102-2.

Much of Count 8 rests on the assertion that the SPDs misled participants about one key fact:  the declining benefit accrual rates for aging participants.  ERISA forbids reductions in benefit accruals due to age.  Specifically, ERISA § 204(h) provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if . . . the rate

---

1989 Plan; and that the 1994 SPD misled participants about the existence of a minimum interest-credit rate.  Those allegations that the SPDs failed to disclose the existence of <u>illegal</u> backloading by means of wear-away are, for the reasons described in connection with the dismissal of Count 6, dismissed; since there was no such backloading violation, there was no duty to disclose the violation.  All allegations against the 1999 SPD are dismissed.

of an employee's benefit accrual is reduced, because of the
attainment of any age."  29 U.S.C. § 1054(b)(1)(H)(i).  In <u>Hirt</u>,
the Second Circuit Court of Appeals held that the statutory term
"rate of benefit accrual," however, refers to an employer's
contribution to a plan, and does not refer to the different
amounts that those contributions may earn as a result of time
and compounded interest.  <u>Hirt</u>, 533 F.3d at 107.  Thus, where
the interest credits that employers contribute to older and
younger workers is the same, their "rate[s] of benefit accrual"
are identical even though the interest credits distributed to
younger workers result in greater "accrued benefits."  <u>Id</u>. at
108.[23]  Declining to hold that the "rate of benefit accrual" had
the same meaning as "accrued benefits," the court held that cash
balance plans did not by definition reduce the rate of benefit
accrual based on age and violate ERISA § 204(h), 29 U.S.C. §
1054(h).  <u>Id.</u> at 110.  Accordingly, Bilello may not allege that
an SPD is misleading based on any failure to disclose that the
plans' formula reduced rates of benefit accrual as participants
age; it is the settled law of this Circuit that cash balance
plans like those at issue here do not do so.

Bilello attempts to evade the <u>Hirt</u> ruling by misstating
<u>Hirt</u>'s holding.  Plaintiff argues that the finding that cash-

---

[23] The "accrued benefit" is the annual benefit commencing at the
normal retirement age.  <u>Hirt</u>, 533 F.3d at 109.

balance plans are not age-discriminatory does not absolve defendants of their duty to disclose the effect of the plan on participants' rates of benefit accruals as they age.  The plaintiff is correct that ERISA requires disclosure of many plan features, regardless of whether or not they violate the law. See, e.g., Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006) (failure to disclose requirement that participants produce proof that they performed the work for which they sought pension credits).  But Hirt found that cash-balance plans do not have the impact on rates of benefit accrual that plaintiff claims must be disclosed. Defendants do not have to disclose a feature of the plans that does not in fact exist.  Any purported lower absolute level of accrued benefits earned by older participants is not a reduction in the rate of benefit accrual. [24]  Bilello's allegation that the SPDs are misleading because they failed to disclose the effect of the cash balance formula on participants' rates of benefit accrual as they aged is therefore dismissed.

---

[24] As explained above, older workers will accrue a smaller benefit in any given year than a younger worker with the same pay credit because the younger worker's interest credit projection will be greater, owing to the fact that the younger worker has more years remaining until retirement age.

4. Count 12: Breach of Fiduciary Duty

Count 12 alleges that the Plan Administrator breached fiduciary duties owed to the class under ERISA § 404(a) by making materially misleading and false statements in connection with the dissemination of the 1989 Plan and certain successor plans[25] which failed to disclose that the cash balance plan amendments reduced participants' benefits.[26]  The alleged misleading statements and omissions prevented plan participants from understanding three things: (1) that the conversion to a cash balance plan decreased the rate of benefit accrual as participants age, (2) that it created wear-away, and (3) that participants' benefits were lower under the cash-balance plan formula than under the Pre-1989 Plan.  The defendants assert that the claim is time-barred, and in any event fails to state a claim.

---

[25] This is apparently a reference to the 1989, 1993 and 1997 Plans.  Count 12 refers to the allegations in Counts 7 and 8.

[26] The defendants move to dismiss that portion of Count 12 which asserts that by the above-described acts the Plan Administrator also violated ERISA §§ 102 and 204(h), 29 U.S.C. §§ 1022 and 1054(h).  These ERISA provisions, in relevant part, regulate SPDs and prohibit reducing an employee's rate of benefit accrual based on the employee's attainment of a certain age.  The defendants point out that amending a plan is not a fiduciary function.  The plaintiff agrees, and represents that Count 12 is addressed to the breach of a fiduciary duty based on the Plan Administrator's own misleading statements, something that it acknowledges "go[es] beyond what is needed to state a 204(h) or SPD violation."

That portion of Count 12 based on the alleged breach of
fiduciary duty associated with the failure to warn that the cash
balance plan results in a decrease in the rate of benefit
accrual as participants age is dismissed, for the reasons
already described in connection with Count 8.  Count 12's second
prong asserts that the Plan Administrator breached its fiduciary
duty by making material misstatements and omissions regarding
the wear-away of pension benefits that occurred through the
adoption of a cash balance plan.  The misrepresentations and
omissions concerning wear-away are alleged to have been
communicated in several kinds of documents.  The SAC identifies
statements in two letters and a September 1990 Summary of
Material Modification, all sent in connection with the 1989
Plan, as misrepresentations concerning wear-away.  In addition,
Bilello alleges that the periodic statements of account activity
that he received were misleading because they made it appear as
if his benefit was increasing, and failed to advise him that the
balance in his hypothetical cash balance account was less than
the protected benefit from the Pre-1989 Plan.  Finally, he
asserts that the 1992 and 1994 SPDs should have but did not
disclose wear-away.

The third prong of Count 12 asserts that the Plan
Administrator had a fiduciary duty to avoid misleading and
materially false statements that prevented participants from

understanding that "their benefits under the cash balance plan
formula, as amended, are lower than their benefits under the
prior traditional plan." Bilello does not explain in what way
and for which participants the benefits were "lower." At other
passages in the complaint, principally in connection with Counts
7 and 8, Bilello refers to misleading statements about the
reduction in "rates of future benefit accrual," and he may be
referring to the same phenomenon in Count 12.[27] Because Bilello
does not explain in his complaint precisely what these lower
benefits are, it is possible that he is simply referring to the
reduction in rates of benefit accrual as participants age, a
claim that has been dismissed, or the existence of wear-away, a
claim which this Opinion permits Bilello to pursue. The
defendants' opposition to the motion to amend, however, does not
raise this point and does not focus specifically on this prong
of Count 12. Thus, to the extent that Bilello has given notice
of misleading statements that prevented participants from

---

[27] In the Factual Background section of the SAC, Bilello claims
that the 1989 Plan "reduces rates of benefit accrual for
participants compared to the final average pay formula of the
Prior Plan." As part of Count 7, Bilello alleges that the 1989
Plan reduced future benefit accrual by 1) "converting the Plan
from a final average pay plan to a cash balance plan," and 2)
"reducing participants' rates of future benefit accrual by this
conversion and plan amendment." Count 8 also alleges that the
1989 Plan reduced the rate of future benefit accrual "as
compared to" the Pre-1989 Plan.

understanding that the conversion to a cash balance plan lowered

their benefits, that claim survives this motion to dismiss.

    a. Statute of Limitations

    Defendants submit that Count 12 is untimely because the

alleged breaches of fiduciary duty concern plan communications,

the latest of which was distributed in 1999.  As a breach of

fiduciary duty claim, Count 12 is subject to the limitations

period set forth in ERISA § 413, 29 U.S.C. § 1113.  That section

provides that a fiduciary duty claim must be brought after the

earlier of

>           (1) six years after (A) the date of the last
>           action which constituted a part of the
>           breach or violation, or (B) in the case of
>           an omission the latest date on which the
>           fiduciary could have cured the breach or
>           violation, or
>           (2) three years after the earliest date on
>           which the plaintiff had actual knowledge of
>           the breach or violation; except that in the
>           case of fraud or concealment, such action
>           may be commenced not later than six years
>           after the date of discovery of such breach
>           or violation.

ERISA § 413, 29 U.S.C. § 1113.  Plaintiff asserts that the

alleged breaches described in Count 12 largely concern

misleading statements that failed to disclose certain effects of

the plan amendments.  Since the earliest that the plaintiff

could have discovered that the Plan Administrator's alleged

failures actually had a negative impact on his pension benefit

by causing a wear-away of his pension benefits was upon receipt

of the calculation of his benefits in September 2007, this claim
is timely.

b. Other Arguments that Count 12 Fails to State a Claim

Defendants also argue that Count 12 fails to state a claim
for breach of fiduciary duty because Bilello has made only
speculative allegations of prejudice and because his allegations
are impermissibly duplicative of his claims alleging violations
of ERISA's notice provisions.  ERISA § 404(a)(1)(B) imposes a
duty on fiduciaries (which include plan administrators) to

> discharge [their] duties with respect to a
> plan solely in the interest of the
> participants and ... with the care, skill,
> prudence, and diligence under circumstances
> then prevailing that a prudent man acting in
> a like capacity and familiarity with such
> matters would use in the conduct of an
> enterprise of a like character and with like
> aims.

29 U.S.C. § 1104(a)(1)(B); Wilkins, 445 F.3d at 579.

Communicating information about the contents of a plan is a
discretionary responsibility giving rise to a fiduciary
obligation.  Bouboulis v. Transport Workers Union of America,
442 F.3d 55, 65 (2d Cir. 2006).  Consequently, "when a plan
administrator speaks, it must speak truthfully."  Ballone v.
Eastman Kodak Co., 109 F.3d 117, 123 (2d Cir. 1997) (citation
omitted).  "Fiduciaries may be held liable for statements
pertaining to future benefits if the fiduciary knows those
statements are false or lack a reasonable basis in fact."

Flanigan v. General Elec. Co., 242 F.3d 78, 84 (2d Cir. 2001).
Those statements may be actionable as a breach of fiduciary duty
if they are "material misrepresentations to plan participants
about changes to an employee pension benefits plan." Mullins v.
Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) (citation
omitted).

The Second Circuit has borrowed from securities law to
formulate the materiality standard applicable to claims of
fiduciary breach under ERISA based on misrepresentations.
Ballone, 109 F.3d at 124.  "[M]isrepresentations are material if
they would induce a reasonable person to rely upon them." Id.
at 122.  Determining the materiality of misstatements is a fact-
specific inquiry.  Id. at 125.

Applying this standard, "when a plan administrator
affirmatively misrepresents the terms of a plan or fails to
provide information when it knows that its failure to do so
might cause harm, the plan administrator has breached its
fiduciary duty to individual plan participants and
beneficiaries." Devlin v. Empire Blue Cross and Blue Shield,
274 F.3d 76, 88 (2d Cir. 2001) (citation omitted).  Omissions
may also give rise to liability for breach of fiduciary duty.
See Pocchia v. NYNEX Corp., 81 F.3d 275, 279 (2d Cir. 1996).
Fiduciaries may be "liable for non-disclosure of information
about a current plan when the omitted information was necessary

to an employee's intelligent decision about retirement."
Flanigan, 242 F.3d at 84.

The Second Circuit, interpreting the Supreme Court's
decision in Varity Corp. v. Howe, 516 U.S. 512 (1996), has ruled
that claims for breach of fiduciary duty may be brought even
when the same facts give rise to other claims for relief.
Devlin, 274 F.3d at 89 (claims for breach of fiduciary duty and
promissory estoppel).  An employer's failure to provide a
required notice may be cognizable under both ERISA's
notification requirements and breach of fiduciary duty
provisions.  Weinreb v. Hospital for Joint Diseases Orthopaedic
Institute, 404 F.3d 167, 171 n.1 (2d Cir. 2005).

Bilello has stated a claim for fiduciary duty based on the
Plan Administrator's allegedly misleading and materially false
statements that did not reveal that participants' benefits under
the cash balance plan formula were allegedly lower than their
benefits under the Pre-1989 Plan and that a period of wear-away
would occur.  As a result of these statements, participants were
allegedly unable to plan reliably for retirement and
misunderstood the terms of their employment.  The knowledge that
an employee will not receive the benefits that he or she
previously expected would understandably impact any "intelligent
decision about retirement" such that, at this stage in the
litigation, they are sufficiently material and non-speculative

51

to support a claim for breach of fiduciary duty.  See Flanigan,
242 F.3d at 84.  Defendants' position that ERISA's notice
provisions are the "only" regulations of those notices misstates
the law, which allows for fiduciary liability for the
dissemination of flawed SPDs and other notices.  See Weinreb,
404 F.3d at 171 n.1; see also Devlin, 274 F.3d at 87
(contemplating breach of fiduciary duty claims based on, inter
alia, a non-compliant SPD).

     Finally, the assertions that the Plan Administrator had a
fiduciary duty to avoid misleading and materially false
statements that prevented participants from understanding that
1) their benefits would wear away and 2) that "their benefits
under the cash balance plan formula, as amended, are lower than
their benefits under the prior traditional plan" may not be
dismissed simply because these same assertions underlie other
theories of liability that have been dismissed and cannot be
resurrected.  Those theories include the claim that the
defendants were obligated by ERISA § 204(h), 29 U.S.C.
§ 1054(h), to explain the effect of the conversion to a cash
balance plan.  As explained in the April 24 Opinion, 2009 WL
1108576, at *4, that statute required only that the defendants
make a more limited disclosure, and the plaintiffs do not
contest that the defendants made that limited disclosure.  As
explained above, misstatements are actionable even in the

absence of a duty to disclose.  Once one chooses to speak, one must speak accurately.  Ballone, 109 F.3d at 123.

5. Counts 10 and 11: The Individual Claims

Finally, defendants argue for the dismissal of the two individual claims pleaded by Bilello in Counts 10 and 11.[28] Bilello's individual claims address the Plan Administrator's refusal to provide plan documents and calculation worksheets.

Bilello describes a series of written requests that he made in 2007 for the plan documents and SPDs on which the defendants relied to calculate his benefits, their calculation worksheets, all plan documents in effect from 1960 under which the JPMC Plan or its predecessors were established or operated, and more specifically the Pre-1989 Plan and its SDP, and the 1989 Plan. The Plan Administrator refused to provide plan documents in effect prior to 2002.  While the Plan Administrator provided certain worksheets, Bilello asserts that they were not "written in a manner calculated to be understood by the average plan participant."  Specifically, a computer printout indicating Bilello's total non-forfeitable accrued pension benefit did not explain how Bilello's "Prior Service Balance" was calculated. Similarly, a 45-page calculation sheet did not set forth the

---

[28] Defendants argued for the dismissal of Counts 10 and 11 in their February 25, 2008 motion to dismiss, and their arguments have yet to be addressed.

formula used to calculate the Prior Service Balance, and was too lengthy, complex and apparently incomplete.

Count 10 alleges a breach of statutory disclosure obligations under ERISA §§ 104 and 105, 29 U.S.C. §§ 1024 and 1025.  It asserts that the failure to provide the requested documents prevented Bilello from understanding the impact of the cash balance formula and from further supplementing his retirement savings.

Count 11 alleges that the Plan Administrator violated the fiduciary duties established under ERISA § 404(a), 29 U.S.C. § 1104(a), when it refused to provide Bilello with complete plan documents governing the calculation of his accrued benefit and specifically showing how it calculated his Prior Service Balance.  Bilello claims again that the Plan Administrator's breaches prevented him from understanding the impact of the cash balance plan formula and from supplementing his retirement savings.

Defendants argue that they had no duty to disclose any documents besides those required by ERISA's disclosure provisions, which they claim are limited to the current plan documents and a current account statement.  Because there was no violation of ERISA's disclosure requirements, they argue that no claim for breach of fiduciary duty lies.

Congress' purpose in enacting the ERISA disclosure provisions was to ensure "that the individual participant knows exactly where he stands with respect to the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 118 (1989) (citation omitted). See also Wilkins, 445 F.3d at 580 (noting "ERISA's purpose of ensuring adequate disclosure with respect to pension and welfare plans"). One source of a Plan Administrator's disclosure obligation is found in ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), which provides that "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report . . . or other instruments under which the plan is established or operated." Id.; McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund, 320 F.3d 151, 162-63 (2d Cir. 2003). "Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators must disclose on demand of plan participants." Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 147 (2d Cir. 1997). Its requirement is not "all-encompassing," and does not require disclosure of technical data, such as that contained in actuarial reports. Id. at 143. With regard to the obligation to provide earlier versions of the plan or calculation formulas, ambiguity arises from the fact that the statute does not define "instruments." Id. at 142. The Second Circuit has

> infer[red] from Congress's use of the
> limited term "instruments" in § 104(b)(4)
> for the disclosures that administrators must
> make when requested by plan participants,
> rather than broader terms such as
> "documents," "records," or "reports," as
> used elsewhere in ERISA to require
> disclosures to others, that Congress did not
> mean the duty imposed in § 104(b)(4) to
> extend to all documents, records, and
> reports.

Id. at 146.  Consequently, the disclosure obligation under this provision is limited, and "other instruments under which the plan is established or operated" refers to "formal documents that govern the plan, not to all documents by means of which the plan conducts operations."  Id. at 143.  Cf. Allinder v. Inter-City Products Corp. (USA), 152 F.3d 544, 549 (6th Cir. 1998) (definition of "other instruments" is "properly limited to those class of documents which provide a plan participant with information concerning how the plan is operated.").  "Formal documents" are those that set out the rights, duties, and obligations of employers and plan participants.  Weinstein, 107 F.3d at 143.

The other disclosure provision at issue, ERISA § 105(a), provides in part that

> [e]ach administrator of an employee pension
> benefit plan shall furnish to any plan
> participant or beneficiary who so requests
> in writing, a statement indicating, on the
> basis of the latest available information-
> (1) the total benefits accrued, and

> (2) the nonforfeitable pension benefits, if
> any, which have accrued, or the earliest
> dates on which benefits will become
> nonforfeitable.

29 U.S.C. § 1025(a)(2)(A).  Such a statement must be "calculated

to be understood by the average plan participant."  ERISA §

105(a), 29 U.S.C. § 1025(a)(2)(A)(iii).  A plan administrator

who fails to provide the statement within 30 days of a request

may "be personally liable to such participant or beneficiary in

the amount of up to $100 a day from the date of such failure."

29 U.S.C. § 1132(c)(1); Swede v. Rochester Carpenters Pension

Fund, 467 F.3d 216, 218 n.2 (2d Cir. 2006).  The Second Circuit

has not yet construed ERISA § 105(a).

Determining whether a fiduciary has breached its duty to

provide certain documents begins with examining whether ERISA

required the fiduciary to make the contested disclosures.  There

can be no breach of fiduciary duty without a breach of the

underlying ERISA provisions creating the obligation to provide

particular documents.  See, e.g., Weinstein, 107 F.3d at 147

(disclosure obligation limited to the categories of disclosures

required by ERISA).

Plaintiff fails to state a claim based on the failure to

disclose calculation worksheets.  A calculation worksheet is not

a formal document governing a plan, but rather is an instrument

"by means of which the plan conducts operations."  Weinstein,

57

107 F.3d at 143.  While the calculation formula's form and content are dictated by governing plan documents, it is not itself a governing document and need not be produced pursuant to § 104(b)(4).  See id. at 144.

Nor is a worksheet a statement of plan benefits governed by § 105(a).  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  United States v. Kozeny, 541 F.3d 166, 171 (2d Cir. 2008) (citation omitted).  Where the statute's language is unambiguous, "the sole function of the courts is to enforce it according to its terms."  Id. (citation omitted).  In other words, "[w]hen a court determines that the language of a statute is unambiguous, its inquiry is complete."  United States v. Santos, 541 F.3d 63, 67 (2d Cir. 2008).

By its plain language, ERISA § 105(a) unambiguously requires a plan administrator to furnish a pension benefit statement that indicates "the total benefits accrued," and "the nonforfeitable pension benefits."  A failure to comply imposes daily fines on the plan administrator.  29 U.S.C. § 1132(c)(1). There is no requirement in ERISA § 105(a) that the plan administrator disclose the supporting calculations underlying the amounts of accrued benefits.  Nor is there any ambiguity in the text that would countenance an investigation of the

legislative history to understand the genesis of this disclosure requirement.  Kozeny, 541 F.3d at 171.

Having chosen to provide the worksheet to Bilello, the Plan Administrator did not increase its statutory disclosure obligations.  A contrary ruling would create disincentives for voluntary disclosure, cooperation and assistance.

Some district courts have found that ERISA § 105(a) requires an explanation of benefits beyond a statement of the total benefits accrued, because calculation formulas will "directly assist the requesting party in determining the extent of his or her interest (monetary) in the plan."  Proujansky v. Blau, Nos. 92 Civ. 8700, 86013 (CSH), 2001 WL 963958, at *9 (S.D.N.Y. Aug. 22, 2001) (citation omitted); Maiuro v. Federal Express Corporation, 843 F. Supp. 935, 941-42 (D.N.J. 1994), aff'd, 43 F.3d 1461 (3d Cir. 1994) (construing §§ 1025(a) and 1024(b) together).  These decisions have rested on ERISA's general objective of protecting employee benefits and promoting disclosure to help employees monitor their pensions.  See, e.g., Maiuro, 843 F. Supp. at 941; see also Proujansky, 2001 WL 963958 at *9 ("'Congress' purpose in enacting the ERISA disclosure provision was to ensure that the individual participant knows exactly where he stands with respect to the plan'") (quoting Firestone, 489 U.S. at 118).  Without any ambiguity in the statutory text, however, there is no basis for creating

additional requirements beyond those that are expressly

included.  Santos, 541 F.3d at 57.  Moreover, applying Weinstein

by analogy, Congress would not have restricted the information

required to be included in a pension benefit statement if it had

intended to require a more general disclosure of information.

Weinstein, 107 F.3d at 146 ("[h]ad Congress meant to require

unlimited disclosure, or even disclosure of all documents that

would be useful to plan participants, it would not have used the

restrictive 'instruments under which' language") (citing ERISA §

104(b)(4)).

Applying ERISA § 104(b)(4), to the extent that the 1989

Plan, the Pre-1989 Plan, or any other predecessor plan is still

an "instrument[] under which the [current] plan

is . . . operated," the Plan Administrator was required to

disclose those documents.[29]  29 U.S.C. § 1024(b)(4).  Defendants

were not, however, required to provide any SPDs besides the

"latest updated summary plan description."  See Curtiss-Wright

Corp., 514 U.S. at 84 ("ERISA requires . . . a set of all

currently operative, governing plan documents") (emphasis

supplied).  The defendants' motion to dismiss Counts 10 and 11,

therefore, is granted except for that portion of these claims

---

[29] The defendants contend that they have provided Bilello with a
wealth of material, including many plan documents.  While they
may be able to show that they have fulfilled their statutory
disclosure obligations, the issue presented by this motion is
limited to the adequacy of the plaintiff's pleading.

which encompasses any formal plan documents from the period
before 2002 which were still being used to operate the plan that
was in effect in 2007.

CONCLUSION

Plaintiff's May 27, 2009 motion for leave to file a SAC is
granted.  Counts 2-5 and 9 have been dismissed on consent
through the Order of June 8, 2009.  The defendants' February 25,
2008 motion to dismiss the FAC and the plaintiff's April 27,
2009 motion for reconsideration of the SOL Opinion, to the
extent they apply to the SAC, are granted or denied as discussed
in this Opinion.

Counts 6 and 7 are dismissed in their entirety in this
Opinion.  Counts 1, 8, 10, 11, and 12 are dismissed in part.
The surviving claims are:

- Count 1's allegation that the interest-credit rates
employed under the 2002 and 2005 Plans caused backloading
violations;

- The allegations in Count 8 that the 1992 and 1994 SPDs
misinformed participants regarding the existence of wear-away,
that the 1992 SPD misinformed them regarding the 1989 Plan's
reduction in rates of benefit accrual as compared with the Pre-
1989 Plan; and that the 1994 SPD misinformed them regarding the
lack of a minimum interest rate; and

- Count 12's allegations of omissions and misstatements in connection with the 1989, 1993, and 1997 Plans that prevented participants from understanding that the cash balance plan formula lowered their benefits compared with the Pre-1989 Plan and created a period of wear-away; and

- The claims in Counts 10 and 11 premised on the failure to provide formal plan documents prior to 2002 that were used to "operate" the plan in effect in 2007.

SO ORDERED:

Dated:    New York, New York
          August 12, 2009

                                    _____
                                         DENISE COTE
                                    United States District Judge

62